UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA　　　:　　Hon. Edward S. Kiel, U.S.D.J.
　　　　　　　　　　　　　　　　:
　　　　　v.　　　　　　　　　　:
　　　　　　　　　　　　　　　　:　　Crim. No. 20-800 (ESK)
CHRISTOPHER KYLE JOHNSTON　　:
and TRENT BROCKMEIER

---

**BRIEF OF THE UNITED STATES IN OPPOSITION TO DEFENDANTS'
POST-TRIAL MOTIONS**

---

ALINA HABBA
United States Attorney
401 Market Street
Camden, New Jersey 08101
(856) 757-5026

<u>On the Brief</u>:
R. David Walk, Jr.
Daniel A. Friedman
Assistant United States Attorneys

# Table of Contents

**Page**

TABLE OF AUTHORITIES ................................................................................................ iv

TABLE OF ABBREVIATIONS ......................................................................................... ix

I.     PRELIMINARY STATEMENT ............................................................................ 1

II.    LEGAL STANDARD ............................................................................................. 2

    A.  Rule 29 ............................................................................................................... 2

    B.  Rule 33 ............................................................................................................... 5

III.   ARGUMENT ........................................................................................................... 6

    A.  Ample Evidence Proved that the Defendants Conspired to Commit Health
        Care Fraud and Wire Fraud ........................................................................... 6

        1.  Johnston and Brockmeier controlled the criminal enterprise. ......................... 8

        2.  Johnston and Brockmeier enrolled and managed corrupt sales
            representatives. .................................................................................................. 10

            a.  Top Tier and Candace Craven ................................................................... 11

            b.  Supreme Medical ....................................................................................... 16

            c.  Military Medical Relief 21 ........................................................................ 19

            d.  Boardwalk Medical .................................................................................... 24

        3.  Johnston and Brockmeier directed Central Rexall practices that
            were part of the fraud. ...................................................................................... 32

            a.  Tripling resveratrol ................................................................................... 32

            b.  Directing substitution of hyaluronic acid for resveratrol ......................... 35

            c.  Directing maximum number of refills ....................................................... 38

            d.  Directing false test adjudications .............................................................. 39

            e.  Failure to require collection of copays ..................................................... 42

            f.  Approving commission payments to sales representatives for
                prescriptions for themselves and their family members ........................... 44

     g.   Directing or approving false statements to PBMs and others to conceal the fraud ................................................................ 45

4. Witnesses with less knowledge than Johnston and Brockmeier knew that Central Rexall was committing fraud. .................................. 49

5. Johnston and Brockmeier were willfully blind to the fraud. ......................... 51

6. Johnston and Brockmeier received the proceeds of the fraud. ..................... 57

7. Courts have affirmed convictions based on similar evidence. ........................ 57

8. Conclusion .................................................................. 59

B. Johnston and Brockmeier's Other Challenges to Count 1 are Without Merit ........... 59

1. The Government proved a lack of medical necessity, and it is not an unconstitutionally vague term. ................................................... 60

2. A doctor's signature is not conclusive proof of medical necessity. ................. 61

3. The jury heard ample evidence that the defendants' fraud scheme included misrepresentations, concealment of material information, and false statements .............................................................. 64

4. The Court correctly decided that sufficient evidence was introduced to warrant the willful blindness instruction. ........................................ 73

5. The Government presented more than sufficient evidence of materiality ..... 77

C. Ample Evidence Proved That Defendants Conspired to Use a Means of Identification Without Lawful Authority "with the intent to commit, or to aid or abet, or in connection with" Their Fraud Scheme. .................................... 81

1. The Government did not need to prove that the use of the identity was at the "crux" of the fraud – the Court rejected that interpretation pretrial. .................................................................... 82

2. The statute does not require that the test adjudications themselves netted defendants any money. ................................................. 82

3. Materiality is not an element of Count 2, and the evidence showed material misrepresentations to PBMs in any event. ........................ 84

4. The jury heard substantial evidence that the defendants directed, and knew about, the use of false test adjudications to aid or abet and in connection with their fraud. ................................................. 85

5. The statute does not require proof that the defendants knew that their use of someone else's identity is illegal. .................................. 86

D. The Evidence was Sufficient to Prove Venue for Count 4. ......................... 87

E. A New Trial is Not Warranted, as There were no Trial Errors Warranting a New Trial, and the Overwhelming Evidence of Defendants' Guilt Shows that They were Not Wrongly Convicted ............................................... 92

1.  The Government complied with the Court's pretrial ruling by excluding evidence of the Anti-Kickback Statute, and any references to W2 and 1099 sales representatives were relevant, not improperly prejudicial, and not plain error. ........................................................................ 93

2.  Evidence of defendants' failure to collect copays was charged in the Indictment, intrinsic to the fraud, directly relevant, and not plain error...... 95

3.  Evidence about criminal investigations in the compounding industry was relevant, not improperly prejudicial, and often received without objection, and the Court's instruction mitigated any unfair prejudice. ......... 98

4.  The Court did not commit plain error by allowing the introduction of evidence of the profits the defendants made, which was essential to proving the money laundering charge and relevant to show defendants' motive and intent. ...................................................................... 100

5.  Evidence of how defendants took control of Central Rexall's compounding operations was relevant and admitted without objection ...... 102

6.  The verdict was not against the weight of the evidence ............................. 102

IV.  CONCLUSION ...................................................................................... 103

## Table of Authorities

Cases                                                                                    Page(s)

*Bauer v. United States,*
  2018 WL 4145901 (D.N.J. Aug. 30, 2018)................................................................ 89

*Coleman v. Johnson,*
  566 U.S. 650 (2012)........................................................................................ 3

*Dubin v. United States,*
  599 U.S. 110 (2023)........................................................................................ 82

*Gov't of the V.I. v. Derricks,*
  810 F.2d 50 (3d Cir. 1987) .............................................................................. 6

*Griffin v. United States,*
  502 U.S. 46 (1991)........................................................................................ 59

*Johnston v. United States,*
  520 U.S. 461 (1997)........................................................................................ 93

*Kluger v. United States,*
  2018 WL 4145902 (D.N.J. Aug. 30, 2018)................................................................ 89

*Neder v. United States,*
  527 U.S. 1 (1999)................................................................................ 68, 77

*Turner v. United States,*
  396 U.S. 398 (1970)........................................................................................ 59

*United States v Adamo,*
  534 F.2d 31 (3d Cir. 1976) .............................................................................. 91

*United States v. Amirnazmi,*
  648 F. Supp. 2d 718 (E.D. Pa. 2009) .............................................................. 6

*United States v. Anand,*
  2022 WL 6755821 (E.D. Pa. Oct. 11, 2022)............................................................ 60

*United States v. Anderson,*
  980 F.3d 423 (5th Cir. 2020) .......................................................................... 66

*United States v. Ashfield,*
  735 F.2d 101 (3d Cir. 1984) ...............................................................2, 3, 4, 10

*United States v. Barkers-Woode,*
  136 F.4th 496 (3d Cir. 2025).......................................................................... 83

*United States v. Benjamin,*
  125 Fed. Appx. 438 (3d Cir. 2005)................................................................ 72

*United States v. Berger,*
  224 F.3d 107 (2d Cir. 2000) .......................................................................... 5

*United States v. Bertram,*
  900 F.3d 743 (6th Cir. 2018) ...............................................................61, 64, 68

*United States v. Bethancourt,*
   65 F.3d 1074 (3d Cir. 1995) ................................................................... 77

*United States v. Bibb,*
   471 F.3d 491 (3d Cir. 2006) ..................................................................... 2

*United States v. Black,*
   469 F. Supp. 2d 513 (N.D. Ill. 2006) .................................................... 88

*United States v. Bolos,*
   104 F.4th 562 (6th Cir. 2024) ......................................................... 60, 97

*United States v. Boone,*
   279 F.3d 163 (3d Cir. 2002) ................................................................. 23

*United States v. Brodie,*
   403 F.3d 123 (3d Cir. 2005) ..........................................................passim

*United States v. Bryant,*
   655 F.3d 232 (3d Cir. 2011) ...............................................49, 67, 100

*United States v. Caraballo-Rodriguez,*
   726 F.3d 418 (3d Cir. 2013) ..........................................................passim

*United States v. Cartwright,*
   359 F.3d 281 (3d Cir. 2004) ................................................................... 4

*United States v. Castro,*
   776 F.2d 1118 (3d Cir. 1985) ............................................................... 71

*United States v. Chalker,*
   966 F.3d 1177 (11th Cir. 2020) ..................................................... 58, 97

*United States v. Chartock,*
   283 Fed. Appx. 948 (3d Cir. 2008) ..................................................... 48

*United States v. Chu,*
   2022 WL 2314839 (D.N.J. June 28, 2022) ......................................... 60

*United States v. Coleman,*
   811 F.2d 804 (3d Cir. 1987) ................................................................... 4

*United States v. Fernandes,*
   272 F.3d 938 (7th Cir. 2001) ................................................................. 2

*United States v. Ferriero,*
   866 F.3d 107 (3d Cir. 2017) ...............................................66, 67, 68

*United States v. Flores,*
   454 F.3d 149 (3d Cir. 2006) ........................................................... 3, 57

*United States v. Gambino,*
   314 F.3d 163 (3d Cir. 2011) ................................................................... 2

*United States v. Gaudin,*
   515 U.S. 50 (1995) ................................................................................ 77

*United States v. Goldberg,*
　　830 F.2d 459 (3d Cir. 1987) ................................................................. 89

*United States v. Green,*
　　617 F.3d 233 (3d Cir. 2010) ................................................................. 74

*United States v. Grenado,*
　　523 Fed. Appx. 153 (3d Cir. 2013) ....................................................... 72

*United States v. Grow,*
　　977 F.3d 1310 (11th Cir. 2020) ...............................................58, 61, 64, 97

*United States v. Idowu,*
　　157 F.3d 265 (3d Cir. 1998) ................................................................... 4

*United States v. Johnson,*
　　302 F.3d 139 (3d Cir. 2002) ............................................................. 5, 92

*United States v. Kemp,*
　　500 F.3d 257 (3d Cir. 2007) ................................................................. 95

*United States v. Khorozian,*
　　333 F.3d 498 (3d Cir. 2003) ................................................................. 74

*United States v. Lacerda,*
　　958 F.3d 196 (3d Cir. 2020) ............................................................. 2, 93

*United States v. Lallande,*
　　2023 WL 535317 (D.N.J. Aug. 8, 2023) ................................................ 89

*United States v. Lavenant,*
　　607 Fed. Appx. 217 (3d Cir. 2015) ....................................................... 88

*United States v. Lore,*
　　430 F.3d 190 (3d Cir. 2005) ................................................................... 2

*United States v. Ludwikowski,*
　　944 F.3d 123 (3d Cir. 2019) ................................................................. 93

*United States v. McLean,*
　　715 F.3d 129 (4th Cir. 2013) .......................................................... 60, 61

*United States v. McNeill,*
　　887 F.2d 448 (3d Cir. 1989) ................................................................... 3

*United States v. Monaco,*
　　2024 WL 617718 (3d Cir. Feb. 14, 2024) .............................................. 60

*United States v. Montgomery,*
　　2022 WL 2284387 (6th Cir. June 23, 2022) ........................57, 58, 64, 97

*United States v. Mussare,*
　　405 F.3d 161 (3d Cir. 2005) ................................................................... 2

*United States v. Nazir,*
　　211 F. Supp. 2d 1372 (S.D. Fla. 2002) ................................................. 66

*United States v. Olatunji,*
  872 F.2d 1161 (3d Cir. 1989) ............................................................ 67

*United States v. Ozcelik,*
  527 F.3d 88 (3d Cir. 2008) ................................................................. 2

*United States v. Palin,*
  874 F.3d 418 (4th Cir. 2017) ............................................................ 68

*United States v. Pearlstein,*
  576 F.2d 531 (3d Cir. 1978) ............................................................. 70

*United States v. Pecora,*
  798 F.2d 614 (3d Cir. 1986) ............................................................. 70

*United States v. Perez,*
  223 Fed. Appx. 336 (5th Cir 2007) ................................................... 88

*United States v. Persaud,*
  866 F.3d 371 (6th Cir. 2017) ..................................................... 49, 101

*United States v. Puccio,*
  2024 WL 4100244 (3d Cir. Sept. 6, 2024) ....................................... 74

*United States v. Quiles,*
  618 F.3d 383 (3d Cir. 2010) ............................................................. 23

*United States v. Renteria,*
  903 F.3d 326 (3d Cir. 2018) ............................................................. 90

*United States v. Riley,*
  621 F.3d 312 (3d Cir. 2010) ......................................................... 3, 23

*United States v. Salahuddin,*
  765 F.3d 329 (3d Cir. 2014) .............................................. 5, 21, 23, 102

*United States v. Sandini,*
  888 F.2d 300 (3d Cir. 1989) .............................................................. 3

*United States v. Schlei,*
  122 F.3d 944 (11th Cir. 1997) .......................................................... 91

*United States v. Sharma,*
  190 F.3d 220 (3d Cir. 1999) ............................................................. 73

*United States v. Silveus,*
  542 F.3d 993 (3d Cir. 2008) ....................................................... 6, 102

*United States v. Smith,*
  294 F.3d 473 (3d Cir. 2002) ............................................................. 48

*United States v. Smith,*
  573 F.3d 639 (8th Cir. 2009) ........................................................... 66

*United States v. Stadtmauer,*
  620 F.3d 238 (3d Cir. 2010) .............................................. 50, 73, 74

*United States v. Stewart,*
    185 F.3d 112 (3d Cir. 1999) ................................................................... 74

*United States v. Thornton,*
    1 F.3d 149 (3d Cir. 1993) ........................................................................ 6

*United States v. Tyson,*
    653 F.3d 192 (3d Cir. 2011) ............................................................ 23, 48

*United States v. Vas,*
    497 Fed. Appx. 203 (3d Cir. 2012) ....................................................... 49

*United States v. Weir,*
    2025 WL 1235776 (M.D. Tenn. April 29, 2025) ................................... 61

*United States v. Wert-Ruiz,*
    228 F.3d 250 (3d Cir. 2000) ............................................................ 74, 75

*United States v. Wexler,*
    838 F.2d 88 (3d Cir. 1988) ...................................................................... 4

*Universal Health Services v. United States ex rel. Escobar,*
    136 S. Ct. 1989 (2016) ..................................................................... 67, 68

## <u>Statutes</u>

18 U.S.C. § 1028A .................................................................................. 82

18 U.S.C. § 1028(a)(7) ..................................................................... 82, 83

18 U.S.C. § 1035 .................................................................................... 64

18 U.S.C. § 1343 .................................................................................... 64

18 U.S.C. § 1347 .................................................................................... 64

18 U.S.C. § 1349 .................................................................................... 64

18 U.S.C. § 1956 (i) ............................................................................... 88

18 U.S.C. § 1956 (i)(1) .......................................................................... 87

18 U.S.C. § 1956 (i)(2) .......................................................................... 87

18 U.S.C. § 1956 (i)(3) .......................................................................... 88

18 U.S.C. § 3237 .............................................................................. 88, 89

42 U.S.C. § 1320a-7(b) .......................................................................... 93

## <u>Rules</u>

Fed. R. Crim. P. 7(c)(1) ......................................................................... 91

Fed. R. Crim. P. 29(c) .............................................................................. 2

Fed. R. Evid. 401 ................................................................................... 98

Fed. R. Evid. 402 ................................................................................... 94

## **Table of Abbreviations**

DB      refers to the Omnibus Brief in Support of Defendants' Post-Trial Motions

BDX    refers to Brockmeier Defense Exhibits

JDX    refers to Johnston Defense Exhibits

GX      refers to Government Exhibits

Tr.      refers to the transcript of the trial

I.    **PRELIMINARY STATEMENT**

The jury convicted defendants Christopher Kyle Johnston and Trent Brockmeier after seven weeks of testimony that included: 10 cooperating co-conspirators, two of whom worked closely with the defendants in the conspiracy; two Central Rexall pharmacists; an employee of Express Scripts, which was defrauded by defendants; two doctors; and an IRS agent. The evidence showed that Johnston and Brockmeier were the founders and controlling managers of a massive criminal conspiracy that defrauded health insurers out of tens of millions of dollars and put nearly $40 million in defendants' pockets. To any objective observer, the Government presented overwhelming evidence of the defendants' guilt on all three counts, and the jury agreed, convicting defendants on the second day of deliberations.

Johnston's post-trial motions, which Brockmeier has joined, pay lip service to the "demanding and deferential" standard that applies to motions for a judgment of acquittal or a new trial but then entirely disregard the governing standards. Their 166-page brief tries to relitigate issues decided before trial, cherry-picks favorable testimony while ignoring evidence that undercuts their arguments, and repeatedly asks the Court to draw inferences and review the evidence in the light most favorable to them—precisely the opposite of what the Court is required to do in ruling on post-trial motions. Because overwhelming evidence supports the jury's verdict, and because there were no errors of any consequence at trial, the Court should deny defendants' motions.

II.     **LEGAL STANDARD**

A.     **Rule 29**

A judgment of acquittal under Federal Rule of Criminal Procedure 29(c) is appropriate only if, after reviewing the record in the light most favorable to the prosecution, the Court determines that no rational trier of fact could find proof of guilt beyond a reasonable doubt.   *United States v. Caraballo-Rodriguez,* 726 F.3d 418, 430 (3d Cir. 2013) (en banc); *United States v. Bibb*, 471 F.3d 491, 494 (3d Cir. 2006).   "The burden on a defendant who raises a challenge to the sufficiency of the evidence is extremely high."   *United States v. Lore*, 430 F.3d 190, 203-04 (3d Cir. 2005) (quotation omitted); *see also United States v. Fernandes*, 272 F.3d 938, 943 (7th Cir. 2001) ("a challenge to the sufficiency of the evidence is an uphill battle").   "Reversal of a conviction is only appropriate where there is 'no evidence, regardless of how it is weighted, from which the jury could find guilt beyond a reasonable doubt.'" *United States v. Lacerda*, 958 F.3d 196, 225 (3d Cir. 2020) (quoting *United States v. Mussare*, 405 F.3d 161, 166 (3d Cir. 2005)).

Under Rule 29, the Court's inquiry is "limited to determining whether the conclusion chosen by the factfinders was *permissible*."   *United States v. Ashfield,* 735 F.2d 101, 106 (3d Cir. 1984) (emphasis added); *see also United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005).   The Court must "examine the totality of the evidence, both direct and circumstantial."   *United States v. Gambino*, 314 F.3d 163, 170 (3d Cir. 2011).   Further, "the government's proof need not exclude every possible hypothesis of innocence."   *United States v. Ozcelik*, 527 F.3d 88, 94 (3d Cir. 2008) (quotation omitted).   Accordingly, "[t]he evidence does not need to be inconsistent

2

with every conclusion save that of guilt if it does establish a case from which the jury can find the defendant guilty beyond a reasonable doubt." *United States v. Sandini*, 888 F.2d 300, 311 (3d Cir. 1989) (quotation omitted).

A "trial court's ruling on the sufficiency of the evidence is governed by strict principles of deference to a jury's findings." *Ashfield*, 735 F.2d at 106. In considering a Rule 29 motion, a Court cannot "usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury.'" *United States v. Flores*, 454 F.3d 149, 154 (3d Cir. 2006) (quoting *Brodie*, 403 F.3d at 133). Instead, the Court "must view the evidence and the inferences logically deducible therefrom in the light most favorable to the government," *United States v. McNeill*, 887 F.2d 448, 450 (3d Cir. 1989), and "must treat all of the incriminating evidence as true and credible," *United States v. Riley*, 621 F.3d 312, 329 (3d Cir. 2010). The jury's "verdict must be upheld as long as it does not 'fall below the threshold of bare rationality.'" *Caraballo-Rodriguez*, 726 F.3d at 431 (quoting *Coleman v. Johnson*, 566 U.S. 650, 656 (2012)). Thus, the question for the Court is whether the evidence presented at trial, when viewed in the light most favorable to the Government, was sufficient for any rational jury to conclude that the Government proved each element of the offenses beyond a reasonable doubt. As explained below, it clearly was.

Defendants misstate the law in several important respects. They cite several cases, almost all decided before 2013, in which the Third Circuit found trial evidence insufficient. But in *Caraballo-Rodriguez*, the Third Circuit, sitting en banc, concluded that before 2013 it had "failed to apply the deferential standard the law requires on review of sufficiency of the evidence challenges" and disavowed its prior approach. 726

F.3d at 419.  The court specifically disavowed three cases Johnston and Brockmeier

cite as good law: *United States v. Wexler*, 838 F.2d 88 (3d Cir. 1988), *United States v.*

*Cartwright*, 359 F.3d 281 (3d Cir. 2004), and *United States v. Idowu*, 157 F.3d 265 (3d

Cir. 1998).  *See* 726 F.3d at 425-27; *but see* DB at 7, 9.  Defendants also inexplicably

cite *Caraballo-Rodriguez* as an example of the Third Circuit "reversing [a] conviction,"

DB at 109, but in fact the en banc Third Circuit *reversed* the trial court's judgment of

acquittal and remanded with instructions to "reinstate the jury's verdict of conviction."

726 F.3d at 434.  The cases cited by defendants do not provide valid authority for

overturning the jury's verdict.

Defendants also quote *United States v. Brodie*, 403 F.3d 123 (3d Cir. 2005), as

holding that convictions cannot be obtained by "'piling inference upon inference,'" DB

at 7, but they omit the rest of the sentence, which endorses using a chain of inferences

if they support the jury's verdict:  "Conspiracy cannot be proven 'by piling inference

upon inference' *where those inferences do not logically support the ultimate finding of*

*guilt."* 403 F.3d at 134 (quoting *United States v. Coleman*, 811 F.2d 804, 807 (3d Cir.

1987)) (emphasis added).  And defendants ignore what the Third Circuit actually did

in *Brodie*: *reverse* the district court's entry of a judgment of acquittal, finding that

inferences drawn from circumstantial evidence proved the charged conspiracy beyond

a reasonable doubt.  403 F.3d at 135-58; *see Ashfield*, 735 F.3d at 103 (finding evidence

of guilt sufficient even though, "as with most white-collar crimes, [it] consists of a

complex web of inferential proof").

Finally, defendants quote a Second Circuit case for the proposition that

"'[w]here the evidence is at least as indicative of innocence as guilt, the Court must

direct a verdict of acquittal.'" DB at 7 (quoting *United States v. Berger*, 224 F.3d 107, 116 (2d Cir. 2000)). Putting aside that the trial evidence was far more indicative of guilt than innocence, that is not the law in the Third Circuit. In *Caraballo-Rodriguez*, the en banc Third Circuit specifically rejected the proposition it had followed in previous cases that "the jury's verdict could not stand when the evidence was as consistent with contraband other than controlled substances" as with drugs. 726 F.3d at 432. The court continued: "Reversing the jury's conclusion simply because another inference is possible – *or even equally plausible* – is inconsistent with the proper inquiry for review of sufficiency of the evidence challenges[.]." *Id.* (emphasis added). The court emphasized that the "proper question" before a court reviewing a jury's verdict is not "which inference was the *most plausible*," a question Johnston and Brockmeier improperly ask this Court to answer, but "whether the jury's inference was *merely rational*." *Id.* at 434 (emphasis in original). The court held that the jury's verdict "must be upheld . . . [u]nless the jury's conclusion is irrational." *Id.* at 432. A review of the trial evidence shows that the jury's conclusion here was supported by ample evidence and easily satisfies the "merely rational" standard.

### B.    Rule 33

The authority to grant a new trial pursuant to Rule 33(a) is limited to those instances where the Court "believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted." *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002) (quotation omitted). "Thus, motions for a new trial based on the weight of the evidence are not favored. Such motions are to be granted sparingly and only in exceptional cases." *United States v.*

*Salahuddin*, 765 F.3d 329, 346 (3d Cir. 2014) (quotation omitted); *United States v. Silveus*, 542 F.3d 993, 1004-05 (3d Cir. 2008); *Gov't of the V.I. v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987).

A district court may grant a motion for new trial under Rule 33(a) if it finds that errors occurred during the trial and that those errors "when combined, so infected the jury's deliberations that they had a substantial influence on the outcome of the trial." *United States v. Thornton*, 1 F.3d 149, 156 (3d Cir. 1993) (quotation omitted). Harmless errors that do not deprive a defendant of a fair trial provide no basis for granting a defendant's Rule 33 motion. *Id.* The defendant bears the burden of establishing that a new trial should be granted and must therefore show "(1) that error occurred at trial, and (2) that error had a substantial influence on the verdict." *United States v. Amirnazmi*, 648 F. Supp. 2d 718, 720 (E.D. Pa. 2009), *aff'd*, 645 F.3d 564 (3d Cir. 2011).

## III.   ARGUMENT

### A. Ample Evidence Proved that the Defendants Conspired to Commit Health Care Fraud and Wire Fraud.

The elements of the wire fraud and health care fraud conspiracy offense charged in Count 1 are that: (1) two or more persons agreed to commit wire fraud and health care fraud; (2) the defendant was a party to or member of that agreement; and (3) the defendant joined that agreement knowing of its objective and intending to join with at least one other conspirator to achieve that objective. Tr. 3775-76 (Jury Instructions). The evidence at trial proved those elements beyond a reasonable doubt.

Johnston and Brockmeier's criminal conspiracies centered around compound medications, which are supposed to be medications specifically tailored by prescribing doctors to meet the unique medical needs of particular patients. Tr. 123 (Taff); Tr. 671 (Rolling). That is how Johnston and Brockmeier advertised their compounding pharmacy, as one that prepared "products that are tailor made for the individual patient" and part of "[a]n established tradition which allows a physician to prescribe a very specific medication, prepared by a pharmacist, for a patient's individual needs." GX 145A; Tr. 2766 (Casseri).

The trial evidence established that Johnston and Brockmeier started and controlled a vast conspiracy to submit fraudulent insurance claims for compound medications. Johnston and Brockmeier: hand-picked and managed the co-conspirator sales representatives who got prescriptions signed; directed the rapid expansion of Central Rexall to fill all of the new prescriptions; dictated the medically unnecessary medications that were placed on the prescription pads, which yielded higher and higher profits; directed Central Rexall to submit fraudulent test adjudications, which helped them identify even more lucrative formulas; directed employees to ship out medicines even when individuals did not pay their copays, a clear sign that the medicines were unnecessary; turned a blind eye to numerous practices that everyone else could see were evidence of fraud; wrote or approved false and misleading

communications to cover up the conspiracy; and reaped the substantial profits of the fraud.

### 1. Johnston and Brockmeier controlled the criminal enterprise.

Contrary to defendants' statement that it was Hayley Taff who oversaw the compounding pharmacy operations, DB at 2 (just one example of how their brief fails to portray the evidence in the light most favorable to the Government, which the law requires), the evidence showed that Johnston and Brockmeier started and controlled Central Rexall's compounding operations. The operations started in 2013, when Johnston and Brockmeier entered into a management agreement that gave them the authority to manage Central Rexall's compounding operations and receive 90% of the profits. Tr. 133, 142 (Taff); GX 55. The agreement also gave them responsibility for billing insurers and collecting from insurers – the very function at the heart of the fraud. Tr. 144-45, 380 (Taff); GX 55.

And they did not just have authority on paper to control the compounding operations. Witness after witness testified that Johnston and Brockmeier were the ones who made the decisions about compounding operations, including how to expand the operations, what employees to hire, what sales groups to retain, how much sales groups were paid, what medicines would go on the prescription pads, whether to ship medicines if copays were not paid, whether to honor prescriptions from questionable providers, and how to respond to inquiries. *See, e.g.*, Tr. 151-58, 162-63, 214, 228-32, 248, 390 (Taff); Tr. 668-69 (Rolling); Tr. 857, 869, 892-93, 914 (Olsen); Tr. 1819, 1887

(Hickman); Tr. 2253 2275-76, 2322 (Boyle); Tr. 2622-26 (Farahat); Tr. 2757-63, 2769 (Casseri).

Johnston and Brockmeier were actively engaged managers who knew about and directed every aspect of the compounding operations. Brockmeier gave himself the title of Chief Operating Officer, was in the office every day, and oversaw the business and the pharmacy operations, Tr. 153 (Taff); Tr. 2761-63 (Casseri). Johnston was General Counsel, brought in and managed the major sales groups, brought in compound medication formulas that Central Rexall marketed, started the use of preprinted prescriptions pads, and made policy decisions. Tr. 127-28, 136, 154, 161, 236-37 (Taff). Compliance officer Ryan Boyle took direction from Brockmeier, whom he spoke with every day, and Johnston, whom he spoke with several times per week. Tr. 2250-51 (Boyle). Johnston and Brockmeier were intimately involved in deciding which medications would appear on Central Rexall's preprinted prescription pads, decisions that were made based on the medicine's reimbursement rather than medical benefits. *See, e.g.*, Tr. 228-33 (Taff). Defendants received and reviewed regular reports, including monthly commission analysis reports with detailed information about the activities of each sales group. *See, e.g.*, Tr. 218-20 (Taff); Tr. 2650, 2653-58 (Farahat); GX 812, 812B, 862, 862B. Brockmeier had access to and regularly used Quickbase, the database that showed in real time what prescriptions were being filled, the reimbursement amounts, and other information. Tr. 292-93 (Taff); Tr. 2649 (Farahat); Tr. 2816 (Casseri). The jury could reasonably infer that Johnston and Brockmeier knew about specific actions taken at Central Rexall based on their active management of its operations. *See Brodie*, 403 F.3d at 150-51 (giving "substantial

9

weight" to inference that company's president who was actively involved in company affairs knew about company's criminal conduct); *Ashfield*, 735 F.2d at 108 (defendant's substantial role in the management of an enterprise permits an inference of knowledge and willful participation in charged crime).

Major decisions were made by both Johnston and Brockmeier, who shared information continually during the conspiracy. *See, e.g.*, Tr. 1819 (Hickman); Tr. 2757-58 (Casseri). Brockmeier kept Johnston informed by talking to him on the phone "constantly." Tr. 154-55 (Taff); *see* Tr. 2760 (Casseri). Brockmeier said that Johnston was a "micromanager." Tr. 154-55 (Taff). Phone records show that Johnston and Brockmeier spoke several times a day, an average of 45 minutes every single day (including weekends) between December 2013 and August 2016. Tr. 3137-38 (Brooks). They spoke for more than 100 minutes on numerous days and for more than 200 minutes on a few days. Tr. 3142 (Brooks). From this evidence, the jury could infer that any information that was given to one defendant was shared with the other defendant. *E.g.*, *Brodie*, 403 F.3d at 151 (finding such an inference permissible based upon less compelling evidence). Indeed, defendants elicited no evidence—and did not argue to the jury—that either one was a mere figurehead who was not aware of Central Rexall's operations.

## 2. Johnston and Brockmeier enrolled and managed corrupt sales representatives.

One key piece of the widespread fraud was the corrupt sales force that caused medically unnecessary prescriptions to be submitted to Central Rexall. Johnston recruited these sales representatives, and he and Brockmeier managed them. Tr.

2770 (Casseri).  Because prescription volume was the defendants' only goal, experience in selling pharmaceuticals was not required.  Tr. 2769-70 (Casseri).  As the trial evidence summarized below established, the top four sales groups – Supreme Medical, Boardwalk Medical, Top Tier, and Military Medical Relief 21, *see* GX 897B2 – were all corrupt, and they were all managed by Johnston and Brockmeier.  Tr. 2771-72, 2842-43 (Casseri). From defendants' responsibility for recruiting and managing the sales representatives and all the evidence of defendants' knowledge of their activities, the jury could infer that Johnston and Brockmeier were aware of the fraudulent nature of the prescriptions submitted by these sales groups.

### a.  Top Tier and Candace Craven

Johnston recruited Top Tier and was close to its principals, Wayne Wilkerson and Michael Chatfield.  Tr. 236-38, 266 (Taff); GX 176B. Defendants brought in Top Tier over Taff's objections to Brockmeier that Top Tier did not contact patients.  Tr. 236-37 (Taff).  Defendants then managed Top Tier.  Tr. 2771 (Casseri).  When Top Tier started as a Central Rexall sales group, Brockmeier directed that Central Rexall fill prescriptions without verifying that the patients wanted or even knew about the prescriptions, which was contrary to even Central Rexall's normal practice.  GX 183, 183A, 191; Tr. 2426-27 (Boyle).  Those prescriptions included numerous prescriptions supposedly signed by Candace Craven, including a whopping 171 in July 2014.  *Id.;* GX 1071.  Craven almost immediately became Central Rexall's biggest prescriber:  she prescribed more than twice as much as any other prescriber.  Tr. 257-60 (Taff); Ex.

868, 868A2.  And Top Tier immediately became Central Rexall's most lucrative sales group.  Tr. 244 (Taff); GX 865A2.

From the start, the facts surrounding Craven's prescriptions told Johnston and Brockmeier that the prescriptions were not legitimate and not medically necessary:

- **The sheer number of prescriptions:**  Craven's signature appeared on prescriptions for over 170 compound medications in July 2014, including as many as 23 on a single day.  GX 1068, 1071.  But compound medications are supposed to be specialty medications that a prescriber specifically tailored to an individual's particular medical needs.  The jury could rationally conclude that a prescriber would not legitimately conclude 170 times in a month that her patients needed a specially tailored combination of ingredients that just happened to be the exact formula offered by Central Rexall.

- **The locations of the patients.**  Craven's patients had home addresses in different states from Craven's practice, including in places where she was not licensed to practice.  GX 3; Tr. 627-28 (Craven).

- **The unusual nature of the medicines prescribed.**  Craven's prescriptions did not make sense to even a casual observer.  They included prescriptions for an 11-year-old with supposed age spots; eczema cream for a three-year-old; the same scar cream for a three- and 77-year-old; and the same supplement for a 16- and 77-year-old.  Tr. 629-33 (Craven).

These signs of the illegitimate nature of Craven's prescriptions were apparent to Johnston and Brockmeier, as they appeared in reports sent to and by them.  And then Johnston and Brockmeier were told in August 2014, after an investigation by Central Rexall pharmacist John Mark Rolling, that numerous Craven patients who had prescriptions supposedly signed by Craven said that they knew nothing about Craven.  Tr. 250-52 (Taff); Tr. 698-701 (Rolling); GX 218B, 218C2.  Rolling told Brockmeier that "something doesn't seem right about this" and discussed not taking any more Craven prescriptions.  Tr. 700 (Rolling).  Meanwhile, Taff told Brockmeier that Craven was not meeting with patients and did not have a valid doctor-patient relationship with them.  Tr. 253 (Taff).  Taff told Brockmeier that Central Rexall should not accept

Craven prescriptions, but he overruled her and decided to continue accepting them. Tr. 253 (Taff). Johnston's response to these concerns was to email Central Rexall employees and stress the importance of bringing in sales groups and keep filling prescriptions despite these patent red flags. Tr. 255 (Taff); Tr. 701 (Rolling); GX 220.

Defendants now argue that they appropriately addressed the situation by having Ryan Boyle look into the matter and telling people to look carefully at her prescriptions, but defendants did not require anyone to take the one blindingly obvious step anyone would take in this situation: talk to Craven herself and ask if she signed the prescriptions or saw the patients. Boyle never spoke to her, Tr. 2303-05 (Boyle), and Craven never spoke to anyone at Central Rexall. Tr. 624, 648 (Craven). Calling prescribers is what pharmacists do all the time. Tr. 677-78 (Rolling). And given that Craven was unhappy that her signature stamp was used without her permission and that she believed Top Tier was going to tell Central Rexall that that had occurred, Tr. 645 (Craven), the reasonable inference is that had anyone from Central Rexall called Craven, she would have responded that she never signed many of those prescriptions.

Defendants' claim to have acted in good faith instead of in furtherance of the fraud is also rebutted by what they did after Rolling's report: Instead of cutting off Top Tier for submitting prescriptions bearing Craven's signature for patients who did not know her, Johnston and Brockmeier rewarded Top Tier with commissions, including commissions on three prescriptions John Mark Rolling had identified as fraudulent. Rolling's report to Johnston and Brockmeier identified three patients

(L.C., A.K., and V.S.)[1] who did not know who Craven was.  GX 218B, 218C2.  But when Johnston emailed Wilkerson the Top Tier commission report nearly three weeks later, on September 13, 2014, the commission report showed that those three individuals' prescriptions were filled, for a total reimbursement of $54,778.71.  GX 814, 814B.  At Top Tier's 40% commission rate, Top Tier would have received a $21,911.48 commission on those fraudulent prescriptions.  Instead of reprimanding Wilkerson or cutting his commission, Brockmeier sent Wilkerson an email about the August 2014 commission report that said: "Great work!!"  GX 240.

Central Rexall continued to fill Craven's prescriptions at Johnston's and Brockmeier's direction.  She continued to be Central Rexall's top provider, prescribing over $1,000,000 worth of prescriptions per month, more than twice as much as anyone else, through at least September 2014.  Tr. 256-260 (Taff); GX 868, 868A2.  Taff understood that it was wrong to continue to accept Craven prescriptions but continued because she was making money.  Tr. 260 (Taff).

And then in December 2014, Johnston and Brockmeier received even more evidence that Top Tier and Craven were committing fraud:  a federal grand jury subpoena seeking information about Top Tier and Top Tier's principals Wilkerson and Chatfield.  Tr. 266-67 (Taff); Tr. 2308-09 (Boyle).  Brockmeier told Johnston that he should stop talking to Chatfield; Johnston refused.  Tr. 266-69 (Taff).  Boyle and outside counsel told Johnston to terminate Top Tier, but Johnston delayed the decision.  Tr. 2310-13 (Boyle).  The investigating AUSA told Central Rexall's counsel,

---

[1] The cited two exhibits contain the full names of these three individuals.  They are the three names highlighted in red in GX 218C2.

who relayed that information to defendants, that he had information that "someone had signed the doctors' names and sent the prescription order to Central Rexall," Tr. 2316 (Boyle); GX 327 – exactly what happened with Craven's prescriptions. But Johnston and Brockmeier did not direct Central Rexall to do any investigation into Top Tier claims that had been submitted. Tr. 2317 (Boyle). Defendants also were told that the AUSA was investigating whether pharmacies were fraudulently generating prescriptions, but defendants did not change the business or take any steps to prevent fraud. Tr. 2318-21 (Boyle).

Johnston and Brockmeier decided that Central Rexall would stop filling new prescriptions from Top Tier, but they continued to fill previously submitted Top Tier prescriptions and accepted and filled new prescriptions from Chatfield's new company Top Shelf. Tr. 266-67 (Taff). They stopped doing business with Wilkerson, but only because he was a hothead. *Id.* And defendants continued to have Central Rexall fill Craven prescriptions for several months in 2015, despite all this evidence that her prescriptions were fraudulent. GX 824A, 825A, 826A. If they had contacted Craven, she would have told them that she stopped writing for Top Tier in November 2014 because they were doing things wrong, including using her signature stamp without her permission. Tr. 625 (Craven).

All these facts show that the defendants were either aware of or (at the very least) willfully blind to the fraudulent nature of Craven's prescriptions. In their brief, defendants try to blame others and argue their own interpretation of the facts. But that is not the question at this stage. The question now is not whether a juror, considering the issue anew, would be more persuaded by defendants' interpretation or

15

the Government's; the question is whether it was rational for the jury to conclude, based on all the evidence and the inferences drawn from that evidence, that defendants knew that the Craven prescriptions were medically unnecessary.  That is certainly a rational conclusion based on the evidence.

### b. Supreme Medical

Johnston brought Supreme Medical to Central Rexall in May 2014, approved giving Supreme a 45% commission, and personally sent prescription pads to Supreme's head, Tom Isley.  GX 135, 138, 138A.  Johnston and Brockmeier both managed Supreme Medical even after Casseri became Vice President of Sales.  Tr. 2771-72 (Casseri).  And Johnston and Brockmeier profited immensely:  Central Rexall received over $24 million from Supreme prescriptions.  Tr. 3474 (Galloway).

Isley shared defendants' desire to manipulate the formulas of medications to maximize the reimbursement rate instead of finding medically necessary medications. He sent defendants frequent emails proposing new medications based on their high reimbursement rates.  *See, e.g.*, Tr. 224-26 (Taff), 685-87, 693-95, 708-09, 722-23 (Rolling); GX 136, 141, 168, 331, 383.  It was Isley who sent Johnston the dramatically increased resveratrol formula in January 2015, which Isley said reimbursed for over $22,000, and which led Central Rexall to triple the amount of resveratrol in its metabolic supplement.  GX 331.

There were numerous red flags involving prescriptions from Supreme:

- In August 2014, Central Rexall contacted a doctor about prescriptions for Samantha Mapelli, a Supreme sales rep, and found that the doctor's office had no record of her as a patient.  GX 204, 205.  Brockmeier was informed of this

incident.  GX 204.  Despite this red flag, Central Rexall filled three Mapelli prescriptions that month.  Tr. 3466 (Galloway); GX 800B.

- Also in August 2014, Isley asked for payment on a related party prescription, and Brockmeier made an exception.  Tr. 2645 (Farahat); GX 227.

- In February 2015, a Supreme patient told Central Rexall that she did not know the prescribing physician.  GX 347.

- In April 2015, a Supreme patient was called about a prescription and said he had never heard of the doctor, and the doctor's address could not be verified.  GX 433.

- On another occasion in April 2015, Nancy Cook of Central Rexall wrote a Supreme sales representative about a patient who had not seen or spoken to the prescribing doctor, and commented: "This is occurring too frequently recently. . . . Please advise of what is occurring with your group's patients as this is a repeated occurrence."  GX 434.  Cook forwarded these emails to Brockmeier.  *Id.*

Perhaps the biggest red flag was the conduct of Dr. Jeff Durgin.  On March 3, 2015, Dr. Durgin sent Central Rexall an email saying that he "signed a contract which ensures" Central Rexall would "be receiving many prescriptions from" him.  GX 411.  The email was forwarded to Boyle, who understood that the contract was with a sales representative group to pay Dr. Durgin to write prescriptions.  Tr. 2407-08 (Boyle).  But Dr. Durgin's reference to a contract was never investigated.  *Id.*  Instead, Johnston and Brockmeier proceeded to reward Supreme with even more money instead of terminating the relationship.  On March 9, a few days after Dr. Durgin's email, Supreme's head Tom Isley sent Brockmeier and Johnston an email asking to receive payments biweekly (instead of monthly) based on expected greatly increased volume of prescriptions.  GX 806.  Johnston immediately responded that he had spoken to Isley and approved this.  *Id.*

Dr. Durgin's prescriptions skyrocketed right after his email and Johnston's decision to increase Central Rexall's payments to Supreme: after sending Central Rexall only 41 new prescriptions in February 2015, Dr. Durgin sent Central Rexall 689 new prescriptions in March and 541 prescriptions in April. GX 1080, 1082. The numbers of prescriptions Durgin wrote on some single days are eye-popping: 100 and 134 on two days in March; 130, 51, 89, 58, 50, 84, 53, and 56 on separate days in April. *Id.*; Tr. 3501-03 (Galloway). These prescriptions are obviously fraudulent, as no doctor could examine anywhere near that number of patients and make a decision that it was medically necessary for each of those patients to receive a compound medication supposedly tailored to their individual medical needs. Brockmeier (and, by inference, Johnston) were aware of these numbers, as Brockmeier had access to Quickbase and received the March and April 2015 commission reports showing the extraordinary Durgin numbers. Tr. 2660-63 (Farahat); GX 807-P, 808, 808B, 809A, 810A. Those commission reports also show that far from cracking down on Supreme or Dr. Durgin, defendants rewarded Isley by increasing his commission rate from 45% to 50%. Tr. 2661 (Farahat). Johnston and Brockmeier also profited handsomely: Supreme's prescriptions brought Central Rexall $9.8 million in April 2015, Tr. 2661-62 (Farahat), which put over $4 million into Johnston and Brockmeier's pockets. A rational jury could conclude that Johnston and Brockmeier knew that Supreme's, and specifically Dr. Durgin's, prescriptions were medically unnecessary.

Defendants point to occasions when Boyle investigated some individual incidents involving Supreme sales reps, but that misses the larger and more important point: Johnston and Brockmeier never took action to terminate Supreme despite the

repeated instances of fraudulent conduct by Supreme sales representatives and patients.  A rational jury could certainly conclude that they never took action concerning Supreme cash cow Dr. Durgin, despite his email to Central Rexall stating that he had signed a contract to give prescriptions to Central Rexall, and despite the enormous number of prescriptions, fraudulent on their face, that he was sending to Central Rexall – because those prescriptions were making Johnston and Brockmeier millions.

### c.  Military Medical Relief 21

In late 2014, Tony Serna was operating Military Medical Relief 21 ("MMR 21"), an organization for veterans and active members of the military.  Tr. 1072 (Serna).  After someone reached out to Serna on behalf of Central Rexall,[2] Johnston contacted Serna and invited him to visit Central Rexall.  Tr. 1073-74 (Serna); *see* Tr. 269 (Taff) (Johnston brought Serna to Central Rexall).  Serna accepted the offer and met with Johnston and Brockmeier in early December 2014.  Tr. 1075 (Serna); *see* Tr. 2380-81 (Boyle).

At this meeting, Serna told them about MMR 21 and about his lack of any pharmaceutical sales background.  Tr. 1077-79 (Serna).  Undaunted by Serna's lack of qualifications to sell compound medications, Johnston proposed having MMR 21 refer members to doctors who would prescribe Central Rexall compound medications.  *Id.*

---

[2] Although Serna could not remember the last name of the person who contacted him, independent evidence supports the inference that the person was part of Supreme Medical.  In January 2015, Tom Isley of Supreme wrote to Central Rexall that he was supposed to "be paid an override commission on the sales for Dr. Tony Serna." GX 329.  Johnston responded that Isley was correct and authorized the override commission, *id.*, which shows that Johnston understood that Supreme was responsible for steering Serna to Central Rexall.

Serna said that he had no doctors, and Johnston responded that they could help get doctors. *Id.* Serna proposed having members see their own doctors, but Johnston said that would not work because the members' own doctors would not prescribe Central Rexall compound medications. Tr. 1080 (Serna).

Johnston suggested telling members that they were participating in a study and would be paid for their feedback. Tr. 1083 (Serna). Serna expressed concern about the legality of that arrangement, and Johnston assured him it was legal. *Id.* The study was fictitious. Tr. 1131 (Serna). Serna reached an agreement with Johnston and Brockmeier: MMR 21 would send members to doctors for evaluations that were free to the members and would pay the members to be in the study; MMR 21 would pay the doctors, who would prescribe medications and send the prescriptions to Central Rexall; and Central Rexall would pay MMR 21 a 40% commission, a portion of which was to be used to pay the doctors. Tr. 1087-88, 1121-23, 1162 (Serna); *see* GX 287A. And Johnston and Brockmeier would manage MMR 21 and Serna. Tr. 2772 (Casseri).

On December 2, the day after the initial meeting, Brockmeier told Boyle that the meeting went well and asked him to prepare an agreement. Tr. 2381-82 (Boyle); GX 279. On December 4, Serna emailed Brockmeier with an agreement and wrote: "Please send me a list of doctors you may have that we may refer business to." Tr. 1089-90; GX 284. Brockmeier forwarded the email to Johnston and Boyle with a single word: "yess." GX 284; Tr. 2383-84 (Boyle). Brockmeier was excited about Serna's joining Central Rexall because it would mean a lot of business. *Id.* Boyle discussed with Johnston and Brockmeier that Serna was marketing directly to military members, and they did not object. Tr. 2384 (Boyle).

20

Someone at Central Rexall provided a list of doctors to MMR 21,[3] and Serna met first with Drs. Simmons and Wagner and then with Dr. Elder-Quintana. Tr. 1091-92, 1109-16 (Serna). He reached the same deal with both: MMR 21 would send patients to the doctors and pay the doctors $250 per evaluation; the doctors would do an evaluation over the phone and prescribe Central Rexall medications. *Id.* Serna then told Johnston that he had met with the doctors and that MMR 21 would be paying them for doing the evaluations. Tr. 1116-17. Johnston approved the arrangement. *Id.*

By themselves, the terms of the deal Serna struck with Johnston and Brockmeier establish a conspiracy to commit fraud through medically unnecessary prescriptions: the patients were receiving medicines because they were paid to be in a fictitious study and not because they needed them, and the doctors were paid by a Central Rexall sales representative to prescribe Central Rexall medications rather than exercising their independent medical judgment. And what happened afterwards showed Johnston and Brockmeier knew the prescriptions were fraudulent and medically unnecessary:

- In a February 5, 2015, email exchange on which Brockmeier was copied, a patient said that "the only reason he agreed to get the prescription was to get paid" – in other words, the prescription was not medically necessary. GX 352,

---

[3] Serna's email asking Brockmeier for a list of doctors corroborates his testimony that Central Rexall provided these doctors. Johnston claims nonetheless that these doctors could not have been provided by Central Rexall because the doctors did not previously prescribe Central Rexall medications. But that inference is not compulsory – Central Rexall could have provided the names even if those doctors had not previously prescribed – and all inferences are to be drawn in favor of the Government. And the legal standard for reviewing a jury's guilty verdict requires the Court to credit Serna's testimony. *See United States v. Salahuddin*, 765 F.3d 329, 346-47 (3d Cir. 2014) ("[T]he jury was made aware— through cross-examination, closing arguments, and the jury instructions—of [a cooperating witness's] motivations, potential bias, and inconsistent testimony. Equipped with this knowledge, it was the jury's responsibility to decide whether or not to believe [the witness's] testimony").

353.  Sabrina Kline of Central Rexall told Serna and Brockmeier that this was illegal.  *Id.*

- Taff told Brockmeier in early 2015 that Serna's patients were getting paid.  Tr. 270-71 (Taff).  Serna continued as a Central Rexall sales representative.  *Id.*

- Dr. Wagner prescribed an extraordinary volume of prescriptions in a short time. In just four months, Dr. Wagner wrote 545 new prescriptions for compound medications, including more than 15 prescriptions on multiple days, 40 prescriptions on a single day, 213 in the month of February 2015, and 248 in March.  Tr. 3492-93 (Galloway); GX 1072, 1074.  Tricare paid $6,573,362.98 for Dr. Wagner's prescriptions.  Tr. 301 (Taff); GX 896B.

- Dr. Elder-Quintana also prescribed an extraordinary number of prescriptions. In the same four months, he wrote 411 compound medication prescriptions, including 181 in January, 59 on a single day in February, and more than 20 on several days.  Tr. 3495-96 (Galloway); GX 1076, 1078, 1079.  His prescriptions cost Tricare $4,599,068.60.  Tr. 301 (Taff); GX 896B.

- Boyle told Johnston that the volume of compound prescriptions from just a few prescribers raised red flags because it showed there probably was not a valid doctor-patient relationship.  Tr. 2385 (Boyle).  Johnston dismissed his concerns. *Id.*

Defendants' actions when Tricare ended coverage provide even more evidence of their guilt.  On April 24, 2015, the Defense Health Agency wrote Central Rexall informing them that DHA was suspending payment "due to you having dispensed compound drugs to TRICARE beneficiaries based upon prescriptions written by physicians whom we have concluded may not have established a physician-patient relationship with beneficiaries necessary to write valid prescriptions."  GX 444.  That told Johnston and Brockmeier what was already evident to them about the MMR 21 prescriptions.  In response, Johnston and Brockmeier did not ask Serna to confirm that Drs. Elder-Quintana and Wagner had a valid physician-patient relationship; instead, Johnston lied to Serna and told him that Tricare stopped paying because of the ingredients in the medications.  Tr. 1172 (Serna).

22

Defendants largely ignore this evidence, asking this Court to dismiss it because Serna falsely denied at trial that he met with prosecutors to prepare for his redirect testimony. But the applicable legal standard is clear: a court reviewing a guilty verdict must "not . . . usurp the role of the jury by weighing credibility[.]" *Brodie*, 403 F.3d at 133. A court ruling on a motion for acquittal "must treat all of the incriminating evidence as true and credible." *United States v. Riley*, 621 F.3d 312, 329 (3d Cir. 2010); *see United States v. Quiles*, 618 F.3d 383, 395 (3d Cir. 2010) ( "our standard of review requires that we view Ayala," a witness with serious credibility problems, "as a credible witness."); *see also United States v. Tyson*, 653 F.3d 192 (3d Cir. 2011) (reversing judgment of acquittal; district court erred by basing decision on its own credibility determinations). This Court must assume that the jury accepted as true any witness's testimony incriminating the defendant, even if the witness lied about certain other matters. *See, e.g.*, *Salahuddin*, 765 F.3d at 347-49 (rejecting argument that testimony of witness who gave false and contradictory testimony could not support verdict, as jury was free to believe some parts of the testimony and not others); *United States v. Boone*, 279 F.3d 163, 189 (3d Cir. 2002) ("A jury is free to believe part of a witness' testimony and disbelieve another part of it."). And so this Court must accept as true Serna's testimony about his discussions with Johnston and Brockmeier – a decision made easier by the ample independent evidence, cited above, that corroborates Serna's account. That corroborating evidence includes the emails documenting Serna's request for doctors; the documented complaint from an MMR21 patient; Taff's testimony that she told Brockmeier that MMR 21 patients were getting

paid; and the extraordinary number of prescriptions received from Doctors Elder-Quintana and Wagner in a short period of time.

### d. Boardwalk Medical

Boardwalk Medical was the last of the four groups to sign up with Central Rexall, and the relationship was corrupt both taken in isolation and considered in light of Johnston and Brockmeier's corrupt relationships with Top Tier, Supreme Medical, and MMR 21.

Although William Hickman, the head of Boardwalk Medical, did a small amount of Central Rexall business in 2014 through another distributor, the relationship between Hickman and the defendants started in earnest in January 2015. Hickman called Central Rexall, asked to speak to the owner, and was put in touch with Johnston. Tr. 1791-92 (Hickman). Hickman told Johnston that Boardwalk Medical was in his wife's name to hide his activities from Merck, his employer; Johnston had no problem with that subterfuge. Tr. 1796 (Hickman). Hickman told Johnston that he was operating in New Jersey and wanted to be a main distributor for Central Rexall. Tr. 1791-92 (Hickman). Johnston agreed. *Id.* First with Johnston and then with Brockmeier, Hickman negotiated a 45% commission. Tr. 1792-93 (Hickman).

Hickman quickly learned which insurance plans covered Central Rexall's compound medications, the biggest being the plan for New Jersey state and local government employees. Tr. 1809 (Hickman). Hickman found that most doctors were unwilling to prescribe many compound medications because they are supposed to be tailored to a specific need for a patient. Tr. 1804 (Hickman). Hickman told Johnston

24

that he was marketing directly to patients with the right insurance, and Johnston approved, saying it was "a smart move," Tr. 1809, 1889, 2041 (Hickman), even though that violated Central Rexall's agreement with Express Scripts. Tr. 3198-3201 (Stockwell).

Hickman assembled a vast sales force of 30 people to target individuals with the right insurance. Tr. 1810-11 (Hickman). Many of these sales representatives had no experience in pharmaceutical sales and no knowledge of the drugs they were selling; the Boardwalk representatives included firemen, police officers, teachers, a maintenance worker, and a gym floor installer. Tr. 1441, 1456 (Tedesco); Tr. 1692-93 (Ritson); Tr. 3351-52 (Bessey). These reps received no training in the medical benefits of compound medications. Tr. 1441 (Tedesco). Hickman told Johnston and Brockmeier about his many sales representatives, and they did not require the sales reps to sign up with Central Rexall or take compliance or fraud training. Tr. 1803 (Hickman). Robert Bessey, the gym floor installer, was listed in Central Rexall's commission reports as a sales representative, but he received no compliance training before he sold the medications. Tr. 3353-55 (Bessey). And William Hickman himself was not required in 2015 to take any compliance training or even sign the statement that he had read a manual. Tr. 2169-71 (Hickman).

Hickman and Tedesco, experienced pharmaceutical sales representatives who were the leading members of Boardwalk, did not receive meaningful educational information about the compound medications that they could have used to convince doctors about the benefits and side effects of Central Rexall's medications. Tr. 1434, 1446, 1552-55 (Tedesco); 1828 (Hickman). Instead, they were told that they should

25

pick the medications with the highest reimbursements and select the maximum number of refills. Tr. 1435-37 (Tedesco); Tr. 1825-26, 2013 (Hickman); *see* Tr. 264 (Taff) (Brockmeier wanted the maximum number of refills checked to maximize the amount of money Central Rexall made). For example, the email from Central Rexall to Hickman with the pad for the new metabolic with triple resveratrol said only that it had ingredients "commonly prescribed to help with weight management" but touted that it "delivers very high reimbursements – nearing the scar and wound level. We are excited about this one." GX 354A. This email and its attached information sheet said nothing about how the combination of ingredients would work together on a patient or include any studies of the formula. Tr. 1552-55 (Tedesco); Tr. 1723 (Ritson).

Lacking any real information to use to persuade prescribers that Central Rexall's compound medicines were medically necessary or appropriate, Hickman and Tedesco and the sales representatives under them resorted to using various methods to persuade individuals to receive compound medications and doctors to sign the prescriptions. The majority of Boardwalk's prescriptions were signed by Dr. John Gaffney, who signed prescriptions for 220 people, most of whom were not his patients, and not one of which was based on a determination that the prescribed medication was medically necessary. Tr. 1627-33 (Gaffney). Gaffney was paid to sign the prescriptions. Tr. 1623-24 (Gaffney). Many prescriptions were signed by Dr. Brian Sokalsky, who signed prescriptions in a quid pro quo arrangement with Tedesco: Tedesco would send him new patients, and Sokalsky would sign prescriptions for Tedesco. Another two doctors, Drs. Kauffman and Alario, signed prescriptions as a favor to Hickman and sales representative Keith Ritson, respectively, after letting

26

Hickman and Ritson go through their files to identify patients with the right insurance coverage.  Tr. 1805-06 (Hickman); 1695-1715 (Ritson).  And many of the Boardwalk patients were paid to receive the medications.  Tr. 1998 (Hickman); Tr. 1446-47 (Tedesco).

Numerous aspects of the Boardwalk prescriptions made it apparent to Johnston and Brockmeier that the prescriptions were not medically necessary, but defendants did not investigate or question them:

Family members all receiving the same medications with the maximum number of refills:  Several families, including husbands, wives, children, and relatives, all received multiple prescriptions with the same medication and large number of refills.  For example, five members of Broccoli family, men and women, elderly and middle-aged, received the same medications, almost always with the maximum number of refills checked.  Tr. 1456-62 (Tedesco); Tr. 1932-33 (Hickman); GX 5E.  These included a year's supply of the separate wound, scar, and antifungal medications, GX 5E, which Brockmeier was told by pharmacist Olsen was medically unnecessary, Tr. 929-30, and 12 months of the hyaluronic acid metabolic, GX 5E.  The Broccoli family prescriptions reimbursed for $561,000.  Tr. 3524-25 (Galloway).  The five members of the Sher family received medicines that reimbursed for over $1,000,000.  Tr. 3524-25 (Galloway).  Their medications were refilled up to 10 times.  Tr. 1937-38 (Hickman).  The Kresz family received over $600,000 in medications, Tr. 3524 (Galloway), and they did not even want them – they sent many of them back in 2016.  Tr. 2376-79 (Boyle); GX 749A-F.  Taff and Central Rexall pharmacy technicians noticed and expressed concern that whole families – parents, children, relatives – were getting multiple

27

prescriptions with the same medication and large number of refills, including the Broccoli family.  Tr. 293-94 (Taff).  Taff was concerned about the large number of prescriptions and large number of refills, which caused her to question "whether the patients actually needed the medications."  Tr. 294 (Taff).  She raised her concern with Brockmeier, but he dismissed it.  *Id.*  No one from Central Rexall scrutinized the Boardwalk prescriptions despite all the red flags they raised.  Tr. 2847 (Casseri).

Dr. Gaffney's extraordinarily large number of prescriptions: Dr. Gaffney wrote an enormous volume:  758 prescriptions for 220 patients with reimbursements totaling $26,897,590.39 *in one year*.  Tr. 300 (Taff); Tr. 1627-33 (Gaffney); GX 896B, 1086.  This included single days with 63, 38, and 31 prescriptions and many days with more than 15 prescriptions of supposedly specialty individualized medications.  GX 1084. Brockmeier could see those numbers from the Quickbase database he regularly reviewed and the reports he regularly received, and Johnston was aware that Gaffney sent Central Rexall a large number of prescriptions.  Tr. 313 (Taff).  Johnston and Brockmeier discussed with Casseri the volume of Dr. Gaffney's prescriptions.  Tr. 2846.  It was apparent to Casseri that "there's no way a doctor could see that many patients in that little amount of time to get that amount of prescriptions into the pharmacy."  Tr. 3011 (Casseri).  And it is inconceivable that one doctor could legitimately determine in a year that 220 patients all needed the exact same compound medications – medications that are supposed to be individually tailored to the needs of particular patients – and that those patients all just happened to have a medical need for the most expensive medications Central Rexall was offering.  Taff raised with Brockmeier her concern about the enormous number of prescriptions Dr.

28

Gaffney was sending Central Rexall, but he dismissed that concern as well. Tr. 296-97 (Taff). Boyle also talked to Johnston and Brockmeier about his concerns about Dr. Gaffney being a large prescriber. Tr. 2409 (Boyle). But no one from Central Rexall ever contacted Hickman to verify that Dr. Gaffney was actually seeing patients. Tr. 1818-20 (Hickman). No one ever called Dr. Gaffney to ask about his 220 prescriptions, check if he had actually seen his patients, or verify his prescriptions were medically necessary. Tr. 1633, 1636-37 (Gaffney).

Dr. Sokalsky's large number of prescriptions: Dr. Sokalsky signed numerous prescriptions with 11 months of refills for medications that were not medically appropriate for 12 months. GX 11, 11A. He prescribed the hyaluronic acid metabolic supplement to replace patients' resveratrol metabolic supplement, Tr. 1475-76 (Tedesco); GX 11, 11A, even though the medications were very different, hyaluronic acid is not effective taken orally, and his sales representative received no information on the hyaluronic acid formula. Tr. 1068 (Olsen); Tr 1579-80 (Patel). He signed libido cream prescriptions for two young women even though the active ingredient does not work on women. Tr. 927 (Olsen). He authorized 28 prescriptions on a single day in July 2015 and 29 on a single day in December 2015. GX 1088. He wrote a total of 169 prescriptions in a little less than one year for which Central Rexall received $5.4 million. Tr. 300 (Taff); GX 896B, 1090. There is no evidence anyone called him.

Dr. Kauffman's large number of prescriptions: Dr. Kauffman also wrote a very high number of prescriptions: $5,094,611.34 in about a year on 187 prescriptions. Tr. 301 (Taff); GX 896B, 1094. These included 42 in a short period in July 2015 and 25 on a single day in December 2015. GX 1092. Taff raised her concerns about Dr.

29

Kauffman's prescription volume with Brockmeier, and he again dismissed it and did not want to do any investigation into Dr. Kauffman or Boardwalk. Tr. 296-97 (Taff).

The Boardwalk doctors' immediate substitution of one very different medication for another:  When one very expensive Central Rexall metabolic supplement was no longer covered, Drs. Gaffney, Kauffman, and Sokalsky all immediately called or wrote in a replacement without examining or talking to patients. Tr. 1475-76, 1491, 1543 (Tedesco); Tr. 1846-48, 1850-63 (Hickman); GX 1084, 1090, 1094.  Some instances would have been apparent to anyone like defendants overseeing the compounding operations, such as Dr. Gaffney's calling in a huge number of prescriptions in December 2015. Tr. 1491-92 (Tedesco); GX 5.  Johnston and Brockmeier did not question these obviously medically inappropriate prescriptions – indeed, Johnston told Hickman to make sure that the doctors switched from the resveratrol metabolic to the hyaluronic acid metabolic right away, Tr. 1844-48 (Hickman), to keep the money flowing.

In a particularly egregious example, Chris Casseri sent Hickman 27 prescriptions for Dr. Kauffman's signature with the type of medication, the medication quantity, and the number of refills already checked off. Tr. 2872-76 (Casseri); Tr. 1850-61 (Hickman); GX 649, 649A, 655, 655A.  Casseri told Johnston and Brockmeier that he was doing this. Tr. 2875-76 (Casseri).  Dr. Kauffman signed the prescriptions without seeing or examining the patients. Tr. 1859 (Hickman).  Hickman faxed them back a day after he received them. Tr. 1859-61 (Hickman); GX 7.

Filling questionable prescriptions:  Central Rexall compliance officer Ryan Boyle emailed Hickman because two different prescribers wrote overlapping

30

prescriptions for two families and one prescriber (Jason Chacker) wrote prescriptions for a family member (Sondre Chacker). Tr. 1876-79 (Hickman); GX 495. Boyle's email said that "[f]lags were raised" by these facts, including Chacker's writing for a relative. GX 495. No one talked to the prescriber or the patients, and the questionable prescriptions were filled. Tr. 1877-79, 1929-31, 2165-66 (Hickman). Central Rexall received $417,000 for the Chacker family's medications. Tr. 3525 (Galloway). Based on Boyle's testimony that he discussed issues like this with the defendants, Tr. 2530-31, the jury could reasonably infer that Boyle discussed this issue with them and approved his response – including filling the prescriptions that raised red flags.

Failure to call all Boardwalk patients to verify they wanted the medicines: Although Central Rexall's policy was to call every patient to verify they wanted prescriptions, including new formulas, that did not always happen with Boardwalk patients, which was apparent from the Quickbase notes. Tr. 2019, 2057 (Hickman). Central Rexall even sent Hickman an email on June 30, 2015 stating that "if we are not able to contact the patient, [medications] are being sent through regardless." Tr. 2167 (Hickman); BDX 1359.

Failure to call Drs. Gaffney or Sokalsky after fraud investigation started: When Central Rexall learned in early 2016 that Express Scripts was questioning the Boardwalk prescriptions, cutting off all payments, and conducting a fraud investigation, no one from Central Rexall called Dr. Gaffney or Dr. Sokalsky. Tr. at 1493 (Tedesco); Tr. 1636-37 (Gaffney); Tr. 1898-1904 (Hickman); Tr. 3085 (Casseri).

The reason why Johnston and Brockmeier did not investigate any of these questionable practices is obvious: they either knew they were fraudulent or were

willfully blind because Boardwalk was, in Chris Casseri's words, Central Rexall's "cash cow" and "golden goose." Tr. 2842-43. By July 2015, Boardwalk Medical brought in 60% of Central Rexall's prescriptions and 77% of its net revenue. Tr. 291-93 (Taff); GX 880, 880A, 880A2. By December 2015, Boardwalk accounted for 79% of all prescriptions and 87% of Central Rexall's revenue. Tr. 321-22 (Taff); GX 886, 886A2. And for the period from July 2015 through February 2016, Boardwalk accounted for over 90% of Central Rexall's reimbursements. Tr. 3515 (Galloway). Rather than making any effort to check on the numerous red flags presented by Boardwalk, Johnston and Brockmeier gave Hickman higher and higher commission percentages, the last being 56% of the insurance reimbursement, and a trip to the 2016 Super Bowl. Tr. 1878-80, 1883-84, 1896-97, 1892-93, 1942 (Hickman). The clear inference, and without a doubt a permissible inference that a rational jury could have drawn, is that Johnston and Brockmeier did not ask any questions because they knew medications were being prescribed to make money and not because they were medically necessary, and defendants did not want to stop the money flowing into their pockets.

### 3. Johnston and Brockmeier directed Central Rexall practices that were part of the fraud.

In addition to bringing in and managing these four corrupt sales groups, Johnston and Brockmeier directed numerous Central Rexall practices that were part of the fraud and facilitated or concealed the fraud.

### a. Tripling resveratrol

Brockmeier, with assistance from Johnston, directed Central Rexall to put a metabolic vitamin combination on its prescription pad with far more resveratrol than was medically necessary.  In the beginning of 2015, Central Rexall offered a metabolic vitamin combination that had 100 milligrams of resveratrol per capsule, to be taken twice a day.  GX 17, 17A.  Because the recommended daily dose of resveratrol was 500 milligrams, the existing capsule kept the patient within the recommended dosage.  Tr. 703-04 (Rolling).

In January 2015, Brockmeier sent Rolling a proposed formula with 350 milligrams per capsule, with directions to take two capsules two to three times per day – so the patient would get 1,400 to 2,100 milligrams per day.  Tr. 704-05 (Rolling); GX 319.  Rolling told Brockmeier that the existing formula had plenty of resveratrol and that increasing the resveratrol would not benefit the patient.  Tr. 705-07 (Rolling); GX 320.  Central Rexall pharmacist Melissa Olsen's email reaching the same conclusion was forwarded to Brockmeier and Johnston on January 13, 2015.  Tr. 885-90 (Olsen); GX 316.

But Brockmeier, along with Johnston, continued to pressure Rolling.  Tom Isley of Supreme Medical informed Johnston that the formula with 2,100 milligrams per day of resveratrol was reimbursing for $22,000 to $27,000 per patient for a one-month supply.  Tr. 708-10 (Rolling); GX 331.  Johnston forwarded that email to Brockmeier and Rolling, and Brockmeier and Johnston pressured Rolling to increase the amount of resveratrol or else Central Rexall would lose business.  Tr. 715-16 (Rolling); GX 331.  Rolling went along with their request because they were pushing him and because the increased amount of resveratrol would not harm the patient, although it also would

33

not benefit the patient.  Tr. 716-17 (Rolling).  Rolling would not have increased the resveratrol had the decision been left to him.  Tr. 716-17 (Rolling).  The final formula offered by Central Rexall had 300 milligrams per capsule to be taken two to three times per day.  Tr. 881-82 (Olsen); GX 20A.  The increased resveratrol did not have any medical benefit – in fact, the resveratrol over 500 milligrams in a day would pass through the body and exit in the patient's urine.  Tr. 881-83, 893 (Olsen); Tr. 1585-86 (Patel).

With Johnston and Brockmeier's approval, Central Rexall promoted the higher resveratrol pill as a medicine that would help with weight control, but there were no studies or tests showing that the formula actually helped with weight loss.  Tr. 883 (Olsen); Tr. 2812-14 (Casseri); Tr. 1825-26 (Hickman); GX 345, 354A.  The increase in resveratrol did result in a reimbursement of approximately $20,000 per patient per month, which was more than triple the reimbursement for the previous formula and excited Brockmeier.  Tr. 718 (Rolling); Tr. 2209-10 (Hickman).  A batch of 600 capsules had a profit over the cost of the ingredients of $212,767.96.  Tr. 894 (Olsen).  And Central Rexall would go on to make over $10 million from the medications with triple, medically unnecessary resveratrol.  GX 897A2.

Johnston and Brockmeier argue that doctors made the decision to prescribe the increased resveratrol formula, but this argument ignores defendants' active role in creating the formula, causing it to be placed on prescription pads, and causing it to be distributed to sales representatives.  Defendants had their sales representatives tell doctors, without any supporting evidence, that the new formula helped with weight management; to prompt them, they called the new metabolic "GW-WT."  Defendants

34

also did not tell prescribing doctors that the real reason for this new formula was the increased insurance reimbursement rather than any medical benefit. This decision was in line with the Central Rexall policy of not telling prescribers what medications would reimburse for, because prescribers would not write a prescription if they knew it cost $10,000 to $20,000. Tr. 2792-94 (Casseri); GX 477. Prescribers also believed that a medicine was placed on a preprinted pad because of a determination that it was medically appropriate, Tr. 1596-97 (Patel), and thus were misled by the omitted information, *i.e.*, that the triple resveratrol formula was designed only to make money and was not medically necessary for any patient. And a very large number of the triple resveratrol prescriptions were signed by doctors who, as is shown elsewhere, defendants had reason to know were not prescribing based on medical necessity: Dr. Gaffney and Dr. Durgin each signed prescriptions for at least 40 patients, many of which were refilled multiple times. *See* GX 4, GX 5. The jury reasonably could have inferred that the prescriptions were the result of defendants' misrepresentations and omissions and that defendants would have known that.[4]

### b. Directing substitution of hyaluronic acid for resveratrol

Defendants also were responsible for Central Rexall replacing the triple resveratrol formula with another medically unnecessary formula using hyaluronic acid. After insurers stopped covering resveratrol, Central Rexall management, including Johnston and Brockmeier, were anxious to find a similarly lucrative

---

[4] Defendants improperly cite to a 2018 study, which was not introduced as evidence at trial, in purported support of a contention that 1000mg/day of resveratrol could be beneficial. DB at 25 n.7. For obvious reasons, a document that is not in the trial record and post-dated the conspiracy cannot be used to manufacture reasonable doubt, let alone support an inference in the defendants' favor.

replacement.  Tr. 725-33 (Rolling); Tr. 1832-33 (Hickman); Tr. 2862 (Casseri).  In June

2015, Hickman forwarded to Casseri an email proposing a formula with hyaluronic

acid as a substitute for the resveratrol formula.  *Id.*; GX 501.  Casseri forwarded the

email to Johnston and Brockmeier, who were pleased.  GX 501; Tr. 2866-67 (Casseri).

As Johnston and Brockmeier were advised by email, the primary attribute of

this new formula was that it would reimburse for around $10,000.  *Id.*  Hyaluronic

acid is not medically similar to resveratrol, which is an antioxidant that promotes

blood flow; hyaluronic works on the joints and skin.  Tr. 727, 821 (Rolling); Tr. 1045

(Olsen).  Hyaluronic acid also is not helpful when taken orally.  Tr. 1068 (Olsen); Tr

1579-80 (Patel).  There was no medical reason to substitute hyaluronic acid for

resveratrol.  Tr. 917 (Olsen).  And Johnston and Brockmeier were told by Olsen a year

before that there was no medical basis for including hyaluronic acid in medications.

Tr. 906-10 (Olsen); GX 208.  Despite this, defendants pressed John Mark Rolling to

create a new supplement using hyaluronic acid, which he did in a few days.  Tr. 729-32

(Rolling).  Central Rexall did no studies of the medical benefits of the new hyaluronic

acid formula before putting it on its prescription pad; its only virtue was the high

reimbursement it would garner.  *Id.*  And Central Rexall figured out the high

reimbursement by submitting test adjudications on New Jersey employees without a

valid prescription.  Tr. 1838-43 (Hickman); Tr. 2867-69 (Casseri).

As soon as Rolling developed the hyaluronic acid formula, Central Rexall

pressured sales representatives to switch patients who had been prescribed the triple

resveratrol formula to the medically very different (and very medically unnecessary)

hyaluronic acid formula without giving them any literature to justify the change.  Tr.

36

1844-48 (Hickman); Tr. 1475-76 (Tedesco); Tr. 2867-71 (Casseri). Johnston personally told Hickman about the new formula, and Hickman told him that Dr. Gaffney would simply be calling Central Rexall to change resveratrol patients to the hyaluronic acid formula. Tr. 1844-48 (Hickman). Johnston did not object and told Hickman to work with Casseri to get it done, and he did. *Id.* Dr. Gaffney immediately called in the prescriptions to Central Rexall without talking to the patients about the new medication, and Central Rexall never called the patients to ask them about the new formula. *Id.*; Tr. 2872 (Casseri).

Defendants claim that doctors' authorization of the switch from resveratrol to hyaluronic acid absolves them of blame, DB at 25, but that ignores the full factual context of the switch. The change was made in early July 2015 without any information offered to doctors or sales representatives to show that that two formulas were at all equivalent or even similar – because they were not. At that time, as is detailed above, Johnston and Brockmeier knew that Boardwalk Medical was responsible for over 60% of Central Rexall's prescriptions and over 77% of its revenue, and they knew many reasons to question the legitimacy of prescriptions originated by Boardwalk, especially the ones signed by Dr. Gaffney. They also could see from Quickbase and internal reports that large numbers of patients were immediately switched from the resveratrol formula to the hyaluronic acid formula. *See, e.g.*, GX 844A2, 845A2, 846A2 (commission reports showing the switch). Based on all of these facts and circumstances, the jury could infer that Johnston and Brockmeier understood that the hyaluronic acid prescriptions were part of the fraud and were not medically necessary.

37

### c. Directing maximum number of refills

Brockmeier directed sales representatives to have doctors check the maximum number of refills on all Central Rexall prescriptions because that would make Central Rexall the most money.  Tr. 262-64 (Taff); Tr. 2774 (Casseri).

For many of these medicines, 12 months of refills was medically unnecessary:

- Pharmacist Melissa Olsen told Brockmeier that 11 or 12 refills on Central Rexall's antifungal gel and its wound care cream were not medically appropriate.  Tr. 928-30 (Olsen).  Brockmeier decided nonetheless to put that option on the prescription pads.  Tr. 930 (Olsen).  After that, "[p]retty much every prescription we received [for those medications] had the full 12 refills marked."  Tr. 930 (Olsen).

- Johnston received a study showing that Central Rexall's wound medication cleared up a very serious wound in two months, which meant that there was no reason for Central Rexall to place an option for 12 months of wound cream refills on its prescription pads.  JDX 89, 89A; Tr. 698 (Taff).

- Doctor Saurabh Patel testified that a one-year supply of Central Rexall's wound cream would never be appropriate, as the doctor should reassess the wound after a few months.  Tr. 1578.  He also testified that a 12-month supply of the antifungal gel would never be medically necessary.  *Id.*

- Nurse practitioner and prescriber Candace Craven testified that she would not order even six months of refills because she would want to see the patient before deciding if refills were appropriate.  Tr. 617-18 (Craven).  If the medication worked and the condition healed, she would not order a refill; and if the medication was not working, she would not order a refill.  *Id.*  It is never medically appropriate to give a patient six months of refills of a new medication without following up.  *Id.*

Defendants argue that checking the maximum number of refills was merely a convenience for the patient in case the patient wanted more.  But the trial evidence established that a prescription is supposed to represent *a doctor's* determination that the prescribed medicine is medically necessary based on the patient's medical needs.  Tr. 3167-68 (Stockwell).  That necessarily includes the number of refills the patient's condition requires, as that is part of the prescription.  When the patient asks the

38

prescription to be refilled months after the original prescriptions, that request needs to be based on doctor's decision that the medication was medically necessary in that month. As summarized above, Dr. Patel, nurse practitioner Craven, and pharmacist Olsen testified that it would often be inappropriate to check 12 refills. And defendants' argument defies common sense and experience–if that were true, then every doctor would check 12 months of refills every time they write a prescription, and every juror knows that simply does not happen.

### d. Directing false test adjudications

Both Johnston and Brockmeier ordered numerous false test adjudications to find the most profitable formulas. *See, e.g.*, Tr. 684-93, 710-12, 739-40 (Rolling); Tr. 864-65 (Olsen); Tr. 2775-86 (Casseri); GX 141, 144, 148, 194, 259, 321, 331, 645, 681. They asked for test adjudications to be run before deciding to place a formula on a prescription pad to find the highest reimbursing formula for the pad. Tr. 2777 (Casseri).

As Taff and Rolling explained at trial, the adjudication process is how Central Rexall made insurance claims to pharmacy benefit managers such as Express Scripts ("PBMs"). Tr. 165 (Taff). The adjudication process required Central Rexall to have received an actual prescription signed by a doctor after examining the patient, and the adjudication claim represented to the PBM that Central Rexall had a valid prescription. Tr. 168-69, 172-73 (Taff); Tr. 674-75 (Rolling); Tr. 3167-68, 3253 (Stockwell). A Central Rexall pharmacy technician would enter into the pharmacy software system the information from an actual prescription, including the patient's name, date of birth, insurance number, doctor's name, and the ingredients in the

39

compound medication.  Tr. 165-66 (Taff); Tr. 674-75 (Rolling).  The technician then would transmit the information to the PBM, and that transmission communicated to the PBM that Central Rexall actually had a prescription and was asking to be paid for it.  Tr. 165-66 (Taff); Tr. 675 (Rolling).  The PBM would respond instantly whether the prescription was covered, how much the PBM would pay, and what the copay was.  *Id.*

A test adjudication, like any adjudication, represented to a PBM that Central Rexall had received an actual prescription from a doctor who had prescribed the medication after examining the patient, but that representation was false because Central Rexall did not have an actual prescription signed by a doctor for that medication.  Tr. 173 (Taff); Tr. 680 (Rolling); Tr. 3253 (Stockwell).  For a test adjudication, the person requesting the test adjudication would give the pharmacy technician the formula for the medication, and the technician would enter the formula into the pharmacy software system and then would take the doctor and patient identifying information from another prescription, as no doctor had actually prescribed that medication.  Tr. 680-81 (Rolling).  The pharmacy technician would not ask the patient or the doctor if Central Rexall could use their information.  *Id.*  The pharmacy technician then would transmit that insurance claim to the PBM.  *Id.*   The test adjudication would look to the PBM just like a legitimate adjudication claim, and nothing about it signaled to the PBM that it was just a test.  Tr. 681-82 (Rolling).  By causing Central Rexall personnel to submit test adjudication claims, defendants caused Central Rexall to make false insurance claims.  Tr. 682-83 (Rolling); Tr. 3173-75, 3181-82 (Stockwell).

40

Johnston and Brockmeier were well aware that test adjudications were wrong; they are false representations to the PBM that Central Rexall had an actual prescription for a medicine actually prescribed by a doctor to a patient, as Express Script's Blake Stockwell testified.  Tr. 3253, 3333-34, 3340 (Stockwell).  Taff told Brockmeier that test adjudications were not permitted under Central Rexall's agreement with PBMs and that they had to have an actual prescription; he rolled his eyes and directed them to be done behind her back.  Tr. 173-75, 516-17, 600 (Taff).  Johnston and Brockmeier also received the Express Scripts contract with Central Rexall and the Express Scripts manual, both of which prohibited test adjudication claims.  Brockmeier signed the Express Scripts agreement, which states that Central Rexall could be terminated if it submits a fraudulent prescription drug claim and that the pharmacy was responsible for making sure prescriptions are valid.  Tr. 3181-83 (Stockwell); GX 37.  The trial evidence also showed that Johnston had the Express Scripts manual – he forwarded it to Boyle, Tr. 2481 (Boyle), JDX 336, 336-1– and the manual also prohibited test adjudication claims.[5]  The jury could reasonably find that the defendants knowingly submitted false test adjudications as part of the fraudulent scheme and could reasonably reject defendants' arguments that they were an innocuous "price check."

---

[5] In addition to Taff, Casseri and Rolling also knew at the time that it was wrong to submit test adjudications without a valid prescription.  Tr. 683, 755 (Rolling); Tr. 2791 (Casseri) (lied to the FBI when asked about test adjudications because he knew they were wrong).

41

### e. Failure to require collection of copays

Central Rexall's agreement with Express Scripts and other PBMs required Central Rexall to collect copays from patients. Tr. 196 (Taff); Tr. 3184-86, 3189-92 (Stockwell); GX 61. Defendants were aware of this requirement, because it was in Central Rexall's agreement with Express Scripts and because they were repeatedly instructed that they had to collect copays, not just try to collect them. Tr. 197 (Taff); 2252-56 (Boyle); GX 273.[6] But as Taff informed Brockmeier, patients would sometimes decline to receive prescriptions due to the amount of the copays, which varied from five to over a thousand dollars. Tr. 201-02 (Taff).

Defendants addressed this issue in three ways. First, in the early months of the conspiracy Brockmeier was asked whether to ship medications to patients without first calling them about the copays, "especially" when the reimbursement was "hundreds $'s." GX 119. He sometimes responded by waiving individual copays. *Id.* ("Do NOT hold up scripts for copays"); *see* GX 123, 125. The reason for one such decision made clear his thinking: patient Ronald Morana wanted to cancel his prescription because he did not want to pay a $10 copay. Catherine of Central Rexall

---

[6] Defendants devoted much energy at trial to arguing that Express Scripts did not require collection of copays, and they try to relitigate that issue anew in their posttrial motions. DB at 148 n.48. But there was ample evidence that Central Rexall's agreement with Express Scripts required collection of copays, *see, e.g.,* Tr. 210-11 (Taff); Tr. 2583-85, 2596 (Boyle); GX 244; Tr. 3184-86 (Stockwell), and the Rule 29 standard requires this Court to view the evidence in the light most favorable to the Government.

Defendants also recycle an argument made to the jury that Central Rexall could not insist on payment before shipping because the patients did not come to the pharmacy in person. But the trial evidence showed that Central Rexall could have required payment by credit card over the phone before shipping. Tr. 2584-85 (Boyle). That is what other mail order pharmacies do. Tr. 3196 (Stockwell) (Express Scripts' mail order pharmacy collects over 97% of copays). And any juror who has ordered something over the phone or online knows that virtually every seller requires payment before something is shipped. *See* Tr. 3747 (jury instruction telling jurors to rely on their common sense).

42

asked if they could waive the copay and wrote: "which I am assuming is OK by you since we got $2,900 + reimbursement from insurance." GX 123. Brockmeier's response: "All good." *Id.*

Second, Brockmeier established a policy under which Central Rexall would ship very expensive medications without requiring the patient to pay the copay. Under this policy, Central Rexall would merely make attempts to collect copays instead of actually collecting them upfront and would ship medicines even if patients did not pay their copays. Tr. 200-01, 211-14 (Taff); 2252-53 (Boyle); 2824-25 (Casseri). And so Central Rexall kept filling and refilling prescriptions without requiring the patient to pay the copay because that was in Central Rexall's financial interest. Tr. 1821-23, 2173-74 (Hickman); Tr. 2252-53 (Boyle). As a result, as of September 2014, Central Rexall failed to collect 70% of copays and was owed $300,000 in unpaid copays, which covered hundreds of pages in an internal report. Tr. 2673-75 (Farahat). As of September 2015, Central Rexall had $268,000 in unpaid copays, which represented thousands and thousands of unpaid copays. Tr. 319-20 (Taff); GX 883. By any definition, this was a routine failure to collect copays, and Central Rexall never told Express Scripts about that failure. Tr. 3206 (Stockwell).

Third, Johnston and Brockmeier caused Central Rexall to enter into a sham contract with Affordable Medication Solutions ("AMS"). Tr. 202-08 (Taff); GX 193. Unlike a legitimate copay discount program, where the drug manufacturer pays the pharmacy the difference between the copay and the discounted amount, AMS did not promise to pay any portion of anyone's copays or any money to Central Rexall, *see* GX 193; Tr. 2588-89 (Boyle), and the AMS program never actually paid anyone's copays,

Tr. 202-08 (Taff); Tr. 2259 (Boyle).  In fact, Central Rexall paid AMS $11,000 per month over the life of the contract, so in practice, Central Rexall was paying a portion of the discounted copays itself and was waiving the remainder of the difference. Central Rexall used the AMS contract as a device for inducing patients to agree to receive compound medications, because they could tell patients that their copays had been reduced from hundreds or thousands of dollars down to $20.  Tr. 202-208 (Taff); Tr. 2257-59 (Boyle).  Taff testified that AMS supposedly was going to give Central Rexall data under the contract, but even that was an illusion, as AMS never gave Central Rexall any data.  Tr. 207-08 (Taff).  Brockmeier told Taff that if she was ever asked, she should "make sure [to say] that we received the data," Tr. 208 (Taff) – a direction to lie that evidences Brockmeier's consciousness of guilt and awareness that the AMS contract was phony.  And when Express Scripts asked Central Rexall for information about AMS, Johnston approved an answer that falsely represented the AMS program as a legitimate coupon program.  Tr. 3212-14 (Stockwell); GX 578.[7]

### f. Approving commission payments to sales representatives for prescriptions for themselves and their family members

Starting in the summer of 2014, Central Rexall had a policy of not paying sales representatives commissions for prescriptions for themselves and their family members due to the obvious risk of inappropriate prescriptions.  Tr. 2640 (Farahat). Ryan Boyle testified that the reason for the policy was that compensating a sales representative for his own prescriptions created incentives for representatives to get

---

[7] It was reasonable for the jury to reject defendants' version of facts about the AMS program.  *See* DB at 57.  Their suggestion that Central Rexall expected AMS to pay it the difference between the actual copay and the discounted copay was refuted by the contract, which lacked any provision for AMS to pay Central Rexall.  GX 193.

medically unnecessary prescriptions, and that he discussed the policy with both Johnston and Brockmeier.  Tr. 2357-59; GX 237.  Khaled Farahat testified that before the policy was implemented, in a single month, Central Rexall paid $229,000 in reimbursements for these related-party prescriptions.  Tr. 2639-40; GX 233, 233A. Brockmeier commented to Johnston that this was "out of control."  GX 234.  But even though this policy was implemented to deter medically unnecessary prescriptions, Brockmeier made numerous exceptions to appease sales representatives who wanted more money.  Tr. 2359-65 (Boyle); Tr. 2642-49 (Farahat); Tr. 2823-24 (Casseri); GX 227, 239, 241, 276, 324, 366, 387.  Central Rexall's policy did not prevent anyone who needed a medication from receiving one; it simply was supposed to prevent large payments in exchange for receiving a medication.  GX 237.  The jury could reasonably find that Brockmeier's exceptions to this policy furthered the fraud by causing medically unnecessary prescriptions to be filled.

### g. Directing or approving false statements to PBMs and others to conceal the fraud

The jury heard numerous examples of how Johnston and Brockmeier made or approved false and misleading statements to keep the fraud going, keep the money fraudulently obtained from the PBMs, and avoid detection by PBMs.

Johnston had Central Rexall lie to CVS about AMS:  In response to questions from PBM CVS about the AMS copayment card, Johnston approved false statements that Central Rexall was going to receive payment from AMS for copays.  Tr. 2266-67 (Boyle); GX 575A, 575B.  That was false, as the AMS-Central Rexall contract did not provide for AMS to pay Central Rexall; it was Central Rexall that paid AMS.  *Id.*

45

Johnston lied to CVS about being terminated by a provider network: In June

2015, Good Neighbors Pharmacy Provider Network, a Pharmacy Services

Administration Organization ("PSAO") to which Central Rexall belonged, told Central

Rexall that it was being terminated from the network. Tr. 2365-68 (Boyle); GX 530.

Boyle discussed this serious development with Johnston and Brockmeier, and they

looked for a new PSAO. Tr. 2368-71 (Boyle). As part of that effort, Johnston emailed

CVS Caremark and said that Central Rexall "recently made the decision to move away

from the Good Neighbors Pharmacy Provider Network (GNPPN)." Tr. 2372 (Boyle);

GX 566. Johnston made that false statement because telling the truth—that Central

Rexall was terminated—would negatively affect their attempt to get into another

network, which they wanted to keep receiving money from the PBMs. Tr. 2372-73

(Boyle).

Johnston approved lies about Central Rexall's use of 1099 contractors:

Johnston approved false or misleading answers about whether Central Rexall used

1099 contractors. He was aware that this was an important issue for PBMs, as he

received law firm advice in March 2015 that PBMs were taking issue with the use of

1099 contractors and that Central Rexall should switch to W-2 employees. Tr. 2341-44

(Boyle); GX 377A, 435. In August 2015, as part of CVS's recredentialing, Central

Rexall was asked if it had a sales force to promote compounding services directly to

patients or prescribers and if they were W-2 employees or 1099 contractors. Tr. 2352-

53 (Boyle); GX 576. Boyle responded with an intentionally misleading statement that

Central Rexall employed seven sales personnel who were employees and did not have

any individual sales personnel who are 1099 contractors. Tr. 2353 (Boyle). The truth

46

was that Central Rexall employed many 1099 sales groups comprised of countless individuals.  *Id.*  Boyle responded dishonestly because he had discussed this subject with Johnston and Brockmeier and they believed that Central Rexall would not be able to pass recredentialing if they answered honestly.  Tr. 2353 (Boyle).  Boyle sent the draft dishonest response to Johnston before it went out, and Johnston did not object to it.  Tr. 2354-55 (Boyle); GX 577.  Other PBMs asked similar questions about whether Central Rexall used a 1099 sales force, and Central Rexall, with the approval of Johnston, gave the same intentionally misleading response.  Tr. 2353-54 (Boyle).

Johnston approved false answers on a recredentialing application:  In December 2014 and January 2015, Johnston approved a response to a recredentialing application that had numerous false answers.  Tr. 3634 (Galloway); GX 300, 300A, 300B; JDX 523. Boyle sent Johnston a draft response that had some answers blank and others completed and asked for help with some questions, and Johnston replied that he would review it that night.  *Id.*  The draft response Boyle sent to Johnston said that the pharmacy shipped 89% of its prescriptions out of state; the final response, which the jury could infer was prepared or approved by Johnston, contained the false response that Central Rexall shipped only 50.2% out of state.  JDX 523; Tr. 3092-94 (Casseri). The draft response had a blank in response to the request to describe the pharmacy's sales force; the final response stated that Central Rexall's sales reps were engaged in "Direct to physician marketing of pharmacy services."  JDX 523.  The jury could find that response was false and misleading because Central Rexall sales reps marketed directly to patients – Johnston was specifically told that by Serna in early December 2014, Tr. 1077-79 (Serna), as Boyle confirmed, Tr. 2384.  The draft response had a

47

blank in the response to the request to describe the methodology for selecting formulas; the final response falsely stated that *all* formularies are obtained from reputable sources like PCCA or Freedom Pharmaceuticals. JDX 523. The jury could find that response was false and misleading because many of Central Rexall's formulas came from sales representatives, not PCCA or Freedom. Tr. 3094 (Casseri).

Johnston approved false and misleading statements to Express Scripts about AMS: In August and September 2015, Express Scripts sent Central Rexall some questions about the AMS program, and Boyle sent his draft answers to Johnston for approval (GX 578) before sending them to Express Scripts (GX 582). The answers falsely gave the impression that the AMS program was a legitimate manufacturer coupon program and that Central Rexall was receiving money from the AMS program, while failing to disclose that the AMS contract was a sham and that Central Rexall never actually received any money from the AMS program. Tr. 3212-14 (Stockwell); Tr. 2259 (Boyle).

This evidence of concealment and false statements further proves Johnston and Brockmeier's knowledge that they were committing fraud, their fraudulent intent, and their knowing participation in the fraud conspiracy. It is well established that a false statement "betrays knowledge of unlawful conduct." *United States v. Tyson*, 653 F.3d 192, 202-03 (3d Cir. 2011). "[A]cts of concealment [also are] relevant to a finding of a conspiracy." *United States v. Smith*, 294 F.3d 473, 479 (3d Cir. 2002); *United States v. Chartock*, 283 Fed. Appx. 948, 954-55 (3d Cir. 2008) (not precedential) (based on acts of concealment, "a jury may properly infer that the defendants were culpably involved with, and knowingly furthered, the fraudulent scheme."). Lies to conceal activity also

48

provide the jury a basis for inferring intent to defraud. *United States v. Bryant*, 655 F.3d 232, 249 (3d Cir. 2011); *see United States v. Vas*, 497 Fed. Appx. 203, 2073d Cir. 2012) (not precedential) (defendant's nondisclosures, acts of concealment, and false statements are evidence "from which the jury could have inferred that Vas knew his actions were unlawful and acted with fraudulent intent"); *United States v. Persaud*, 866 F.3d 371, 380 (6th Cir. 2017) (as proof of fraudulent intent, "a jury may consider circumstantial evidence and infer intent from evidence of efforts to conceal the unlawful activity, from misrepresentations, from proof of knowledge, and from profits."). Johnston and Brockmeier's numerous lies and acts to conceal the fraud provide strong evidence of their guilt.

### 4. Witnesses with less knowledge than Johnston and Brockmeier knew that Central Rexall was committing fraud.

Numerous witnesses who knew as much or even less than Johnston and Brockmeier about Central Rexall's operations concluded that Central Rexall was receiving payment for prescriptions for medically unnecessary medications – that is, was committing fraud:

- Hayley Taff testified that she knew it was wrong to keep taking Craven prescriptions after evidence came to light that many of her patients were not called and several did not know her. Tr. 256-60. She also testified that she understood at the end of the summer in 2015 that Central Rexall was submitting a large number of medically unnecessary prescriptions to Express Scripts and getting paid for them. Tr. 315-17. And she testified that she told Brockmeier about all the facts and concerns on which she based this conclusion. *Id.*

- Chris Casseri testified that he saw in 2015 that Central Rexall was doing the same things as pharmacies under federal criminal investigation, including questionable doctor/patient relationships, high number of prescriptions from individual doctors, high reimbursement amounts for supplements, and a number of red flags. Tr. 2880-81. He sent Johnston and Brockmeier articles

49

about these investigations, and they did nothing. *Id.* Casseri concluded that in 2015 Central Rexall was filling compound medication prescriptions that were not medically necessary, submitting claims to PBMs for medically unnecessary medications, and being reimbursed for medically unnecessary prescriptions. Tr. 2881.

- William Hickman concluded by the middle of 2015 that Central Rexall was not running a legitimate compounding business because the medicine was not medically necessary, patients did not have a doctor-patient relationship, multiple family members were loaded up on multiple products, and copays were not being collected. Tr. 1945.

- Keith Ritson testified that when he got access to Quickbase and saw all the information about Boardwalk (the same information available to Brockmeier), he "found [some things] to be alarming." Tr. 1734. He saw that husbands and wives each had the same three prescriptions which were being refilled every month, which was unlikely for people who were not paid. Tr. 1735. He also noticed the concentration in high-volume prescribers, who were authorizing multiple refills. *Id.* He "immediately got nervous, because I knew something wasn't right here," and contacted a lawyer. Tr. 1736.

- John Mark Rolling testified that what Central Rexall was doing was not legitimate. Tr. 845.

Based on this testimony, as well as all of the other overwhelming evidence, it was rational for the jury to infer that Johnston and Brockmeier also understood that Central Rexall was committing fraud by submitting and getting paid for medically unnecessary prescriptions. *See generally United States v. Stadtmauer*, 620 F.3d 238, 243-51 (3d Cir. 2010) (summarizing evidence showing that outside accountant knew that partnership returns defendant signed on behalf of real estate partnerships were false and misleading because defendant himself had configured his company's internal accounting software to treat capital expenditures as ordinary business deductions and the returns necessarily reflected that improper treatment).

### 5.  Johnston and Brockmeier were willfully blind to the fraud.

In addition to all the evidence discussed above from which the jury could infer that Johnston and Brockmeier knew they were committing fraud, the jury heard extensive evidence that Johnston and Brockmeier repeatedly ignored countless red flags and, thus, were willfully blind to the fraud.  Some examples have already been discussed.  Here are some additional examples:

Patients and doctors with no knowledge of the prescriptions:  Before Johnston and Brockmeier arrived and brought in their corrupt sales force, Central Rexall did not receive complaints that doctors and patients had no knowledge of prescriptions written by and for them.  Tr. 176 (Taff).  But after they arrived, Johnston and Brockmeier were told of those incidents repeatedly:

- In June 2014, Johnston and Brockmeier received an email about "another prescription that we received where the doctor denies ever writing this for the patient."  GX 156.

- Also in June 2014, Brockmeier and Johnston received a report of "patients not having a clue they were prescribed their medications."  GX 161.

- A few days later, Brockmeier and Johnston received a report of a doctor denying a prescription.  GX 160.

- In September 2014, Brockmeier received an email informing him that a Dr. Crowther had "no clue about compounding prescriptions" in his name that were being filled by Central Rexall.  Tr. 273-75 (Taff); GX 232.

- Also in September 2014, Brockmeier received an email report of several patients stating that they had no idea that the doctor had prescribed the medications, and most patients did not want them.  GX 235.  The sales representative was InforMD, and Central Rexall received $3.6 million from InforMD prescriptions. Tr. 3479 (Galloway).

- Later in September 2014, Brockmeier received an email about a sales representative pretending to be a patient.  GX 247.  Central Rexall received almost $6 million from that rep's sales group.  Tr. 3481 (Galloway).

51

- In October 2014, Brockmeier received an email showing that a patient had never heard of the prescribing doctor. GX 263.

- In August 2015, Boyle forwarded Johnston a report of an incident in which Central Rexall reached out to patients and they did not recognize the prescribing doctor. Tr. 2294-55 (Boyle); GX 562.

- As summarized above, Johnston and Brockmeier were aware of repeated occasions of Top Tier and Supreme Medical patients and doctors not knowing about prescriptions, the most glaring being the Candace Craven prescriptions.

Defendants tried at trial to rebut this evidence by pointing to evidence that some incidents were investigated and addressed, but defendants did not show that that happened with all of these red flags. And the defendants' responses show that they allowed the fraud to continue, as they did not, for example, terminate the four most corrupt sales groups – because, a rational jury could infer, they were so lucrative. Boyle testified that defendants sometimes continued accepting prescriptions from the doctors and sales representatives involved in these incidents. Tr. 2275 (Boyle). If an issue arose concerning a prescription, Brockmeier or Johnston (or Casseri) would call the sales representative rather than the doctor, which is contrary to normal pharmacy practice. Tr. 178-83 (Taff); Tr. 2276-79 (Boyle). In one incident he discussed with defendants, Boyle learned that a doctor claimed his script pad was forged, but he spoke only to the sales representative, not the doctor. Tr. 2276-79 (Boyle). The clearest example is the Candace Craven incident, discussed above, in which Johnston and Brockmeier countenanced an "investigation" in which Craven was not spoken to, rebuffed recommendations to stop taken Craven prescriptions, and paid commissions to Top Tier on the very prescriptions that were identified as fraudulent.

Federal criminal investigations into the very practices Central Rexall engaged

in: Johnston and Brockmeier were told repeatedly by Central Rexall staff and outside

52

lawyers that federal criminal investigators were investigating exactly what Central

Rexall was doing:

- As discussed above, Johnston and Brockmeier were told about the federal grand jury investigation of Top Tier. They cut ties with one of Top Tier's principals, because he was a hothead, but continued filling existing Top Tier prescriptions for several months (including Craven's) and continued dealing with Wilkerson at the thinly disguised Top Shelf.

- Defendants also learned from their counsel about prosecutors' broader investigations of compound pharmacies. In February 2015, a lawyer working for Central Rexall emailed Johnston about the federal criminal investigation into the practices of compounding pharmacies, including how prescriptions were generated and the role of sales representatives. Tr. 2318-20 (Boyle); GX 358. In response to this information, Johnston and Brockmeier did not make any significant changes to their business model or policies and did not take any steps to make sure compound prescriptions were not the products of fraud. Tr. 2320-21 (Boyle).

- In May 2015, Johnston sent outside counsel Michael Tucker an email with a link to a CBS News story titled, "Feds open investigations into compounding pharmacies." GX 461.

- During 2015, Casseri sent Johnston and Brockmeier articles about federal criminal investigations of the same conduct Central Rexall was engaged in: questionable doctor-patient relationships; large number of TRICARE prescriptions; high number of prescriptions from one doctor; high reimbursement for supplements. Tr. 2880-81, 3095 (Casseri). Defendants were aware of this conduct but did not make any significant changes in response to what Casseri described as a "number of red flags." Tr. 2881 (Casseri).

- Taff emailed Johnston and Brockmeier an article in the summer of 2015 about the government increasing its investigation into health care fraud in compounding; they did not respond. Tr. 315 (Taff); GX 544.

- In November 2015, outside counsel sent Johnston an article about federal criminal investigations into fraud scheme involving compounding pharmacies. Tr. 2430 (Boyle); GX 628, 628A. The article described numerous elements of the fraud schemes that mirrored what Central Rexall was doing– filling prescriptions based only on telephone consultations, lack of doctor-patient relationships, paying commissions over 50%, charging $10,000 or more per prescription, individual prescribers writing excessive numbers of prescriptions, the same medicine being prescribed for patients of all ages and conditions. Tr. 2430-32 (Boyle). Nothing changed. Tr. 2448 (Boyle).

- Also in November 2015, Boyle sent Brockmeier a DHA slide deck about an investigation. Tr. 2444-45 (Boyle); GX 631, 631A. The slides listed several elements of compound medication fraud schemes – lack of physician/patient relationship; prescriptions written by doctors not in the same region as the patient; patients receiving multiple medications; multiple family members receiving medications; failure to collect copays; using patient recruiters; telling patients they would be paid to participate in a bogus study; and paying 40-50% commissions – all of which Central Rexall was doing. Tr. 2444-47 (Boyle). Other than buying software to check on where doctors were licensed, no steps were taken to investigate or address these red flags. Tr. 2448-49 (Boyle).

Johnston and Brockmeier purposely stuck their heads in the sand and deliberately ignored these signs that they were committing fraud prosecutable by federal criminal authorities.

Central Rexall medications prescribed without a doctor-patient relationship: In addition to the many individual incidents summarized above showing that Central Rexall medications were being prescribed without a valid doctor-patient relationship, Johnston and Brockmeier heard and were willfully blind to other information that Central Rexall prescribers did not have a doctor-patient relationship:

- In early 2015, after seeing a news story about doctors who prescribed compound medications without seeing patients, Taff discussed with Johnston and Brockmeier her concern that their doctors were not actually meeting with the patients. Johnston and Brockmeier were dismissive. Tr. 280-82 (Taff).

- On April 24, 2015, the Defense Health Agency, the administrator for TRICARE, sent Central Rexall a letter stating that it was stopping coverage of Central Rexall compound medications "due to [Central Rexall] having dispensed compound drugs to TRICARE beneficiaries based upon prescriptions written by physicians whom we have concluded may not have established a physician-patient relationship with beneficiaries necessary to write valid prescriptions." Tr. 2386-87 (Boyle); GX 444. Boyle shared the letter with Johnston and Brockmeier, Tr. 2387, but they undertook no investigation into whether this was occurring across other sales groups.

- Around the same time, Brockmeier and Johnston received and discussed a news story in which Dr. Paul Bolger, a Central Rexall prescriber, admitted not meeting with his patients. Tr. 283-84 (Taff); Tr. 2388-89 (Boyle); GX 365.

Johnston and Brockmeier's response to this information, in particular the DHA letter, is a clear example of willful blindness. In response to the DHA letter, outside counsel advised Johnston to conduct an internal review to verify the patient-doctor relationship. Tr. 2390 (Boyle). Despite this legal advice, Central Rexall did not do a company-wide investigation of its physicians. *Id.* Instead, Central Rexall sent a survey to only its TRICARE prescribers, but did not follow up with those who did not respond, nor did anyone actually speak to all of the prescribers. *Id.* And Central Rexall did not contact its non-Tricare prescribers to ask if they had a valid doctor-patient relationship. *Id.*

Johnston's review of Dr. Bolger prescriptions: As part of the response to the DHA letter, outside counsel asked Johnston to review the actual Bolger prescriptions and confirm that there were no red flags in them. Tr. 2392-93 (Boyle); GX 471. Those prescriptions contained numerous red flags: for example, Dr. Bolger's office was in Iowa but signed dozens of prescriptions for patients located in Florida, North Carolina, Georgia, and California, and none for patients in Iowa; one patient received five compound prescriptions on the same date; Dr Bolger was not a dentist but prescribed "magic mouthwash" for many patients. Tr. 2394-97 (Boyle); GX 2; *see also* GX 617 (geographic distance between practitioner and patient is a reason to suspect prescription not valid). But Johnston wrote back to outside counsel saying that he reviewed the Bolger prescriptions and saw nothing in the prescriptions that could have raised any concerns. Tr. 2393-94 (Boyle); GX 472. He did not send outside counsel the prescriptions so they could review them.

55

Prescribers with an impossibly large number of prescriptions: As discussed above concerning the four largest sales groups, numerous prescribers had a very large number of compound prescriptions and accounted for a high percentage of Central Rexall's prescriptions. Boyle was concerned because that showed there probably was no valid provider-patient relationship. Tr. 2385; *see also* GX 617 (number of prescriptions authorized on a daily basis by prescriber provides reasons to suspect prescriptions not based on valid doctor-patient relationship).[8] He talked to Johnston about his concerns but Johnston dismissed them. Tr. 2385 (Boyle). Boyle also talked to Johnston and Brockmeier about Dr. Gaffney being a large prescriber. Tr. 2409 (Boyle). Central Rexall never investigated prescribers who authorized numerous prescriptions on a daily basis. Tr. 2400 (Boyle).

Hayley Taff's advice to Brockmeier that Central Rexall was submitting medically unnecessary prescriptions: By the end of the summer in 2015, it was clear to Taff that Central Rexall was submitting a large number of medically unnecessary prescriptions to PBMs and getting paid for them. Tr. 316-17 (Taff). Taff told Brockmeier all the facts and concerns on which she based her conclusion that Central Rexall was submitting and getting paid for medically unnecessary prescriptions. Tr. 316-17 (Taff). Nothing changed.

---

[8] Defendants contend that the red flags listed in GX 617 had no application to Central Rexall because the statute referenced in the exhibit concerns prescriptions based upon electronic questionnaires. But GX 617 lists the red flags a pharmacy should look for to determine *if* prescriptions were issued based upon electronic questionnaires and therefore does apply to Central Rexall. Exhibit 617 shows that Boyle sent this statute to Johnston, so Boyle evidently believed it applied to Central Rexall. And Boyle testified that this document listed red flags a pharmacy should look for regarding the prescriptions it receives. Tr. 2398-2400. Defendants did not challenge Boyle's testimony in cross-examination or ask him whether the list of red flags he sent to Johnston in fact did not apply to Central Rexall.

All this evidence, considered in the light most favorable to the Government, provided a more than sufficient basis for the jury to draw the entirely rational inference that Johnston and Brockmeier were, at the very least, willfully blind to the fraud that permeated Central Rexall's operations, which in turn supports the inference that they had knowledge of the illegal activity. *See United States v. Flores*, 454 F.3d 149, 155-56 (3d Cir. 2006). Defendants' legal arguments and objections to the willful blindness instruction are discussed in section III.B.4 below.

### 6. Johnston and Brockmeier received the proceeds of the fraud.

As is fitting for the masterminds of the fraud, Johnston and Brockmeier reaped the lion's share of the proceeds. IRS Special Agent Galloway detailed at trial how Central Rexall's profits were distributed from Central Rexall to PMG and Bluen, two companies controlled by defendants, and then to Johnston and Brockmeier's personal accounts. Tr. 3536-51. Brockmeier received over $5 million, and Johnston received just over $34 million. Tr. 3546-51.

### 7. Courts have affirmed convictions based on similar evidence.

Appellate courts have affirmed convictions of defendants for their participation in strikingly similar fraud schemes. Probably the most pertinent example is *United States v. Montgomery*, 2022 WL 2284387 (6th Cir. June 23, 2022), in which the Sixth Circuit affirmed the convictions of Wayne Wilkerson and Michael Chatfield, two of Johnston and Brockmeier's sales representatives with Top Tier, for committing health care fraud by submitting medically unnecessary compound medication prescriptions. Wilkerson, Chatfield, and their conspirators, among other things, targeted patients with insurance that would cover compound medications, created preprinted pads to

maximize reimbursements rather than medical efficacy, maximized refills, and promoted drugs that were "excessively expensive relative to their demonstrated benefit." *Id.* at *9. The Sixth Circuit found that they were properly convicted of conspiracy to commit health care fraud. *Id.* at *10.

*United States v. Grow*, 977 F.3d 1310 (11th Cir. 2020), is also strikingly similar to this case. Defendant Grow recruited people to obtain compound pain creams, scar creams, and metabolics that were not medically necessary. He told his sales representatives to select the highest paying medications, was indifferent to whether patients actually needed the expensive medications, sent preprinted prescriptions with the highest paying medications checked off, pushed to include vastly more expensive ingredients to fraudulent inflate reimbursement rates, tried to conceal his scheme, and told patients they did not have to pay copays. *Id.* at 1322-26. The court found the evidence was sufficient to support Grow's conviction for conspiracy to commit health care fraud. *Id.* at 1326; *see United States v. Chalker*, 966 F.3d 1177, 1185-88 (11th Cir. 2020) (affirming health care fraud conspiracy conviction of defendant who took over community pharmacy and caused a huge spike in compound medication prescriptions; the scheme involved countless patients all receiving the same medications, preprinted prescription pads, waiver of copays, and patients not wanting or needing the medicines). Although *Montgomery*, *Grow*, and *Chalker* have certain aspects not present here, and vice versa, the decisions show that many elements of Johnston's and Brockmeier's criminal conspiracy are indicative of a conspiracy to commit health care and wire fraud.

### 8. Conclusion

A jury's guilty verdict on a conspiracy charge must stand if the evidence is sufficient as to any one of the ways that the defendants committed the crime. *See Turner v. United States*, 396 U.S. 398, 420 (1970); *see also Griffin v. United States*, 502 U.S. 46, 56 (1991). Any one of these ways in which Johnston and Brockmeier conspired to submit medically unnecessary prescriptions would have been sufficient for the jury to find guilt – *e.g.*, just tripling resveratrol, just systematically failing to collect copays, just submitting fraudulent test adjudications, just conspiring with Top Tier to make money on the fraudulent Craven prescriptions, just conspiring with Serna to get unnecessary prescriptions by paying doctors and patients, and just conspiring with Boardwalk to fill prescriptions that many people involved could see were fraudulent. Taken together, these different ways of committing the conspiracy provide overwhelming evidence of guilt. This Court, therefore, should deny defendants' Rule 29(c) motions.

### B. Johnston and Brockmeier's Other Challenges to Count 1 are Without Merit.

In addition to their overall challenge to the sufficiency of the evidence, Johnston and Brockmeier raise a variety of legal and factual challenges to their conviction on Count 1. None provide a basis for vacating the jury's verdict.

### 1.    The Government proved a lack of medical necessity, and it is not an unconstitutionally vague term.

In addition to their unsuccessful challenges to the sufficiency of the evidence, Johnston and Brockmeier recycle the argument they made in their pretrial motion to dismiss that "medical necessity" is an unconstitutionally vague term. DB at 11-18. The Government's opposition to that motion cited numerous cases holding that medical necessity is not unconstitutionally vague.  ECF 137 at 20-22.  The Court agreed and held that "a person of ordinary intelligence" could understand the charge that defendants conspired to submit medically unnecessary claims.  Sept. 30, 2024 Motion Hearing Tr. at 66-67 (citing *United States v. McLean*, 715 F.3d 129, 136 (4th Cir. 2013)).

Defendants cite no case contradicting the Court's pretrial ruling, nor do they cite even a single case vacating a conviction based on the supposed vagueness of the term medical necessity.  In fact, health care fraud convictions in this Circuit and elsewhere are regularly based on the prosecution theory that the defendants submitted medically unnecessary claims.  *See*, *e.g.*, *United States v. Monaco*, 2024 WL 617718 (3d Cir. Feb. 14, 2024) (affirming health care fraud conviction based on medically unnecessary Central Rexall prescriptions) (not precedential); *United States v. Chu*, 2022 WL 2314839 (D.N.J. June 28, 2022) (denying new trial in prosecution for billing for medically unnecessary treatment); *United States v. Anand*, 2022 WL 6755821 (E.D. Pa. Oct. 11, 2022) (health care prosecution based on prescribing medically unnecessary medications); *United States v. Bolos*, 104 F.4th 562, 573 (6th Cir. 2024) ("there is a consistent history of [health care fraud] convictions for the

60

billing of unnecessary medicines and procedures"); *Grow*, 977 F.3d at 1321 (affirming fraud conviction for medically unnecessary compound medication prescriptions); *United States v. Bertram*, 900 F.3d 743, 748-51 (6th Cir. 2018) (affirming fraud conviction of lab owners for submitting medically unnecessary claims); *United States v. McLean*, 715 F.3d at 137-40 (affirming conviction for submitting medically unnecessary claims); *United States v. Weir*, 2025 WL 1235776, at *11-12 (M.D. Tenn. April 29, 2025) (rejecting vagueness challenge to health care fraud prosecution of pharmacy owners based on lack of medical necessity).

In light of how frequently health care fraud prosecutions are based on lack of medical necessity, defendants' argument that there is something vague or confusing about the term medical necessity, or that the Court should scrutinize the evidence more carefully as a result, is without a basis in the law. That is especially so given that the term "medically necessary" does not appear in a statute enacted by Congress, but is an element of the fraud that any rational juror could understand.

## 2. A doctor's signature is not conclusive proof of medical necessity.

Defendants also reiterate an argument, rejected by the jury, that a doctor's signature on a prescription is conclusive proof of medical necessity that no one could or would ever question. DB at 18. Their argument ignores the contrary trial evidence that they knew Central Rexall was filling tens of millions of dollars' worth of medically unnecessary compound prescriptions, and it ignores the law.

The evidence showed that a doctor's prescription is just one part of a fraudulent prescription claim. The pharmacy reviews and fills the prescription. The pharmacy—

61

not the physician—submits the claim for reimbursement to the PBM.  The evidence at trial showed that Express Scripts expects pharmacies to conduct due diligence to confirm they are billing for medically necessary prescriptions, and Central Rexall had a contractual duty to verify that its prescriptions were properly issued.  Tr. 3167-68, 3183-84, 3293 (Stockwell).[9]  John Mark Rolling testified that pharmacists look at prescriptions to determine that they are medically appropriate and will call doctors if they spot an issue with the medical reasonableness of a prescription.  Tr. 678, 841-42; *see also* GX 617 (email from Johnston to Boyle quoting Louisiana law providing that pharmacist has duty to scrutinize doctor's prescription before filling it).  Central Rexall's agreement with Express Scripts required Central Rexall to submit claims only for valid prescriptions.  Tr. 210 (Taff); Tr. 3167-68 (Stockwell).

Trial evidence also showed that Central Rexall's normal prescription processing practice (which defendants at times circumvented) was not to blindly fill every prescription that it received, a process that would be unnecessary under the defendants' theory that physicians are solely responsible for determining medical necessity.  Central Rexall was supposed to call the patient to confirm the prescription, including to make sure that the patient wanted the prescribed medication.  Tr. 164-65, 176, 492-94 (Taff).  Patients were told what their copays were, and one reason is to make sure that the patient actually needed the medication.  Tr. 3184-86, 3272 (Stockwell).  On many occasions discussed above, Central Rexall personnel would

---

[9] Defendants quote some of Stockwell's testimony on this issue but overlook his very important qualifiers in his answers:  he testified *not* that a doctor's signature was conclusive proof of medical necessity but only that a doctor's signature "should be" a statement that it is medically necessary and that "[g]enerally" pharmacists fill prescriptions signed by doctors.  DB at 18.

contact patients, sales representatives, and, on rare occasions, doctors if they spotted some reason to question a prescription. Those contacts sometimes resulted in a determination by Central Rexall not to fill the prescription, even though it had a doctor's signature on it. This shows that Central Rexall had both the ability and the obligation to second-guess a prescriber's signed prescription. As summarized above, Hayley Taff, Chris Casseri, and Keith Ritson all concluded that Central Rexall was paid for medically unnecessary medications, even though those medications were all supported by signed prescriptions.

The defendants' personal knowledge that Central Rexall filled and submitted claims for medically unnecessary prescriptions is further demonstrated by the fact that the defendants did not merely fill unsolicited prescriptions; they were actively engaged in soliciting prescriptions for specific formulas that they manipulated to maximize insurance reimbursement in the face of pharmacist advice that those formulas were not medically necessary for any patient. That is, even if some other defendant in a different case could reasonably hide behind a doctor's signature, these defendants' knowledge that the prescriptions were medically unnecessary was demonstrated through the evidence, described above, such as false test adjudications, ignoring pharmacist advice, systematic failure to collect copays, knowledge of impossibly high numbers of prescriptions from single prescribers, other ignored red flags, and lies to the PBMs.

Defendants can point to no court that has accepted their argument that a doctor's prescription is the beginning and end of medical necessity, which would lead to the absurd result that only licensed physicians—and none of the other participants

in an industry responsible for $4.9 trillion of spending annually—can commit health care fraud. *See* https://www.cms.gov/data-research/statistics-trends-and-reports/national-health-expenditure-data/historical. In fact, as countless cases make clear, pharmacy owners like the defendants cannot hide behind a doctor's signature to avoid a conviction for health care fraud. *See Grow*, 977 F.3d at 1321 ("A doctor's prescription is not a get-out-of-jail-free card. We have found sufficient evidence of healthcare fraud or conspiracy to commit healthcare fraud even where a doctor prescribed the treatment or medication.") (citations omitted); *accord Montgomery*, 2022 WL 2284387 at *10 (rejecting argument that because doctors signed the prescriptions, defendant prescription marketers were not guilty); *Bertram*, 900 F.3d at 750 (rejecting claim that defendant testing laboratory operators could not be guilty of making medically unnecessary claims because doctors are responsible for the medical necessity determination).

### 3. The jury heard ample evidence that the defendants' fraud scheme included misrepresentations, concealment of material information, and false statements.

In a section that is separate from their primary sufficiency of the evidence argument, defendants claim that they should be acquitted because the Government supposedly failed to prove that they conspired to make a specific false statement. DB at 40-65. Defendants were charged with conspiracy to commit health care fraud and wire fraud in violation of 18 U.S.C. §§ 1343, 1347, 1349, not the separate crime of making false statements relating to health care matters, *see* 18 U.S.C. § 1035, and sections 1343 and 1347 criminalize schemes to defraud and schemes to obtain money "by means of false or fraudulent pretenses, representations, or promises." The jury

64

heard ample evidence, summarized above, that the defendants committed that crime. That evidence established schemes that included numerous misrepresentations, false pretenses, concealment of material facts, and false statements. Most obviously, defendants' scheme involved causing to Central Rexall to seek reimbursement from PBMs for prescriptions without disclosing the material fact that those prescriptions were not medically necessary.

In support of their argument, defendants make the bold and novel assertion that "there was absolutely no evidence of a misrepresentation in connection with the claims-reimbursement process," DB at 43, because the PBM claims submission process did not include a box to check stating that the prescription was medically necessary.[10] Defendants ignore the witnesses who testified that when Central Rexall was making an adjudication request to be paid for a medication it was going to dispense, Central Rexall impliedly was representing that it had a valid prescription for that medication – even though there was no box that said "Central Rexall has a valid prescription." *See, e.g.*, Tr. 164-69, 209-10, 516-17 (Taff); Tr. 674-75 (Rolling); Tr. 864, 938-39 (Olsen); Tr. 3167-68, 3174-75, 3253, 3293 (Stockwell).[11] One aspect of a valid prescription is

---

[10] The absurdity of defendants' argument that there is no misrepresentation if there is no box to check is apparent. There was no box to check on the form stating that Central Rexall had received a prescription for that patient, that the prescriber was authorized to prescribe medicines, or even that the patient, doctor, and pharmacy are all legitimate, but all of those facts were implied and understood when Central Rexall made a claim. According to defendants' argument, even Dr. Gaffney, who signed prescriptions without examining patients, did not commit health care fraud because there was no box to check stating that he had examined the patients or that the prescribed medication was medically necessary.

[11] Defendants also argue that "[t]here was no testimony explaining how the adjudication process actually worked – that is, what information was entered when Central Rexall submitted claims." DB at 45 n.17. The jury heard extensive testimony about the adjudication process from Hayley Taff, John Mark Rolling, and Blake Stockwell. *See, e.g.,* Tr. 164-68 (Taff); Tr. 674-75, 680-82 (Rolling); Tr. 3166-77 (Stockwell).

65

that the prescribed medication was medically necessary, including that it was based on a valid doctor-patient relationship and a doctor's assessment that the medicine was medically necessary, and PBMs would not pay for prescriptions that were not valid and not medically necessary.  Tr. 169, 435-36 (Taff); Tr. 673 (Rolling); Tr. 2275, 2281, 2398-99 (Boyle); Tr. 3167-68, 3174-75, 3181-83, 3234, 3236-37, 3253, 3255, 3293 (Stockwell).  That testimony is consistent with the common understanding of a prescription: "[I]n common parlance," a prescription "means only a bona fide order – *i.e.,* directions for the preparation and administration of a medicine, remedy, or drug for a real patient who actually needs it after some sort of examination or consultation by a licensed doctor." *United States v. Smith*, 573 F.3d 639, 651 (8th Cir. 2009) (quoting *United States v. Nazir*, 211 F. Supp. 2d 1372, 1375 (S.D. Fla. 2002)).  In light of these facts, an adjudication request is a claim asking a PBM to pay for a prescription, and that claim necessarily represents that Central Rexall had a valid prescription and the prescribed drug was medically necessary (or, conversely, failed to disclose that Central Rexall did not have a valid prescription and that the drug was not medically necessary).  *See, e.g.*, *United States v. Anderson*, 980 F.3d 423, 429 (5th Cir. 2020) (by submitting an insurance claim for hearing aids, defendants implicitly represented that they were medically necessary).

Defendants' argument that the claims were not fraudulent because there was no "medically necessary" box to check ignores how communications are assessed in fraud schemes, and that fraud includes the concealment of material facts.  A leading case in this circuit is *United States v. Ferriero*, 866 F.3d 107 (3d Cir. 2017), where the court rejected defendant's claim that he was not guilty of wire fraud because he did not

66

make an explicit false statement.  The court reasoned that "[a]ssessing whether a communication is fraudulent, truthful, or otherwise is a highly contextual inquiry." *Id.* at 120.  A "fraudulent representation need not be fraudulent on its face, nor must it necessarily involve affirmative misrepresentation.  Rather, a fraudulent or false representation may be effected by deceitful statements of half-truths or the concealment of material facts."  *Id.* (cleaned up).

The Third Circuit then examined *Universal Health Services v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016), in which "the defendant health care provider submitted Medicaid reimbursement claims without disclosing that the underlying care did not comply with relevant regulations."  866 F.3d at 120.  The Third Circuit reasoned that the "claims were 'clearly misleading in context,' because anyone reading them 'would probably—but wrongly—conclude the clinic had complied with' the underlying regulations."  *Id.* at 120-21 (quoting *Escobar*, 136 S. Ct. at 2000).  The court then found that the evidence was sufficient to conclude that the representation at issue, truthful on its face, was materially false and fraudulent.  *Id.* at 122. "Whether a representation is false or fraudulent is a contextual inquiry that a jury is particularly well-suited to assess."  *Id.* (citation omitted);[12] *accord Bryant*, 655 F.3d at 249 ("'fraudulent representations . . . may be effected by deceitful statements of half-truths or the concealment of material facts and the devising of a scheme for obtaining money or property by such statements or concealments'") (quoting *United States v. Olatunji*, 872 F.2d 1161, 1167 (3d Cir. 1989)).

---

[12] Defendants' brief claims that the Third Circuit has rejected applying *Escobar* in criminal cases, DB at 50, but the brief fails to discuss or even cite *Ferriero*, which does exactly that.

The Sixth Circuit subsequently applied this concept, relying in part on *Escobar* and citing *Ferriero*, in a health care fraud prosecution. The defendants in *Bertram*, 900 F.3d at 743, billed for testing urinalysis samples seven to ten months after they were ordered and taken. The court held that the defendants committed health care fraud because they failed to disclose this material fact, and "[t]he timing of the tests was a material fact because [the insurer] wouldn't have paid for the tests had it known they weren't needed." *Id.* at 749 (citing *Neder v. United States*, 527 U.S. 1, 25 (1999)); *see also Neder*, 527 U.S. at 22 ("the well-settled meaning of 'fraud' required a misrepresentation or *concealment of material* fact") (emphasis added); *United States v. Palin*, 874 F.3d 418, 425 (4th Cir. 2017) (affirming health care fraud conviction, despite defendants' claim that they did not present a false statement to insurers, because they hid the fact that the tests were medically unnecessary). The law is clear that a medical insurance claim's failure to disclose that the claimed good or service was not medically necessary renders it fraudulent.

Consistent with this established authority and with the Model Jury Instruction incorporating *Ferriero*, the jury was instructed, without objection, that claims and statements could be false or fraudulent if there were "deceitful statements of half truths or concealment of material facts." Tr. 3783-84. Central Rexall's claims to be paid for compound medications fit squarely within this definition. Those claims represented that the claims were based on a valid prescription, and the evidence discussed above shows that defendants knew that representation was not true. Those claims also constituted false or fraudulent statements because they were "deceitful statements of half-truths [and] concealment of material facts," including such facts as

68

that prescriptions were signed without a valid doctor-patient relationship, doctors were paid for signing prescriptions, patients were paid to get prescriptions, sales representative were paid commissions on prescriptions for themselves and their family members, ingredients were increased solely to increase reimbursement without any medical benefit, prescriptions were obtained by a phony copay discount program and without collecting copays, and prescriptions were not medically necessary. Tr. 3233-37 (Stockwell).

This evidence also refutes defendants' argument that the Government proved, at most, a breach of contract. *See* DB at 46-47. Central Rexall's contract with Express Scripts set forth the expectations and obligations of the pharmacy when submitting claims. At defendants' request, the jury was instructed that "ordinary breach of contract or a failure to honor one's promise" does not give rise to criminal liability. Tr. 3772-73. The jury reasonably found that the defendants' fraudulent statements, statements of half-truths, and concealment of material facts from Express Scripts made their conduct fraudulent, and not a mere breach of contract. In addition to the fraudulent claims themselves, the jury heard that defendants made or approved numerous false statements in furtherance of their conspiracy to defraud health insurers. The detailed evidence showing that those statements and that they were false is summarized above. Defendants now argue that those false statements (a) were insufficient to prove the scheme alleged and did not have "anything to do with the Government's actual theory of criminality,' and (b) constituted a prejudicial variance. DB at 52. Neither argument withstands scrutiny.

69

The false statements were relevant evidence of the scheme.  Defendants suggest that the false statements were not relevant to the charged crime, but they do not argue directly that those statements should not have been admitted, and defendants did not object to the admission of the false statements.  The false statements were relevant for at least two purposes:  they kept the fraud scheme going and avoided its detection, and they evidence the defendants' criminal intent.

It is well established that false statements made to keep a scheme going, advance its purpose, and avoid its detection are relevant and admissible as intrinsic evidence.  *See, e.g.*, *United States v. Pecora*, 798 F.2d 614, 630 (3d Cir. 1986) (acts of concealment are intrinsic to and in furtherance of the conspiracy); *United States v. Pearlstein*, 576 F.2d 531, 535-37 (3d Cir. 1978) (deceitful actions to lull others into continuing to do business with fraudsters are relevant to prove the scheme to defraud).  As discussed above, false and deceptive statements are relevant to prove the existence of the scheme, knowledge, and intent.  The false statements that defendants claim had nothing to do with the charged scheme were relevant for those purposes:

- The false statements to CVS/Caremark:  CVS was a PBM, and Central Rexall submitted claims to it.  Tr. 2264 (Boyle).  The false statement was made in a letter to CVS concerning a finding in a CVS audit that the AMS copay card was not a valid coupon card.  Tr. 2266 (Boyle).  The letter appeals from the determination that the claim should not be paid because the AMS card was not valid.  GX 575B.  The letter is part of the fraud, as it is part of the effort to persuade a PBM to reimburse compound medication claims, and it falsely characterizes the AMS program, which is part of the scheme.

- Direction to Melissa Olsen to lie about the copay discount program:  Brockmeier's direction to Melissa Olsen was contained in a defense exhibit, BDX 1110, and so defendants cannot complain about its admission or use at trial.  In the email, Brockmeier stated that referring to the AMS program as a discount—even though that is exactly what it was—"is a dangerous statement as it misleads others to think we are discounting our copays of which we are

definitely not do so." *Id.* The reason for this direction to lie is obvious: Central Rexall's agreement with Express Scripts, which Brockmeier signed, stated that "[c]opayments may not be waived or discounted . . . ." GX 37 ¶ 2.4.a; Tr. 3185 (Stockwell). The direction from Brockmeier avoided having Central Rexall personnel publicly state that Central Rexall was breaching its agreement with Express Scripts, which would imperil Central Rexall's ability to keep collecting money from Express Scripts.

- <u>Letter to Defense Health Agency re Stalling</u>: The letter was submitted to the DHA as part of Central Rexall's efforts to obtain payment for Central Rexall's fraudulent TRICARE claims, by arguing that Central Rexall had an excellent compliance program. GX 686, 686A. The letter was therefore part of the conspiracy's efforts to obtain payment for those claims. Defendants argue that they had nothing to do with the uncorrected false statement in the letter, but Johnston reviewed the letter before it was sent. Tr. 2402 (Boyle).

- <u>Johnston's approval of false answers on Catamaran recredentialing application</u>: This application, JDX 523, was entered into evidence by the defense, *see* Tr. 2557, and the Government put in evidence in response showing that it contained numerous false answers approved by Johnston. These statements were made to Catamaran, a PBM, as part of defendants' efforts to obtain payment for compound medications. It is part of the scheme.

- <u>Johnson's lies to CVS about being terminated by Good Neighbors provider network:</u> As discussed above, Johnston told these lies in an attempt to gain access to another provider network that would allow the defendants to continue to be paid for fraudulent compound medication claims.

- <u>Test adjudications:</u> Test adjudications are discussed above and in the discussion of the evidence on Count 2. The use of test adjudications was alleged in Count 1 of the Indictment and is the focus of Count 2. Evidence about them is clearly relevant and admissible.

In short, all of these statements were relevant and admissible to prove the charged conspiracies.

<u>There was no variance.</u> Defendants argue that evidence of these false statements, a very small part of a very long trial about medically unnecessary compound medications, amounted to an impermissible variance. They are mistaken.

A variance occurs when the evidence at trial proves facts materially different from those alleged in the indictment. *United States v. Castro*, 776 F.2d 1118, 1121 (3d

Cir. 1985).  But a variance does not occur if the evidence at issue is intrinsic to the

charged offense and is relevant to prove the charged offense.  *See, e.g.*, *United States v.*

*Grenado*, 523 Fed. Appx. 153, 156 (3d Cir. 2013) (not precedential); *United States v.*

*Benjamin*, 125 Fed. Appx. 438, 440-41 (3d Cir. 2005) (not precedential).  As discussed

above, the false statements were relevant to prove the charged offense and did not

cause a variance.

Even if a variance occurs, a defendant can obtain relief only by showing

prejudice.  *Id.*  Defendants show none.  The evidence of false statements other than the

claims themselves was intrinsic to the fraud, proves the defendants' intent to defraud,

and were admitted without objection.  Using the false statements also did not

constitute unfair surprise; all of the documents were in the pretrial discovery, most

were on the Government's pretrial exhibit list, and two of the documents were

introduced by the defendants themselves.

Finally, defendants strain to find support for their variance argument by trying

to compare the amount of time the Government spent in its closing referencing the

false statements to the time spent discussing the medically unnecessary compound

medications.  As the Court will recall, and as is evident from even a cursory

examination of the Government's closing and rebuttal, the overwhelming amount of

time was spent addressing the medically unnecessary prescriptions, including

discussion of the corrupt sales representatives Top Tier, Supreme, MMR 21, and

Boardwalk and the process for putting unnecessary medications on Central Rexall's

prescription pad.  The small amount of time devoted to defendants' lies, which were

made for the purpose of trying to receive payment for fraudulent compound

prescriptions or to keep the fraud going, was entirely appropriate and did not constitute unfair surprise or prejudice defendants.

### 4.    The Court correctly decided that sufficient evidence was introduced to warrant the willful blindness instruction.

The conspiracy charged in this case required the Government to prove that the defendants joined the conspiracy knowing of its objective to commit health care and wire fraud.  Tr. 3775-76 (jury instructions). The knowledge element "may be satisfied upon a showing beyond a reasonable doubt that a defendant had actual knowledge or deliberately closed his eyes to what otherwise would have been obvious to him concerning the fact in question."  *United States v. Brodie*, 403 F.3d 123, 148 (3d Cir. 2005) (cleaned up); *accord United States v. Caraballo-Rodriquez*, 726 F.3d 418, 420 n.2 (3d Cir. 2013) (en banc).

"When supported by the evidence," an instruction on willful blindness "should be given together with the instruction on the appropriate mental state element."  3d Cir. Model Crim. Jury Instruction ("Model Instruction") 5.06 cmt. p. 16; *see, e.g.*, *United States v. Stadtmauer*, 620 F.3d 238, 259-60 (3d Cir. 2010) (trial evidence justified the instruction where defendant emphasized that he quickly signed tax returns without closely examining them even though he knew the returns were prepared using accounting software he had improperly configured).  Such an instruction "ensure[s] that a juror who believe[s] that a defendant turned a blind eye toward his co-defendant's conduct w[ill] not vote to acquit the willfully blind defendant."  *United States v. Sharma*, 190 F.3d 220, 231 (3d Cir. 1999).

"If the charge satisfies this standard, and is supported by sufficient evidence, it is not inconsistent for a court to charge a jury on both an actual knowledge theory and a willful blindness theory." *United States v. Stewart*, 185 F.3d 112, 126 (3d Cir. 1999). "This is so because, if the jury does not find the existence of actual knowledge, it might still find that the facts support a finding of willful blindness." *United States v. Wert-Ruiz*, 228 F.3d 250, 252 (3d Cir. 2000). As the Court noted when considering this instruction, Tr. 3688, the Third Circuit recently affirmed a district court's decision to give a willful blindness instruction in a compound medication fraud case. *United States v. Puccio*, 2024 WL 4100244 (3d Cir. Sept. 6, 2024) (not precedential).

In reviewing the decision to give the instruction, the question before this Court is whether the Court abused its discretion in its "determination that the trial evidence justified the instruction." *Stadtmauer*, 620 F.3d at 252. In making that decision, the Court must "view the evidence and the inferences drawn therefrom in the light most favorable to the Government." *Id.* (cleaned up); *United States v. Khorozian*, 333 F.3d 498, 508 (3d Cir. 2003). "The Government need not present *direct* evidence of conscious avoidance to justify a willful blindness instruction." *Stadtmauer*, 620 F.3d at 259 (emphasis in original). "An abuse of discretion occurs only where the district court's decision is arbitrary, fanciful, or clearly unreasonable." *United States v. Green*, 617 F.3d 233, 239 (3d Cir. 2010) (cleaned up).

The Third Circuit approved the decision to give the willful blindness instruction in similar circumstances in *Brodie*. The defendant there was the president of the corporation involved in criminal conduct, comparable to the position of the defendants here. The Third Circuit examined the facts in detail and found that they showed

74

willful blindness. 403 F.3d at 150-59. The court rejected Brodie's argument that the efforts he took to investigate rebutted willful blindness because "a jury might reasonably take note of the Defendant's failure to ask the 'natural follow-up question[s].'" *Id.; see Wert-Ruiz*, 228 F.3d at 257 ("The fact that Wert–Ruiz did not ask the natural follow-up question to determine the source of those funds could be reasonably considered by a jury to be evidence of willful blindness.").

Defendants do not contend that the willful blindness instruction the Court gave was legally incorrect, and the Court carefully tailored the instruction to accommodate concerns raised by the defendants, who accepted modifications suggested by the Government. Tr. 3688-89, 3726, 3729-30, 3736-37. The Court also gave a good faith instruction and instructed the jury, at defendants' request, that "ordinary civil negligence does not give rise to criminal liability." Tr. 3773-74.

Defendants nonetheless devote eight pages, DB at 72-79, to asking this Court to decide whether the evidence proved willful blindness beyond a reasonable doubt, and they portray the facts in the light most favorable to them. But that is not the right question or the right analysis. The question is whether the evidence was sufficient, reviewed in the light most favorable to the Government, to justify the Court giving the willful blindness instruction. Clearly it was. As the Court noted, the jury could question whether the defendants were really "trying to ferret out issues" and could conclude that the defendants' compliance efforts were "really just a pro forma effort." Tr. 3694.

The evidence supporting the willful blindness instruction was summarized in detail above and will not be repeated. It included the following:

75

- Brockmeier directing Central Rexall not to call patients when the Top Tier group arrived.

- Defendants not calling, or requiring anyone to call, Candace Craven when John Mark Rolling advised them that some of her patients did not know her.

- Defendants deciding to continue to fill Craven prescription through the rest of 2014, including paying Top Tier commissions on fraudulent prescriptions.

- Defendants not doing any investigation or change in practices upon being told that Top Tier and its principals were under federal criminal investigation, other than reluctantly parting ways with one, not both, of those principals – and even then continuing to fill and submit claims for existing Top Tier prescriptions for several months.

- Defendants' failure to investigate the TRICARE prescribers after the DHA terminated Central Rexall based on evidence of a lack of doctor-patient relationship.  It was plainly inadequate to send out survey forms only to TRICARE doctors (none of whom were still sending Central Rexall new prescriptions) and to fail to speak with the doctors or to follow up if the doctors did not respond.

- Johnston telling outside counsel that Dr. Durgin's prescriptions—which were filled with red flags—contained no red flags and failing to change Central Rexall's practices as a result of Dr. Durgin's prescriptions.

- Defendants' failure to investigate all Central Rexall prescribers after the DHA letter telling Central Rexall that it likely filled prescriptions that lacked a physician-patient relationship.

- Defendants' failure to take any remedial action when Casseri, Taff, and outside counsel all sent defendants articles showing that other compounding pharmacies were under criminal investigation for exactly what Central Rexall was doing.

- Defendants' failure to contact doctors with impossibly high prescription volumes.

- Defendants' failure to terminate sales groups despite evidence that their prescriptions were fraudulent.

- Defendants' failure to act when the Quickbase data available to defendants, and used regularly by Brockmeier, showed medications that were medically unnecessary – a conclusion reached by Taff, Central Rexall employees, and Keith Ritson.

- Brockmeier's failure to take any action after Taff told him her concerns, including all of the facts and circumstances that caused her to conclude that Central Rexall was filling and being paid for medically unnecessary prescriptions.

This evidence, considered in the light most favorable to the Government as the Court is required to do, provided more than sufficient support for the Court's decision to give the willful blindness instruction. That decision was not an abuse of discretion.[13]

### 5.    The Government presented more than sufficient evidence of materiality.

The central premise of this case, which the Government proved through multiple witnesses and documents, was that Johnston and Brockmeier orchestrated a scheme to obtain money by submitting claims for drugs that were not medically necessary and that these claims were materially false and misleading because PBMs pay only for claims that are medically necessary. Defendants now argue that there was no evidence to prove materiality. They are wrong.

"In general, a false statement is material if it has a 'natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.'" *Neder*, 527 U.S. at 16 (quoting *United States v. Gaudin*, 515 U.S. 50, 509 (1995)). The evidence presented at trial, considered in the light most favorable to the Government, easily satisfies this standard. Central Rexall witnesses

---

[13] In their willful blindness section, defendants argue that the Government misled the jury about the law by arguing that "it was obvious to anybody in the defendants' position that they were involved in illegal conduct." DB at 76 (quoting Tr. 3899). But (a) the Government made this statement while "[a]n excerpt of [the willfulness] jury instruction [was] up on the screen for" the jurors, Tr. 3899, and so did not mislead them about the law; (b) the statement is proper argument and accurate, as the charge told the jury, among other things, that "[n]o one can avoid responsibility for a crime by deliberately ignoring what is obvious," Tr. 3768, and (c) defendants never objected at trial to this statement, which certainly does not meet the plain error standard. *See United States v. Bethancourt*, 65 F.3d 1074, 1080 (3d Cir. 1995) (finding no plain error in rebuttal summation comment where "experienced" defense counsel "heard nothing . . . warranting any objection whatsoever").

testified that a valid prescription was a requirement for a claim to PBMs, that claims to PBMs represent that Central Rexall has a valid prescription, and that PBMs do not pay for prescriptions that are not legitimate and not medically necessary.  *See, e.g.*, Tr. 168-69, 210, 516 (Taff); Tr. 680-82, 711 (Rolling); Tr. 864, 938 (Olsen).  Blake Stockwell of Express Scripts testified that to make a claim, a pharmacy needs a valid or legitimate prescription based on a doctor's determination of the patient's medical needs and that Central Rexall was required in its provider agreement with Express Scripts to submit only valid claims.  Tr. 3166-68, 3181, 3253-54, 3330-31.  He further testified that submitting fraudulent claims, including claims without a valid prescription and claims where the prescribed drug was not medically necessary, was grounds for termination from Express Scripts' network – *i.e.*, Express Scripts would not pay for the pharmacy's prescriptions.  Tr. 3181-83; *see* GX 37 ¶ 4.2.c.  And he testified that pharmacies are prohibited by their agreement with Express Scripts from compounding prescriptions without a valid prescription.  Tr. 3197-98.

Defendants ignore this testimony.  They also quote verbatim, at length, testimony about what a reasonable PBM would consider important and allege that the testimony fails to establish when a PBM would fail to pay.  DB at 86-87.  But defendants fail to quote four immediately following questions establishing exactly that:

> Q. Would a reasonable PBM pay the pharmacy for prescriptions upon learning that the prescribing doctor did not have a valid doctor-patient relationship?
>
> A. No, sir.

Q. Would a reasonable PBM reimburse a pharmacy for a prescription after learning that the doctor never examined or spoke with the person the doctor wrote the prescription for?

A. No, sir.

Q. Would a reasonable PBM pay for a prescription after learning that the prescribing doctor was paid or otherwise compensated for signing a prescription other than the normal payment for an office visit or examination?

A. No, sir.

Q. Would a reasonable PBM pay for a prescription after learning that the prescription was for a pharmacy sales representative who would receive a commission for that prescription?

A. No, sir.

Tr. 3236.  Defendants also ignore testimony from Hayley Taff, a licensed pharmacy technician, that PBMs would not pay for medically unnecessary prescriptions:

Q. Would the pharmacy benefits managers pay for prescriptions that were not medically necessary?

A. No.

Q. Would the pharmacy benefit managers pay for prescriptions if the doctor did not have a doctor-patient relationship with the patient?

A.  No.

Tr. 169.  All of this testimony established a proper jury question on the materiality of the scheme's false representations that Central Rexall's prescription claims were medically necessary.  A rational jury easily could have concluded that those misrepresentations were material.

The testimony also established the materiality of collecting copays.  The evidence summarized above shows that defendants and everyone at Central Rexall understood that Express Scripts and other PBMs required Central Rexall to collect

79

copays, and the failure to insist upon collection was part of the defendants' scheme to make money from medically unnecessary medications. Although the failure to collect occasional copays is not grounds for termination, the Express Scripts manual provides: "If PBM discovers a Network Provider routinely fails to disclose and/or collect Copayments, such Network Provider will be subject to immediate termination." GX 61 at 18; *see* Tr. 3190-91 (Stockwell). Stockwell testified that if "a majority of the time you are not collecting the appropriate co-payment, . . . we would terminate you." Tr. 3193. The evidence established that Central Rexall did exactly that: it failed to collect 69% of copays, more than the threshold for termination, and concealed that fact from Express Scripts. Tr. 3206 (Stockwell); Tr. 2673-74 (Farahat); GX 245A.

Stockwell also testified that if Express Scripts learned that a pharmacy applied a coupon to discount a copay but did not collect the difference from the coupon provider, Express Scripts would not pay that pharmacy for claims. Tr. 3193. The evidence concerning the AMS program showed that Central Rexall did exactly that as well: it used a coupon to discount copays but did not collect the difference and then failed to disclose the AMS program to Express Scripts and gave misleading answers, approved by Johnson, when asked about the AMS program.

All this evidence, as well as the other evidence summarized above, gave the jury a more than sufficient basis to conclude that the defendants' scheme to defraud included material misrepresentations and omissions.

### C. Ample Evidence Proved That Defendants Conspired to Use a Means of Identification Without Lawful Authority "with the intent to commit, or to aid or abet, or in connection with" Their Fraud Scheme.

The Court charged the jury that it could find the defendants guilty on Count 2 if it found that they conspired to knowingly use the means of identification of another person without legal authority with the intent to commit heath care and wire fraud and conspiracy to commit health care fraud and wire fraud.  Tr. 3792.  The jury heard ample evidence, summarized above, to satisfy those elements.  The evidence showed that Johnston and Brockmeier conspired to conduct false test adjudications, which required using patients' identifying information without lawful authority, and that the test adjudications were done as part of their scheme to defraud PBMs and insurers.

Ignoring the elements in the jury charge, defendants challenge their conviction by arguing: (1) identity theft was required to be the "crux" of the fraud, an argument this Court rejected before trial; (2) they did not receive any money directly from reimbursement of false test adjudications, which is not a requirement of the statute, which criminalizes identify theft in connection with another crime – here, the health care and wire fraud scheme; (3) lack of materiality, but that again is not an element of the crime, and in any event the evidence established materiality; (4) they did not know that false test adjudications were occurring, despite testimony and emails showing that defendants ordered them; and (5) they did not know that false test adjudications themselves were illegal, which the statute does not require.  None of these arguments withstands scrutiny.

81

1. **The Government did not need to prove that the use of the identity was at the "crux" of the fraud – the Court rejected that interpretation pretrial.**

To preserve this argument for appeal, defendants reiterate an argument that they made in their pretrial motion to dismiss the Indictment: that the statute they conspired to violate, 18 U.S.C. § 1028(a)(7), required proof that the use of someone else's identity was at the "crux" of their health care and wire fraud conspiracy, based on the Supreme Court's construction of a different statute, 18 U.S.C. § 1028A, in *Dubin v. United States*, 599 U.S. 110 (2023). The Government demonstrated in response to the defendants' pretrial motion to dismiss that the "crux" requirement did not apply to this statute, ECF 137 at 16-30, and the Court agreed, rejecting the defendants' motion in a detailed opinion, Letter Order, Oct. 24, 2024, ECF 187. Defendants offer no authority contradicting this decision. The "crux" requirement for § 1028A prosecutions is not required for § 1028(a)(7) prosecutions, and the Court did not err by not including the "crux" requirement in its charge to the jury. That is law of the case and defendants present no reason for reconsideration.

2. **The statute does not require that the test adjudications themselves netted defendants any money.**

Without referencing the statutory language or the elements in the jury charge, defendants argue that "fraud is an element of identity theft" and the evidence failed to show they conspired to commit fraud. But neither the plain language of the statute nor the jury instructions require the unauthorized use of an identity to immediately and directly deprive anyone of property; it provides only that a defendant who "knowingly transfers, possesses, or uses, without lawful authority, a means of

identification of another person with the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law" commits the crime. 18 U.S.C. § 1028(a)(7). The statutory elements of § 1028(a)(7) that the Court explained to the jury—to which the defendants did not object—do not state that fraud is an element. Tr. 3792. And defendants cite no case holding that fraud is an element of a § 1028(a)(7) violation.

Defendants seize upon the Court's shorthand description of the crime as "fraudulently using a means of identification" as importing into § 1028(a)(7) a requirement not found in the statute or the case law that the unauthorized use of someone else's identity by itself netted money or property. There is no basis in law or logic for this claim. Based on the context and all of the Court's instructions, which must be read as a whole, the phrase "fraudulently using a means of identification" is a shorthand way to refer to the requirement in this case that the identification was used in connection with wire fraud, health care fraud, and conspiracy to commit health care fraud and wire fraud. *See* Tr. 3790. The jury heard extensive evidence that the defendants committed identity theft "with intent to commit" and "to aid and abet" and "in connection with" defendants' scheme to obtain money from PBMs and insurance companies. *See* 18 U.S.C. § 1028(a)(7). The jury also heard extensive evidence that the defendants' scheme was, in fact, a fraud scheme, as it had the object of depriving the PBMs of money or property. Nothing more is required.[14]

---

[14] Defendants also argue that the identity theft victims were not themselves deprived of property, DB at 98-104, but that is not an element that the Government was required to prove, *see* Tr. 3790 (jury instructions); *cf. United States v. Barkers-Woode*, 136 F.4th 496, 500-02 (3d Cir. 2025) (identity theft victims count as "victims" under the sentencing guidelines even if they do not suffer pecuniary harm).

### 3. Materiality is not an element of Count 2, and the evidence showed material misrepresentations to PBMs in any event.

Defendants also assert that materiality is an element of Count 2 and that the evidence failed to prove materiality, DB at 81-88, but again, the plain language of the statute and the jury instructions that defendants assented to do not require proof that the use of identity was material to a fraud, Tr. 3792. In any event, the evidence showed both that the false test adjudications involved material misrepresentations to the PBMs and that the information obtained was material. As several witnesses testified, a test adjudication claim is a false insurance claim that is not permitted by PBMs because it falsely represents to the PBM that Central Rexall has an actual, valid prescription for the patient, which is an essential prerequisite to any adjudication claim. Tr. 168-75 (Taff); Tr. 674-75, 678-83 (Rolling); Tr. 3173-75, 3181-82 (Stockwell). And defendants' claim that the information is not material because Average Wholesale Price ("AWP") information was available is rebutted by three facts that show the information was material: (1) Express Scripts did not permit test adjudications, Tr. 3173-75 (Stockwell); (2) AWP information would not tell someone whether a particular insurance plan would cover the medication or exactly what the insurance plan would pay. Tr. 3263 (Stockwell); (3) Brockmeier repeatedly requested test adjudications, even after he was told the AWP information, Tr. 688-90 (Rolling); GX 144; 645.

### 4. The jury heard substantial evidence that the defendants directed, and knew about, the use of false test adjudications to aid or abet and in connection with their fraud.

Defendants argue that the evidence was insufficient to show their involvement in false test adjudications. As that evidence is summarized above, it will not be repeated here. The evidence shows that defendants ordered test adjudications to aid and abet the health care fraud scheme and in connection with their conspiracy to defraud insurers by submitting claims for medically unnecessary medications, including medications whose formulas were devised and pumped up to the maximum reimbursable level through the use of false test adjudications.

Johnston argues that the evidence did not show that he understood test adjudications were made without a valid prescription.[15] Two specific examples show that he did. In GX 331, Johnston asked Rolling for the Tricare reimbursement for a proposed formula. Rolling responded that because Tricare has a $1,000 cap, "Anything over that we have to call and get approval. Without a valid rx, I don't think we should try any test." Johnston responded: "Good point. Thanks." In GX 259, Supreme Medical's Tom Isley sent Johnston and Brockmeier a formula for an eczema cream that "another company" was promoting "that is reimbursing upwards of $20k to $30k per script." Brockmeier responded, copying Johnston, and said, "We will run some tests in the am." The clear inference of these emails, and certainly a rational inference for the jury to draw under the Rule 29 standard, is that Johnston understood that Central Rexall was submitting test adjudications "without a valid [prescription]"

---

[15] Brockmeier offers no argument that he was unaware that false test adjudications were occurring, and there is overwhelming evidence contradicting any such assertion. Tr. 175 (Taff); 864 (Olsen), 685, 711-712 (Rolling); GX 141, 148, 194, 259, 321, 645.

– *i.e.*, the fraudulent kind of test adjudications. Indeed, these adjudication requests were made for a formula, not an actual prescription. And Johnston requested or was copied on other requests to submit test adjudications to ascertain the reimbursement amount of particular formulas that Central Rexall was considering putting on its prescription pad. *E.g.*, GX 321, 645, 681. Given that Johnston knew that a formula was not yet on Central Rexall's prescription pads, then the jury could rationally infer that Johnston would understand that Central Rexall did not yet have a prescription signed by a doctor. In addition to the specific emails showing Johnston and Brockmeier discussing the submission of test adjudications for potential formulas, the jury's inference that Johnston knew about test adjudications is supported by the fact that the defendants were executives who had no interaction with patients and would have no conceivable reason to ever ask for adjudication information to advise a patient about the affordability of her medication. Finally, as discussed above, based on the evidence of how Johnston and Brockmeier talked several times a day about Central Rexall and that Johnston was a micromanager, the jury could infer that they discussed test adjudications.

### 5. The statute does not require proof that the defendants knew that their use of someone else's identity is illegal.

Finally, defendants argue that the evidence did not establish that they knew that test adjudications themselves were illegal. Again, that is not an element of the crime as charged to the jury, which told the jury it had to find that the defendant "knowingly" used the means of identification of another person without legal authority. Tr. 3792. There is no willfulness requirement and no requirement of

knowledge that false test adjudications are illegal.  The charged intent was to "use[] the means of identification with the intent to commit or to aid or abet or in connection with healthcare fraud, wire fraud or conspiracy to commit healthcare fraud and wire fraud." *Id.*  As demonstrated above concerning Count 1, the evidence established that criminal intent.  And although not required to convict on Count 2, the evidence summarized above established a basis for the jury to conclude that Johnston and Brockmeier knew false test adjudications were wrong and to infer they knew they were illegal.

### D. The Evidence was Sufficient to Prove Venue for Count 4.

Although neither defendant challenged venue before the jury, Johnston and Brockmeier now ask this Court to rule that the evidence of venue was insufficient as a matter of law.  Because the standard for venue is preponderance of the evidence, not proof beyond a reasonable doubt, the question is whether the jury heard sufficient evidence, viewing the evidence in the light most favorable to the government and drawing all inferences in its favor, to establish venue by a preponderance of the evidence.  The evidence of venue was sufficient on several grounds, any one of which would permit the jury to conclude there was venue.

The statutory bases for venue over money laundering conspiracy charges are several and broad.  18 U.S.C. § 1956(i)(1) provides that a prosecution "may be brought in – (A) any district in which the financial or monetary transaction is conducted," and 18 U.S.C. § 1956(i)(2) states that a money laundering conspiracy prosecution "may be brought in the district where venue would lie for the completed [money laundering] offense . . . or in any other district where an act in furtherance of the . . . conspiracy

took place." 18 U.S.C. § 1956(i)(3) states: "For purposes of this section, a transfer of funds from 1 place to another, by wire or any other means, shall constitute a single, continuing transaction.  Any person who conducts . . . any portion of the transaction may be charged in any district in which the transaction takes place."  And venue for money laundering offenses also may be based on the general venue statute, 18 U.S.C. § 3237.  *See, e.g.*, *United States v. Lavenant*, 607 Fed. Appx. 217, 220-21 (3d Cir. 2015) (not precedential) (finding venue appropriate for money laundering charge based on § 3237); *United States v. Perez*, 223 Fed. Appx. 336, 341 (5th Cir 2007) (venue for money laundering conspiracy appropriate under § 3237); *United States v. Black*, 469 F. Supp. 2d 513, 540 (N.D. Ill. 2006) (venue for money laundering prosecution may be based on § 3237 "[e]ven without the venue provision of 18 U.S.C. §1956(i)").  The evidence satisfied these standards.

The wire transfers that went through New Jersey servers establish venue. Sean O'Malley, managing director and head of the financial intelligence and investigations unit of the Federal Reserve Bank of New York, Tr. 3410, testified that 17 wire transfers listed in Count 4, which other evidence showed was money wired from Central Rexall to the defendants or to companies controlled by them, used the Fedwire Funds Service System and were effectuated by wire signals sent through servers maintained in New Jersey by the Federal Reserve Bank.  Tr. 3412-24; GX 1067.  O'Malley further testified that the wire transfers could not be effectuated unless the signals traveled through the New Jersey server.  Tr. 3431.  Each of these transactions therefore satisfies the plain language of § 1956(i)(3), which defines a wire transfer as "a single, continuing transaction" and authorizes venue over "any district

in which the transaction takes place." Given that a portion of each transaction took place in New Jersey by using servers located in New Jersey, venue was properly laid in the District of New Jersey.

It is well established that venue may be based solely on a wire communication passing through the forum state, including specifically Federal Reserve facilities. *See, e.g.*, *United States v. Goldberg*, 830 F.2d 459, 465 (3d Cir. 1987) (venue over wire fraud charges proper in Eastern District of Pennsylvania because wire transfer of funds passed through Federal Reserve Bank in Philadelphia); *United States v. Lallande*, 2023 WL 535317, at *3 (D.N.J. Aug. 8, 2023) (venue proper because wire transfers went through Federal Reserve Bank in New Jersey; rejecting defendant's argument that a chance routing through a New Jersey server is insufficient to support venue); *Bauer v. United States*, 2018 WL 4145901, at *3 (D.N.J. Aug. 30, 2018) (venue existed because stock trades "were electronically executed by computer servers located in New Jersey"); *Kluger v. United States*, 2018 WL 4145902, at *4 (D.N.J. Aug. 30, 2018) (same).

Defendants try to distinguish these cases because they were based on the general venue provision, 18 U.S.C. § 3237, and not the money laundering venue section, but venue for a money laundering offense may be based on § 3237 as well as § 1956(i), as the cases cited above make clear. Defendants also claim that venue cannot be based on the wires because they did not know that the wires would pass through New Jersey, but the Third Circuit has held that reasonable foreseeability of

actions in the forum state is not required, *United States v. Renteria*, 903 F.3d 326, 331 (3d Cir. 2018), and the jury was instructed accordingly, Tr. 3798.[16]

Payments of over $10,000 to William Hickman in New Jersey establish venue.

An independent basis for venue is that Johnston and Brockmeier sent commission payments containing fraud proceeds of over $10,000 to New Jersey. In their brief, defendants admit that the evidence showed they made those payments to Hickman in New Jersey, and that they knew they were sending those payments to New Jersey, but they claim that those payments cannot provide the basis for venue because, they assert, Count 4 is limited to transfers to Bluen and PMG. They cite no authority to support this argument, which is wrong for at least three reasons:

1. Count 4 is not limited to transfers to Bluen and PMG. The charging paragraph charges Johnston and Brockmeier with a conspiracy to engaged in monetary transactions of over $10,000 in criminally derived property and is not limited to Bluen and PMG. Indictment ¶ 56. The manner and means section of Count 4 alleges in paragraph 59 that defendants transferred the proceeds to Bluen and PMB and then to their personal bank accounts, but paragraph 60 also alleges, without limitation, that defendants "engaged in transactions in amounts exceeding $10,000 with the proceeds of the conspiracy to commit health care fraud and wire fraud." Based on that broad allegation, the Government argued in closing, without objection, that the monetary transactions at issue in Count 4 included "the wire transfers from

---

[16] Defendants argue that upholding venue here would authorize venue in New Jersey whenever a wire communication passed through New Jersey, but the cases cited above reject that concern, and § 1956(i)(3) specifically authorizes venue based on a wire transfer. Given the extensive New Jersey conduct in this case, that concern is not present here.

Central Rexall to sales reps like Boardwalk Medical," Tr. 3908, and that "the wires from Central Rexall to Boardwalk were sent to Hickman's bank account in New Jersey" satisfied the venue requirement.  Tr. 3913.  Those wire transfers were within the charged conspiracy to conduct transfers of criminal proceeds of over $10,000, which included transfers to New Jersey.

2. Count 4 specifically includes an allegation that Hickman received a commission payment of $2,447.076.19.  That allegation is in paragraph 49(d), which is incorporated by reference in Count 4 by paragraph 55.  The Government proved that transaction in criminal proceeds at trial.  GX 950V, 1057.  Defendants claim that allegations incorporated by reference somehow are not really a part of a count, but they cite no authority for this remarkable proposition; the one authority they cite, Fed. R. Crim. P. 7(c)(1), specifically authorizes incorporation by reference.  That transfer of criminal proceeds by itself gave the jury a basis to find venue.

3. The Government could rely on transfers of over $10,000 to Hickman even though they were not specifically included in the Indictment.  The Government is not limited to overt acts charged in the indictment.  *See, e.g.*, *United States v Adamo*, 534 F.2d 31, 38 (3d Cir. 1976) ("the Government is not limited in its proof at trial to those overt acts alleged in the indictment"); *United States v. Schlei*, 122 F.3d 944, 975 n.10 (11th Cir. 1997) (government may base venue on overt acts not included in the indictment).  The only requirement is that the overt acts were in furtherance of the charged conspiracy to engage in transactions in criminal proceeds over $10,000, and the many transactions sent to Hickman in New Jersey proved at trial of amounts exceeding $10,000 were in furtherance of that conspiracy.

91

For all these reasons, there was more than sufficient evidence to establish venue over Count 4, and defendants' motion for acquittal on that count should be denied.

### E. A New Trial is Not Warranted, as There were no Trial Errors Warranting a New Trial, and the Overwhelming Evidence of Defendants' Guilt Shows that They were Not Wrongly Convicted.

In their final section, Johnston and Brockmeier contend that they should receive a new trial because the Court allegedly admitted a few pieces of evidence erroneously. DB at 124-62. Because most of that evidence came in without objection, defendants have the burden of showing that the Court committed plain error by allowing it, and they do not and cannot make that showing. Defendants cannot show that any errors were made, much less errors of such significance that would warrant a new trial. Defendants also argue that the verdict was against the weight of the evidence, an argument that requires them to show this is an "exceptional" case in which a "miscarriage of justice has occurred—that is, that an innocent person has been convicted." *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002) (quotation omitted). The trial evidence showed that Johnston and Brockmeier are in no way innocent; they devised, managed, and reaped the lion's share of the benefits from a massive conspiracy to defraud health insurers. Their request for a new trial should be denied.

92

1.    **The Government complied with the Court's pretrial ruling by excluding evidence of the Anti-Kickback Statute, and any references to W2 and 1099 sales representatives were relevant, not improperly prejudicial, and not plain error.**

The Court ruled before trial that the Government could not introduce evidence that the defendants violated the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7(b) ("AKS"). The Government scrupulously complied with that ruling by redacting references to the AKS from documents and not asking any questions about the AKS. When defendants objected to evidence that, while not mentioning the AKS, might suggest it, the Government redacted the objected-to information. *See, e.g.*, Tr. 2190-91, 2442-43, 3229-31. Defendants' post-trial motions do not identify any time in the trial when the Government introduced evidence about the AKS in violation of the Court's ruling.

But the Government did introduce evidence about how Johnston and Brockmeier assembled, managed, and compensated the corrupt sales force, because the sales force was a critical element of their fraudulent scheme. Defendants apparently recognized the relevance of that evidence at trial, as they never objected to the introduction of this evidence. Because they did not object at trial, the plain error standard applies, which requires the defendant to show that the error "is plain, affects substantial rights, and 'seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" *United States v. Ludwikowski*, 944 F.3d 123, 136 (3d Cir. 2019) (quoting *Johnston v. United States*, 520 U.S. 461, 467 (1997)). In their brief, defendants make no attempt to show how the admission of this evidence satisfies this demanding standard. That alone is fatal. *See United States v. Lacerda*, 958 F.3d 196,

93

211 & n.3 (3d Cir. 2020) (defendant waived his right to review of issue by making no effort to satisfy plain error standard).

At any rate, admitting this evidence was not error of any kind.  How the defendants managed and compensated the sales force was a central part of this case. The Indictment alleges that it was part of the conspiracy that defendants entered into agreements with distributors, compensated them by up to 50% of the insurance reimbursements, had distributors market medications directly to patients, and had distributors obtain medically unnecessary prescriptions by numerous means. Indictment ¶¶ 22, 33, 34.  To tell the jury how this part of the conspiracy operated, the Government quite naturally presented evidence about the defendants' and Central Rexall's relationship with these sales representatives.  The commissioned sales force brought in almost all of the fraudulent prescriptions.  Tr. 597 (Taff).  The amount of the commissions paid was a key part of that story, because paying high commissions persuaded sales representatives to send prescriptions to Central Rexall, Tr. 2919 (Casseri), and as even defendants admit, "commissions could and do incentivize a fraudster to try to engage in fraudulent acts."  DB at 139.  It was not error to admit evidence of the commission arrangements with sales representatives, and there was nothing unfairly prejudicial about that evidence.  *See* Fed. R. Evid. 402 (all relevant evidence is admissible unless excluded on some proper basis).

The Court also did not err by allowing evidence, without objection, that defendants generally did not use W-2 sales employees and lied to the PBMs about the extent to which they used 1099 sales representatives.  The evidence showed that defendants' scheme worked only with 1099 sales representatives – as Casseri testified,

94

"[w]e got rid of the W-2 reps because they just weren't as profitable as it was for 1099 reps." Tr. 2767. There is nothing inflammatory or unfairly prejudicial about telling the jury that 1099 sales representatives were used. The lies defendants told or directed to conceal or downplay Central Rexall's use of 1099 sales representatives were relevant, as is discussed above, to show defendants' attempt to conceal their conspiracy from detection and keep the money coming in, as well as their knowledge and intent. *See United States v. Kemp*, 500 F.3d 257, 297 (3d Cir. 2007) ("Because evidence of Hawkins's consciousness of guilt was of high probative value to the government's case, Hawkins faces a high hurdle in showing that the danger of unfair prejudice *substantially* outweighed the probative value."). It was not plain error to admit this evidence, and the admission neither affected defendants' substantial rights nor seriously affected the fairness of the trial.

> **2.    Evidence of defendants' failure to collect copays was charged in the Indictment, intrinsic to the fraud, directly relevant, and not plain error.**

The Indictment alleges that it was "part of the conspiracy" that at defendants' direction and to encourage patients to receive unnecessary medication, "Central Rexall continued shipping medications to patients without requiring patients to pay copayments, despite the requirement in Central Rexall's agreement with [Express Scripts] that Central Rexall collect copayments from patients." Indictment ¶ 32. Despite this clear allegation in the charging document (which they did not move to strike), Johnston and Brockmeier argue that evidence about their failure to require collection of copays was logically irrelevant. DB at 145-51. It was not. Their lengthy recitation of their version of the copay evidence does not identify any time when

defendants objected to the admission of this evidence, which again means that they must satisfy the plain error standard to win a new trial. Their post-trial motion makes no attempt to show that the Court committed plain error by allowing this evidence to come in without objection, that they were unfairly prejudiced, or that the admission of this evidence resulted in an unfair trial.

The Government demonstrated at length above that the systematic failure to require collection of copays and defendants' attempts to conceal that practice were important elements of the scheme. Defendants' request for a new trial based on the admission of copay evidence rehashes arguments they made at trial, which the jury rejected, without paying any attention to the standard for post-trial review of the evidence. Their central contention is that failure to collect copays has nothing to do with medical necessity, but Blake Stockwell of Express Script testified that copays are critical because they make sure that patients really want the medication that has been prescribed for them and have a medical need for that medication. Tr. 3184-86. The copay requirement helps prevent fraudulent claims because it makes sure that the patient actually wants and needs the medication. *Id.* That conclusion is especially clear in the context of compound medications, which were promoted by defendants as being specially tailored by a doctor for an individual patient's medical needs. It also makes sense, and is certainly a rational inference the jury could have drawn, that a patient's failure to pay a small copay for a supposedly specialty medication evidences

that the patient does not have a medical need for the medication.[17]  *See* Tr. 3273 (Stockwell) (patients are willing to pay copays for products they want).

Several appellate courts have thus recognized that evidence of a compounding pharmacy's failure to collect copays is probative, under Rule 401's lenient standard, of lack of a medical need for those medications.  *See Bolos*, 104 F.4th 562, 566 (6th Cir. 2022) ("Synergy routinely did not collect copays from its patients despite being required by its PBM contracts to do so.  These payments serve as a proxy for necessity and help ensure that patients are invested in getting the care the insurer is being asked to pay for."); *Chalker*, 966 F.3d at 1194-95 ("evidence that Chalker routinely waived copayments" was part of evidence that pharmacy's prescriptions were medically unnecessary); *Grow*, 977 F.3d at 1315-17, 1321 (discussing evidence of waived copays as evidence that compound medications were not medically necessary); *Montgomery*, 2022 WL 2284387, at *11 ("[B]y fabricating a clinical trial, paying customers commissions to order creams, and paying customers' co-pays, they concealed that they were inducing customers to order creams rather than the prescriptions originating from medical necessity and consultation with a doctor.").  The jury could rationally infer from the patients' refusal to pay copays on 70% of these specialty medications that a large number of the medications were not medically

---

[17] Defendants contend that the Government misled the jury by stating in closing that Brockmeier waived copays "up front," DB at 146, but they never objected to this argument as well.  This argument referred to GX 119, in which Brockmeier approved up front shipping medicines without collection of copays, and was a fair interpretation of GX 125 and 126, in which Brockmeier approved crediting a copay before the medicine was shipped.  This argument was not error, much less plain error affecting substantial rights.

necessary and that Johnston and Brockmeier, who allowed patients to receive medicines without paying their copays, knew that.

In a lengthy footnote, defendants argue that they should receive a new trial because some evidence, including failing to collect copays and submitting test adjudications, related more to bad business practices or breaches of contract than fraud. DB at 150 n.49. The evidence, as their argument implicitly acknowledges, does tend to prove the fraud and was therefore properly admitted. *See* Fed. R. Evid. 401. That is unquestionably true for the fraudulent test adjudications, which were part of the fraud and the subject of a separate count. Making false claims to insurance companies to obtain information and systematically failing to collect copays and developing a sham discount program to hide their failure goes far beyond what anyone would think of as merely bad business practices. That certain evidence properly admitted to prove fraud also proved bad business practices and breached Central Rexall's contracts was no bar to its admission, and its admission was not plain error.

### 3. Evidence about criminal investigations in the compounding industry was relevant, not improperly prejudicial, and often received without objection, and the Court's instruction mitigated any unfair prejudice.

To rebut Johnston and Brockmeier's defense that they were unaware that Central Rexall's compounding operation was criminal, the Government introduced documents showing that defendants were told of criminal investigations of compounding pharmacies for the same practices used by Central Rexall. Defendants now contend that the Court erred by admitting some of this evidence – specifically, GX 544, 628, 628A, 436, 131, and 365. DB at 152-56. But these exhibits were received

into evidence without objection by the defense.  *See* Tr. 315 (admission of GX 544); Tr. 2428 (admission of GX 628 and 628A); Tr. 2432 (admission of GX 436); Tr. 3484-85 (admission of GX 131); Tr. 275 (admission of GX 365).  When the defense objected to one article, the Court sustained the objection.  Tr. 2435-50.  And the Court gave a limiting instruction directing the jury that these documents were admissible not for the truth of the matter asserted in them – that the government was conducting investigations into other pharmacies – but only to show the state of mind of the defendants.  Tr. 316.  The Court repeated that instruction, Tr. 2337-38, 2449, and the defense never took issue with the instruction or made a request for an instruction that was denied.[18]

Defendants nonetheless accuse the Government of ignoring the Court's warning on transcript page 2439 about continued use of these articles.  DB at 153.  But the examples defendants cite of the Government purportedly "persisting" and continuing "in the face of" the Court's warning all come on transcript pages 2429, 2432, 2433, and 2434, *before* the Court's warning.  Defendants did not object to the introduction of any of these exhibits until transcript page 2439.  And when the Government much later introduced a single new exhibit, GX 131, during Agent Galloway's testimony, the defense did not object.  Tr. 3484-85.

Because defendants failed to object this evidence, they have the burden of showing plain error, which they cannot do.  In a case in which the defendants'

---

[18] Far from arguing that the compound pharmaceutical industry was necessarily fraudulent or illegitimate, as defendants allege, DB at 151-52, the Government argued and elicited testimony that compound medications could be useful and medically necessary, *see* Tr. 33-34 (Opening Statement), 123-24, 128 (Taff), 670-71 (Rolling), 1566-67 (Patel).

knowledge, intent, and willful blindness in the face of red flags were squarely at issue, these documents provided critical evidence that defendants were put on notice that Central Rexall's business practices were criminal. Chris Casseri testified (without objection) that he sent articles like these to Johnston and Brockmeier because the conduct they described

> was exactly what we were doing or what was taking place at Central at the time. I mean, for instance, you know, doctor-patient – they were questioning doctor-patient relationships. They were talking about high number of TRICARE prescriptions. They were talking about a high number of prescriptions from one doctor. They were talking about high reimbursements – high reimbursement amounts for supplements. There was, you know, a number of red flags that came up to me that said, you know, this is exactly what's going on at Central.

Tr. 2880-81. Defendants made no significant changes as a result of these articles – a classic example of willful blindness. *Id.* This evidence was relevant and admissible to show the state of mind of the defendants, as the Court instructed the jury. Juries are presumed to follow instructions that evidence was admitted for a limited purpose, *see Bryant*, 655 F.3d at 252, and defendants made no argument at trial or now that this instruction was insufficient to mitigate any unfair prejudice. The Court did not commit plain error by admitting, with a limiting instruction, these documents into evidence.

> **4.    The Court did not commit plain error by allowing the introduction of evidence of the profits the defendants made, which was essential to proving the money laundering charge and relevant to show defendants' motive and intent.**

Once again seeking a new trial based on evidence and arguments they did not object to at trial, Johnston and Brockmeier argue that the Court plainly erred by admitting evidence about the amount of money they received from their management

100

agreement with Central Rexall and that the Government improperly mentioned that evidence in its arguments.  DB at 157-59.  But the money received under that agreement was for their share of the profits from Central Rexall's compounding operations, which the trial evidence showed to be fraudulent.  The Government introduced that evidence to prove the money laundering charge in Count 4, which included an allegation that "Central Rexall, through payments to Bluen Medical and PMB, paid defendants CHRISTOPHER KYLE JOHNSTON and TRENT BROCKMEIER a portion of the amounts received from [Express Scripts] and other sources, which represented proceeds of the conspiracy to commit health care fraud and wire fraud."  Indictment ¶ 50.  The evidence also tended to prove defendants' intent and motive for committing the fraud alleged in Count 1.  *See, e.g.*, *Persaud*, 866 F.3d at 380 (jury may infer intent from evidence of profits).[19] And the Government produced no evidence of defendants' wealth, and so the cases cited by defendants concerning wealth evidence are inapposite.  The evidence about defendants' receipt of criminal proceeds was relevant to prove the charged crimes – indeed, it was essential to prove Count 4 – and its admission was not plain error.

---

[19] Defendants place undue weight on the Court's pretrial decision to strike the allegation in paragraph 38 of Count 1 of the Indictment that Johnston received $34 million from Central Rexall, DB at 158, but that decision was made only because Count 1 itself did not include allegations tethering that particular amount of money to criminal conduct, ECF 184 ¶ 4.  The trial evidence made that connection.  And the Court's pretrial decision did not touch Count 4, which included specific allegations about defendants' receipt of money.

101

### 5.    Evidence of how defendants took control of Central Rexall's compounding operations was relevant and admitted without objection.

Defendants' final evidentiary argument complains about testimony showing how Johnston and Brockmeier took over and controlled Central Rexall's compounding operations.  DB at 159-60.  Again, that evidence was received without defense objection because it was relevant to show how the defendants controlled and managed Central Rexall's compounding business, which was how the fraud was conducted and what this entire case was about.  The Court did not commit plain error in admitting this evidence.

### 6.    The verdict was not against the weight of the evidence.

In their final argument, Johnston and Brockmeier contend that the Court should grant a new trial on the ground that the verdict was against the weight of the evidence.  DB at 163-66.  As the Government stated at the start of this brief, "motions for a new trial based on the weight of the evidence are not favored.  Such motions are to be granted sparingly and only in exceptional cases."  *United States v. Salahuddin*, 765 F.3d 329, 346 (3d Cir. 2014) (cleaned up).  Although this Court may exercise its own judgment, it still must give appropriate deference to and not simply second-guess the jury's responsibility to weigh the credibility of witnesses and draw inferences.  *See Salahuddin*, 765 F.3d at 346-47.  And even if a reviewing court were to believe that a verdict is contrary to the weight of the evidence, the court "can order a new trial only if it believes that there is a serious danger that a miscarriage of justice has occurred – that is, that an innocent person has been convicted."  *United States v. Silveus*, 542 F.3d 993, 1117 (3d Cir. 2008) (cleaned up).

102

The verdict was in no way contrary to the weight of the evidence, and Johnston and Brockmeier are not innocent persons who have been convicted. To the contrary, the evidence showed that they started, managed, and profited from a criminal conspiracy to defraud insurance companies, a criminal conspiracy that included their Central Rexall subordinates Hayley Taff and Chris Casseri and numerous sales representative coconspirators defendants managed and controlled, including William Hickman and his subordinates Matt Tedesco, Keith Ritson, Robert Bessey, John Gaffney, and Saurabh Patel; MMR21 and Tony Serna; Top Tier; and Supreme Medical. The jury's verdict was fully consistent with the weight of the evidence and should not be overturned.

## IV.    CONCLUSION

The jury heard more than sufficient evidence to convict defendants Johnston and Brockmeier. Defendants have not identified any errors warranting a new trial. The Court should deny their post-trial motions for a judgment of acquittal and for a new trial.

Respectfully submitted,

ALINA HABBA
United States Attorney

*/s/ R. David Walk, Jr.*
By:    R. DAVID WALK, JR.
DANIEL A. FRIEDMAN
Assistant United States Attorneys

Dated:  July 11, 2025

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned certifies that, on this day I caused to be served on counsel of record, via the Court's Electronic Filing System ("ECF"), a copy of the Brief of the United States In Opposition to Defendants' Post-Trial Motions.

Respectfully submitted,

ALINA HABBA
United States Attorney

*/s/ R. David Walk, Jr.*
R. DAVID WALK, JR.
DANIEL A. FRIEDMAN
Assistant United States Attorneys

Date: July 11, 2025