

**U.S. Department of Justice**
*United States Attorney*
*District of New Jersey*

R. DAVID WALK, JR.   401 Market Street, 4th Floor   (973) 986-7101
*Assistant United States Attorney*   Camden, NJ  08101-2098

November 10, 2025

**VIA ECF**

Honorable Edward S. Kiel
United States District Judge
Mitchell H. Cohen United States Courthouse
Fourth and Cooper Streets
Camden, New Jersey 08102

    Re:    <u>United States v. Christopher Kyle Johnston, et al., No. 20-cr-800</u>

Dear Judge Kiel:

    As requested by the Court during the October 27, 2025 hearing on the defendants' post-trial motions, I write to address several issues raised during the hearing.

    **Willful blindness instruction.**  The Court asked whether a willful blindness instruction was appropriate in a conspiracy case.  Transcript of October 27, 2025 Hearing ("Hrg. Tr.") at 14.  It is.

    The Third Circuit has rejected the argument that "it is impossible to be willfully blind to participation in a conspiracy."  *United States v. Wert-Ruiz*, 228 F.3d 250, 255 n.3 (3d Cir. 2000); *accord United States v. Puccio*, 2024 WL 4100244, at *4 n.5 (3d Cir. Sept. 6, 2024) (not precedential).  Contrary to defendants' suggestion that willful blindness instructions are appropriate only when both conspiracy and a substantive offense are charged, Hrg. Tr. at 20-22, the Third Circuit has affirmed the giving of willful blindness instructions in numerous conspiracy cases, including cases in which conspiracy to commit fraud was the only charge.  *See, e.g.*, *Puccio*, 2024 WL 4100244 at *4; *United States v. Brodie*, 403 F.3d 123, 130, 132, 158 (3d Cir. 2005); *Wert-Ruiz*, 228 F.3d at 254; *see also United States v. Oppong,* 165 Fed. Appx. 155, 162 (3d Cir. 2006) (not precedential) ("We have acknowledged that 'willful blindness' may apply to conspiracy charges."); *United States v. Onque,* 169 F. Supp. 3d 555, 570-71 (D.N.J. 2015) (Simandle, C.J.).

    The Court also asked about the requirement that the defendants made a deliberate effort to avoid knowing about the fraud.  Hrg. Tr. at 23.  The Third Circuit has held repeatedly that a willful blindness instruction is appropriate if the defendant failed to ask natural questions when faced with questionable circumstances, even if the defendant asked some questions and made some

efforts to comply with the law. *See United States v. Stadtmauer,* 620 F.3d 238, 259 (3d Cir. 2010) (instruction warranted where evidence permitted the inference that the defendant "'deliberately avoided 'ask[ing] the natural follow-up questions'"); *Brodie*, 403 F.3d at 158 (willful blindness instruction appropriate when evidence showed the defendant failed to ask natural questions, even though he took some steps to comply with the law); *Wert-Ruiz*, 228 F.3d at 256-58 (willful blindness instruction appropriate based on evidence that defendant "did not ask the natural follow-up question" about questionable practices; "her failure to inquire further evinced willful blindness"); *United States v. Navarro*, 457 Fed. Appx. 152, 153-54 (3d Cir. 2012) (not precedential) (willful blindness instruction appropriate because defendant avoided asking natural follow-up questions); *see also United States v. Flores*, 454 F.3d 149, 156 (3d Cir. 2006) (evidence showed willful blindness because defendant failed to ask questions when concerns were expressed to him).

The Court also asked whether the evidence supported the Court's decision to give the willful blindness instruction. Hrg. Tr. at 26-28. Because this objection is raised post-trial, the question is whether the Court abused its discretion in giving the instruction. *Stadtmauer*, 620 F.3d at 252. In making that decision, this Court must "view the evidence and the inferences drawn therefrom in the light most favorable to the Government." *Id.* (cleaned up). The "Government need not present *direct* evidence of conscious avoidance to justify a willful blindness instruction," but only evidence from which avoidance can be inferred. *Id.* at 259 (emphasis in original).

The evidence summarized on pages 51-57 and 73-77 of the Government's brief provided ample grounds to justify the Court's decision (Trial Tr. at 3688) to give the instruction. That evidence included numerous times when defendants were presented evidence of fraudulent or questionable prescriptions and failed to ask natural questions. Those instances included:

- Candace Craven: Even after being told that several of Craven's patients did not know her, defendants failed to have anyone contact Craven herself, ignored Hayley Taff's warning that Craven did not have a valid doctor-patient relationship, and approved Central Rexall continuing *for seven months* to fill prescriptions bearing Craven's stamped signature, including prescriptions for three patients who, defendants were told, did not know who Craven was. Gov't Br. at 12-15.
- Top Tier: Even after Defendants were told a federal grand jury was investigating Top Tier and its principals for fraud (including fraudulent prescriptions), defendants did not direct Central Rexall to investigate Top Tier's claims (which included prescriptions in Craven's name), continued to fill Top Tier prescriptions, and continued to take new prescriptions from one of Top Tier's principals. *Id.* at 14-15.
- Military Medical Relief 21: Defendants continued using MMR21 even after being told that MMR21's patients were being paid. *Id.* at 21-22.
- Boardwalk: Chris Casseri, Taff, and Ryan Boyle all raised concerns with Brockmeier and Johnston about the Boardwalk prescriptions, including

- Dr. Gaffney's outsized numbers of prescriptions and the suspicious appearance of family members all receiving the same medications, but defendants dismissed those concerns and did not investigate them, *id.* at 28-29. After Taff told Brockmeier about her concerns about Boardwalk and the Gaffney prescriptions, he did not investigate Boardwalk. Trial Tr. at 313.
- Casseri sent defendants articles stating that other pharmacies were under federal criminal investigation for the same practices Central Rexall was following, and defendants did nothing. Trial Tr. at 2280-81.
- Boyle told Johnston about his concern that the outsized volume of prescriptions from a few prescribers was a red flag and showed the lack of a proper provider-patient relationship, but Johnston dismissed those concerns. Trial Tr. at 2385.
- Johnston received an email from Boyle stating that the number of prescriptions authorized by a physician on a daily basis was a red flag, GX 617, but Johnston never had Central Rexall investigate that red flag. Trial Tr. at 2400 (Boyle).

This evidence, viewed in the context of the entire trial record, was more than sufficient to justify giving the willful blindness instruction.

The Court also questioned whether the willful blindness instruction accurately stated the law. Hrg. Tr. at 14-17. Because defendants agreed upon the language of the willful blindness instruction, Trial Tr. at 3726, 3729-30, 3736-37, and never argued at trial or in their post-trial motions that the instruction misstated the law, the issue is not before the Court, and the party presentation rule bars the Court from raising it *sua sponte*. *See, e.g., United States v. Scarfo*, 41 F.4th 136, 186 (3d Cir. 2022) ("we decline to consider an argument Scarfo has not himself articulated."), citing *United States v. Sineneng-Smith*, 590 U.S. 371 (2020) (improper for court to reverse conviction on ground not raised by parties). In any event, the instruction was legally correct, because it correctly told the jurors that they could infer knowledge from willful blindness, Trial Tr. at 3767-72, and was followed immediately by instructions that good faith was a defense and that negligence was not a basis for criminal liability, *id.* at 3772-74. As the Court observed at the post-trial motions hearing, any potential flaws in the willful blindness instruction were harmless because the Court "gave a very specific charge on conspiracy itself and the elements of it." Hrg. Tr. at 21; *see, e.g., Estelle v. McGuire*, 502 U.S. 62, 71 (1991) (an "instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record") (cleaned up). The Court did not abuse its discretion in deciding to give the willful blindness instruction or in instructing the jury about willful blindness.

**Medical necessity.** Defendants argued there was no proof that Central Rexall's claims to Express Scripts asking to be paid for prescriptions implicitly represented that the prescriptions were medically necessary. As even defense counsel conceded, when Central Rexall submitted a claim, Central Rexall impliedly represented that it had a valid prescription: the "representation that Central Rexall has a valid prescription . . . was the representation that

3

implied when Central Rexall submitted a claim." Hrg. Tr. at 12-13. That concession is fully consistent with the Central Rexall-Express Scripts contract, which required Central Rexall to submit only claims based on valid prescriptions. Trial Tr. at 168-69 (Taff), 3167-68 (Stockwell); GX 61 at 18. It is also common sense that anyone submitting an insurance claim impliedly represents that it is valid.

The question then becomes whether a claim that a prescription is valid impliedly represents that the prescription is medically necessary. *United States v. Mattia*, No. 24-2589 (3d Cir. Oct. 21, 2025), holds that the "common-sense definition" of the word "prescription" includes that a doctor has determined that the medicine was needed by the patient, and an insurance claim for payment for a prescription is an implicit representation that the prescription is medically necessary. Slip op. at 10. Because the very definition of "prescription" includes a finding of medical necessity, the Government did not need to put on additional proof of medical necessity.

But the Government did. Multiple witnesses testified that one element of a prescription that Central Rexall submitted for payment to Express Scripts was that there was a valid doctor-patient relationship and that a doctor had determined the prescribed medicine was medically necessary. Trial Tr. at 169 (Taff), 673 (Rolling), 1663-64, 1666-67 (Gaffney), 3167-68, 3181-82, 3236-37, 3253 (Stockwell); *see* Gov't Br. at 65-66. As Dr. John Gaffney testified, a prescription signed by a doctor is "telling the pharmacy" and "the world" that the "prescription is appropriate and medically necessary." Trial Tr. at 1666-67. Given that on post-verdict review, all Government evidence is accepted as true and all inferences are drawn in the Government's favor, *United States v. Riley*, 621 F.3d 312, 329 (3d Cir. 2010), the jury had more than sufficient evidence to conclude that Central Rexall's prescription claims impliedly represented that the prescriptions were medically necessary.

The Court also raised questions about what medical necessity means in the context of these medicines, which do not save lives. Hrg. Tr. at 60-61. Most prescription medications are not lifesaving, but they still require a doctor to determine that the specific medication prescribed is medically necessary to treat a problem the doctor had diagnosed. That is what the Third Circuit concluded in *Mattia*. Slip op. at 10.

The common-sense meaning of medical necessity for Central Rexall's compound medications means that the prescriber has diagnosed the patient with a medical problem and determined that the specific medicine prescribed is necessary to treat that problem – for the wound medication, that the prescriber has diagnosed the patient as having a severe wound requiring Central Rexall's specialized combination of ingredients; for the scar medication, that the patient actually has a scar requiring Central Rexall's scar treatment; for the libido cream containing Viagra, that the prescriber diagnosed the patient with erectile dysfunction; for the metabolic vitamin combinations, that the prescriber diagnosed the patient with a vitamin deficiency or other medical problem requiring Central Rexall's particular combination of medicines. That common-

sense idea, which any juror would be familiar with, is how Drs. Patel and Gaffney defined medical necessity, Trial Tr. at 1569-70 (Patel), 1658-59, 1666-67 (Gaffney), and it also is how other medical professionals explained the term. *See* Trial Tr. at 673 (Rolling), 925-30 (Olsen). Medical necessity also applies to the number of refills, as the evidence showed that 12 months of refills were not medically necessary and were written only to maximize profits. Trial Tr. at 617-18 (Craven), 1578 (Patel).

The Court also asked whether the jury had an evidentiary basis to draw the inference that the very high number of compound medication prescriptions written by some doctors, such as Drs. Bolger and Gaffney, was a sign of fraud. Hrg. Tr. at 73, 106-07. It did. Several types of evidence supported this inference:

- Central Rexall employees saw those high numbers of prescriptions as evidence of fraud, and they shared those concerns with the defendants. *See, e.g.,* Trial Tr. at 316-17 (Taff), 2385, 2409, 2430-32 (Boyle), 2880-81, 3095 (Casseri); GX 628, 628A.
- Boyle sent an email to Johnston stating that under Louisiana law, "the number of prescriptions authorized on a daily basis by the practitioner" is a reason "to suspect that a prescription may have been authorized in the absence of a valid physician-patient relationship." GX 617; Trial Tr. at 2398-2400 (Boyle). Johnston never investigated that red flag. *Id.*
- The nature of compound medications reinforces the inference that these high numbers were indicative of fraud. The evidence showed that compound medications, by definition, are specialized medicines that are individually tailored to patients' particular needs. Trial Tr. at 123 (Taff), 671 (Rolling). That is how defendants promoted Central Rexall medications. GX 145A; Trial Tr. at 2766 (Casseri). A doctor's writing of hundreds of prescriptions for antibiotics during cold and flu season might not be evidence of fraud, but the jury rationally could conclude that one doctor's writing of over 600 prescriptions in a month of supposedly individualized, compounded medications is a sign of fraud.

The evidence showing that defendants Johnston and Brockmeier knowingly and intentionally conspired to defraud using medically unnecessary compound medications is strikingly similar to the evidence in similar convictions for compound medication fraud affirmed by the Sixth and Eleventh Circuits. *See United States v. Montgomery*, 2022 WL 2284387 (6th Cir. June 23, 2022); *United States v. Grow*, 977 F.3d 1310 (11th Cir. 2020); *United States v. Chalker*, 966 F.3d 1177 (11th Cir. 2020). These cases were discussed at length in the Government's brief, and defendants' failure to even attempt to distinguish those cases in their 82-page reply brief or at the hearing is telling.

**Escobar.** The Court asked about two aspects of *Universal Health Services v. United States ex rel. Escobar*, 579 U.S. 176 (2016): (1) whether the Government needed to show that the payor had declined similar fraudulent claims when it had actual knowledge of the fraud, *see* Hrg. Tr. at 96, and (2)

5

*Escobar*'s statement that the materiality standard is demanding and does not punish garden-variety breaches of contract, *id.* at 96, 97-98.

(1) *Escobar* did not impose a requirement in all fraud cases of proof that prior fraudulent claims had been declined. The Court stated: "proof of materiality *can* include, *but is not necessarily limited to*, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement." 579 U.S. at 195 (emphasis added). By the opinion's plain terms, proof of a prior declination is not a prerequisite. Subsequent criminal cases, such as *United States v. Ferreiro*, 866 F.3d 107 (3d Cir. 2017), discussed in the Government's Brief at 66-67, have not treated prior declinations as a prerequisite for criminal fraud cases. And several courts have cast doubt on the idea that *Escobar* changed the materiality standard in criminal cases. *See, e.g., United States v. Melgen*, 967 F.3d 1250, 1259-60 (11th Cir. 2022); *United States v. Raza*, 876 F.3d 604, 620 (4th Cir. 2017).

(2) The Court instructed the jury about the materiality standard in criminal cases (Trial Tr. at 3784-85), and defendants did not claim at trial or in their post-trial motions that these instructions were incorrect. The jury was also instructed that "an ordinary breach of contract or a failure to honor one's promise [does not] give rise to criminal liability." *Id.* at 3773. And the Government presented extensive evidence establishing materiality, which is summarized on pages 77-80 of its brief. *Escobar* provides defendants no relief from the jury's verdict.

**Inferences.** Defense counsel argued that the "bare rationality" standard for evaluating the jury's decision and inferences drawn by the jury, which the en banc Third Circuit established in *United States v. Caraballo-Rodriquez*, 726 F.3d 418, 431 (3d Cir. 2013), is limited to the drug context. Hrg. Tr. at 118. It is not. *See, e.g., United States v. Allison*, 27 F.4th 913, 917 (3d Cir. 2022) (applying bare rationality standard to bribery conviction); *United States v. Tyler*, 956 F.3d 116, 122-23 (3d Cir. 2020) (applying bare rationality standard to witness tampering conviction). Defense counsel also stressed that inferences must be logical and convincing, but *Caraballo-Rodriguez* requires only that inferences be "logical *or* convincing." 726 F.3d at 425 (emphasis added). The Court stressed that a court reviewing a jury's guilty verdict is not "to play the role of an extra juror in assessing all the possible inferences that *could be* drawn," or to decide which inferences the court finds the "*most plausible*," but rather to decide "whether the jury's inference was '*merely rational*.'" *Id.* at 434 (emphasis in original). Under this standard, the inferences the Government has asked the Court to draw—and which the standard of review *requires* to be drawn in favor of the Government—are certainly rational.

The Government's brief discussed numerous rational inferences that supported the jury's verdict, and that discussion will not be repeated here. One particular inference provides a simple route to establishing the sufficiency of the evidence: Taff and Casseri both testified that they knew that Central Rexall was submitting and being paid for medically unnecessary prescriptions.

6

Trial Tr. at 315-17 (Taff), 2880-81 (Casseri).  The jury could rationally infer that Johnston and Brockmeier knew at least what Taff and Casseri knew about Central Rexall's operations (and probably more, as defendants dealt directly with corrupt sales representatives Top Tier, Military Medical Relief 21, Supreme Medical, and Boardwalk) and that Johnston and Brockmeier therefore also knew that Central Rexall was submitting and being paid for medically unnecessary prescriptions.  That rational inference alone supports the jury's verdict.

**Tony Serna.**  The Court asked whether it could ignore Serna's testimony in considering the Rule 29 motion.  Hrg. Tr. at 91.  As even Johnston's counsel conceded, *id.,* "the district court may not make credibility determinations when it rules on a motion for judgment of acquittal." *United States v. Giampa,* 758 F.2d 928, 935 (3d Cir. 1985).

Nor do Serna's false statements warrant vacating the jury's verdict and ordering a new trial.  The Court instructed the jury that even if the jury "believe[d] that a witness knowingly testified falsely concerning an important matter," the jury "may accept some part of the testimony that you believe are true and give it such weight as you think it deserves."  Trial Tr. at 3762.  After the Court told the jury, in essence, that it could accept Serna's testimony about his dealings with defendants even though he knowingly testified falsely about other important matters, it would not make logical sense to hold that this court-sanctioned choice was so wrong that it requires a new trial.  As is discussed below, even in ruling on a Rule 33 motion, the Court must defer to the jury's primary role in assessing credibility of witnesses.  "The law will not countenance a usurpation by the court of the function of the jury to decide the facts and to assess the credibility of the witnesses." *United States v. Rockwell,* 781 F.2d 985, 990 (3d Cir. 1986).

**New trial standard.**  Defense counsel focused their arguments on seeking a new trial based on the weight of the evidence and suggested that the Government has given short shrift to the new trial standard.  The Government's brief sets forth the applicable standard at pages 5-6 and 92-103.  Under the applicable legal standard, the trial judge weighs the evidence but "does not simply substitute his [or her] judgment for that of the jury." *United States v. Hernandez,* 433 F.3d 1328, 1336 (11th Cir. 2005) (cleaned up); *see United States v. Binstein,* 1996 WL 19132, at *16 (D.N.J. Jan. 3, 1996) (Simandle, J.) (in ruling on a motion for a new trial, "a court cannot substitute its own judgment for that of the jury"); *United States v. Levy,* 694 F. Supp. 1136, 1145 (D.N.J. 1988) (Brotman, J.) (rejecting suggestion that "court is free to substitute its own judgment for that of the jury" on a new trial motion).

Consistent with that standard, a court considering a new trial motion must defer to the jury's primary role in assessing witness credibility and must not simply substitute its own judgment of the credibility of the witnesses for the jury's.  Instead, the court must give deference to the "the jury's responsibility to weigh . . . credibility." *United States v. Salahuddin,* 765 F.3d 329, 347 (3d Cir. 2014); *see United States v. Brennan,* 326 F.3d 176, 191 (3d

7

Cir. 2003) (rejecting defense new trial argument that a witness's testimony was unbelievable, as "that determination was, first and foremost, one for the jury"); *Gov't of V.I. v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987) (rejecting new trial motion based in part on conflicts in testimony: "contradictory testimony between [two witnesses] was a matter for resolution by the jury").

The question before the Court is not whether the Court, sitting as a juror, would have reached the same result as the jury or whether the Court believes a different verdict would be more reasonable. *See, e.g., United States v. Messerlain*, 633 F. Supp. 1493, 1514 (D.N.J. 1986) ("our discretion does not extend to the grant of a motion [for a new trial] if the evidence were to fail to convince us of guilt beyond a reasonable doubt"); *Binstein*, 1996 WL 19132, at *16 ("the court cannot set aside a verdict because it believes that another may be more reasonable"). Rather, the question is whether the jury's verdict may stand when it is given the appropriate deference under the applicable legal standard.

Motions for new trial based on the weight of evidence are "not favored" and "are to be granted sparingly and only in exceptional cases." *Salahuddin*, 765 F.3d at 346 (cleaned up). It is not enough to merely disagree with the verdict: "A district court can order a new trial on the ground that the jury's verdict is contrary to the weight of the evidence only if it believes that there is a serious danger that a miscarriage of justice has occurred–that is, that an innocent person has been convicted." *Brennan*, 326 F.3d at 189 (cleaned up). As the Government demonstrated at trial, in its response to defendants' post-trial motions, and at the hearing, the jury's verdict was not contrary to the weight of the evidence, and there is no serious danger, or any danger at all, that innocent persons were convicted. And so the jury's verdict must stand.

Johnston and Brockmeier's new trial motion "[a]t bottom, simply rehashes [their] arguments from trial." *United States v. Xue*, 2023 WL 4622816, at *3 (3d Cir. July 19, 2023) (not precedential). The Third Circuit's pithy rejection of defendant Xue's new trial request applies equally here: "The government put on a series of incriminating witnesses and documents. [Defendants] tried to explain away the documents. In the end, the jury bought the government's story. That was hardly irrational, so we will affirm." *Id.*

**Additional evidence in defendants' reply brief.** Defendants' reply brief includes and refers to numerous documents that were not part of the trial record. *See* Defendants' Reply Brief, Docket Entry 350 ("Def. Rep. Br.") at 12-15, 41 n.27, 46 n.35, and Exh. A-D. Defendants' attempt, without any legal justification, to slip documents into the record for the Court's consideration is improper, just as it would be improper for the Government to pad the record with additional evidence of defendants' guilt.

To decide Rule 29 motions, courts only "review the [trial] record," *United States v. Claxton*, 685 F.3d 300, 828 (3d Cir. 2012), because the question is whether the "the *Government's* evidence" supports the verdict. *Giampa*, 758 F.2d at 934 (emphasis in original); *see also* Fed. R. Crim. P. 29(b) (where, as

happened here, Trial Tr. at 3623, 3675, the trial court reserves decision on a Rule 29 motion, "it must decide the motion on the basis of the evidence at the time the ruling was reserved."). The same is true of Rule 33 motions based on the weight of the evidence, which evaluate only "the weight of evidence presented at trial." *United States v. Mayse*, 2025 WL 2158453, at *7 (D.N.J. July 30, 2025). Defendants make no claim that these additional documents qualify as newly discovered evidence warranting a new trial under Rule 33(b)(1), nor could they – the additional documents came from the discovery in this case and from public records of federal cases filed in 2015 and 2016. Those documents were never admitted into evidence, are not part of the trial record, should not have been included in the defendants' reply brief, and may play no part in the Court's evaluation of the motions.

**Count 4 venue.** There are several alternative bases for venue, any one of which would be sufficient to support the jury's verdict. Perhaps the simplest are the payments of more than $10,000 to William Hickman, which defendants concede were sent to New Jersey. *See* Gov't Br. at 90. Defendants claim that Count 4 is limited to transfers to Bluen, PMG, and the defendants' bank accounts, but that argument ignores Count 4's plain language, which charges a much broader range of conduct than those transfers.

The charging paragraph charges defendants with conspiring to engage in monetary transactions in criminally derived property of a value greater than $10,000, with no limitation to transfers to Bluen or defendants' bank accounts. Indictment ¶ 48. Count 4 then alleges that it was only "*part* of the conspiracy," *id.* ¶ 51 (emphasis added), that defendants transferred money into the bank accounts of Bluen and PMG and then into their personal accounts. That plain language, by using the term "part of," charges that the conspiracy involved more than merely transferring money to Bluen, PMG, and defendants' bank accounts.

Count 4 then makes the point even clearer, as paragraph 52 alleges that it was "further part of the conspiracy that defendants CHRISTOPHER KYLE JOHNSTON and TRENT BROCKMEIER engaged in transactions in amounts exceeding $10,000 with the proceeds of the conspiracy to commit health care fraud and wire fraud." That allegation establishes that the money laundering conspiracy included transactions in addition to the transfers to defendants' bank accounts. Put another way, if Count 4 were actually limited to transfers to Bluen, PMG, and defendants' bank accounts, then paragraph 52 would not have been included, as it would have been superfluous. But it was included and reflects the broad scope of the charged conspiracy. The payments to Hickman are within the scope of the charged conspiracy and support venue.

And one payment to Hickman actually is charged in Count 4. Defendants make much of the fact that paragraph 53 lists only individual transfers to Bluen, PMG, and themselves, but (a) the Government is not limited in its proofs to overt acts listed in the indictment, *see* Gov't Br. at 91; *see also United States v. Schurr*, 794 F.2d 903, 907 n.4 (3d Cir. 1986), and (b) Count 4 also includes (by incorporation, *see* ¶ 47) allegations that defendants paid

9

distributors such as Hickman a portion of the fraudulently obtained insurance reimbursements (¶ 22) and that defendants caused a payment to be sent to Hickman *in New Jersey* of $2,447,079.16 (¶ 46). Payments to Hickman, including the payment that is alleged in Count 4, provided the jury with a basis for venue over Count 4.

The facts and the law also support the Government's alternative basis for venue: that the wire transfers to and from the bank accounts of Bluen, PMG, and defendants were conducted on Federal Reserve servers located in New Jersey. Federal Reserve witness Sean O'Malley testified about the mechanics of a wire transfer from one bank to another: each bank has a master account at the Federal Reserve. Trial Tr. at 3411-12, 3429-30. When a bank sends a wire transfer through the Federal Reserve, as happened here, the Federal Reserve receives the wire communication, and Federal Reserve servers take money out of the originating bank's Federal Reserve account and credit the Federal Reserve account of the bank that receives the wire transfer. *Id.* The servers are not just a "pass through" for wire communications between two banks—the Federal Reserve servers "actually" credit and debit the Federal Reserve accounts of the sending and receiving banks. *Id.* at 3429. In other words, the transfer of funds between the banks was "conducted" in New Jersey because these transactions actually happened in New Jersey on the Federal Reserve server. This evidence, properly understood, satisfies 18 U.S.C. § 1956(i)'s requirement of a financial transaction conducted in the forum district.

The Government stands by its position that sending wire communications through Federal Reserve servers in New Jersey would be sufficient to establish venue under 18 U.S.C. § 1956(i) or, in the alternative, 18 U.S.C. § 3237. But the Court need not reach that issue, as either of the two alternative grounds set forth above provides a clear basis for upholding the jury's conclusion that there was venue in New Jersey over Count 4.

Defendants' post-trial motions should be denied.

    Respectfully submitted,

    TODD BLANCHE
    U.S. Deputy Attorney General

    ALINA HABBA
    Acting United States Attorney
    Special Attorney

    */s/ R. David Walk, Jr.*

    R. DAVID WALK, JR.
    Assistant United States Attorney

cc: All counsel (via ECF)